UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

<u>WESTERN DIVISION</u>

FILED
JAMES BONINI
CLERK

2004 JUL 21  AM 11: 45

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

RICHARD J. KLEIN,

    Petitioner,

    vs.

HEROLD CARTER, WARDEN,

    Respondent.

Case No. C-1-01-794

JUDGE BECKWITH

M. JUDGE BLACK

---

**PETITIONER RICHARD J. KLEIN'S AMENDED HABEAS CORPUS PETITION 2254**
**Fourth petition, third amendment**

---

Respectfully submitted,

Richard J. Klein 350-022

Petitioner/pro se

R.C.I. P.O. Box 7010

Chillicothe, Ohio 45601

COUNSEL FOR RESPONDENT,

Assistant Ohio

Attorney General

Diane Mallory

150 East Gay Street

Columbus, Ohio 43215

## INDEX                                                   PAGE No.

**(I) FIRST GROUND FOR RELIEF:**
     The First District Court of Appeals unreasonably struck
Petitioner's timely filed pro se appeal brief and denied
replacement appellate counsel which denied Petitioner Due
Process, Equal Protection, an Adequate & Meaningful review,
Right of Access to the Courts, and Effective Assistance of
Appellate Counsel..................................................1.

**(II) SECOND GROUND FOR RELIEF:**
          **FAILURE TO GIVE NOTICE OF JUDGMENT**
appellate counsel and the clerk of courts failed to give
proper notice of Appellate Court's December 3, 1999,
judgment entry affirming conviction. The Court of Appeals,
in denying Petitioner access to the courts, denied
Petitioner Federally mandated Due Process, Equal
Protection, an Adequate and Meaningful Appeal, and
Effective Assistance of Appellate Counsel.........................8.

**(III) THIRD GROUND FOR RELIEF:**
          **DENIAL OF APPLICATION PURSUANT TO APP.R. 26(B)**
     The Court of Appeals, in denying Petitioner's
application to reopen pursuant to App.R. 26(B), denied
Petitioner of clearly established Federal Constitutional
rights of Due Process, Equal Protection, Effective
Assistance of Appellate Counsel, and the Right of Access to
the Courts.......................................................10

**(IV) FOURTH GROUND FOR RELIEF:**
          **INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**
     Petitioner was denied Due Process, Equal Protection,
and Effective assistance of Appellate Counsel on an appeal
as of right......................................................12.

**(V) FIFTH GROUND FOR RELIEF:**
          **THE STATE FAILED TO DISCLOSE EXCULPATORY EVIDENCE**
     Petitioner was denied Due Process when the Prosecutors
failed to disclose three (3) forms of exculpatory
evidence.....

**(VI) SIXTH GROUND FOR RELIEF:**
THE STATE KNOWINGLY PRESENTED FALSE, PERJURED, AND VOUCHING
TESTIMONY IN VIOLATION OF PETITIONER'S DUE PROCESS
RIGHTS...........................................................44.

**(VII) SEVENTH GROUND FOR RELIEF:**
          **PETITIONER'S ALLEGED ADMISSION**
     The State violated Petitioner's Fifth and Fourteenth
Amendment rights when it presented at trial detectives'
testimony of alleged statements made by Petitioner during
interrogation, and Petitioner was denied a fair hearing and
reliable determination of voluntariness. Jackson v. Denno,
378 U.S. 368, 84 S.Ct. 1774, 1781 (1964).........................53.

(VIII) EIGHTH GROUND FOR RELIEF: (omitted).

(IX) NINTH GROUND FOR RELIEF:
               FOURTH AMENDMENT RIGHTS CLAIM
     Detectives made an unlawful warrantless arrest without
probable cause, and prosecutors presented alleged admission
stemming from this unlawful arrest at trial in violation of
Petitioner's Fourth and Fourteenth Amendment rights..................64.

(X) TENTH GROUND FOR RELIEF:
               INSUFFICIENCY OF THE EVIDENCE.........................66.

(XI) ELEVENTH GROUND FOR RELIEF:
               INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL....................82.

(XII) TWELFTH GROUND FOR RELIEF:
THE STATE TOOK TWO DRAMATICALLY OPPOSED POSITIONS ON
EVIDENCE AGAINST PETITIONER AND CO-DEFENDANT RICHMOND IN
VIOLATION OF PETITIONER'S DUE PROCESS RIGHTS.......................100.

(XIII) THIRTEENTH GROUND FOR RELIEF:
     By imposing multiple punishments for what is
indisputably one offense, the trial court violated the
Fifth Amendment Double Jeopardy Clause.............................101.

(XIV) FOURTEENTH GROUND FOR RELIEF:
     Unjustified and lengthy delay between the finding of
guilty and the court of appeal's resolution of appeal
denied Petitioner Due Process and Speedy Trial and Appeal
rights.............................................................102.

(XV) FIFTEENTH GROUND FOR RELIEF:
PETITIONER WAS DENIED DUE PROCESS ON APPEAL AS OF RIGHT TO
THE OHIO SUPREME COURT WHEN THE COURT DISMISSED
PETITIONER'S TIMELY FILED MERIT BRIEF..............................107.


               INDEX OF PETITIONER'S EXHIBITS A THROUGH P
(cited as "P. Exhibit" herein; Respondent's exhibits cited as "R.
Exhibit")

EXHIBIT A PETITIONER'S PRO SE "MOTION TO FILE AMENDED, AND
SUPPLEMENTAL BRIEF AND EXTENSION OF FILING DATE" filed July 27,
1999, App. Case No. C-990066. 45 pages.

EXHIBIT B "ENTRY GRANTING MOTION TO FILE SUPPLEMENTAL BRIEF AND
EXTENDING TIME" entered August 13, 1999, App. Case No. C-990066.

EXHIBIT C "ENTRY GRANTING JOINT MOTION TO EXCEED THE PAGE LIMIT"
entered August 5, 1999, App. Case No. C-990066.

EXHIBIT D PETITIONER'S PRO SE "MOTION TO REDUCE NUMBER OF COPIES"
13 pages, entered June 15, 2000, App. Case No. C-990066. 13
pages.

**EXHIBIT E** "ENTRY OVERRULING MOTION TO REDUCE NUMBER OF COPIES" entered June 6, 2000, App. Case No. C-990066. 1 page.

**EXHIBIT F** PETITIONER'S PRO SE "MOTION FOR DELAYED REPOENING APPEAL RULE 26(B)(2)(b)" (motion for leave showing good cause) 21 pages, and "APPLICATION FOR DELAYED REOPENING APPEAL RULE 26(B)(2)(b)" (demonstrating ineffective assistance of appellate counsel) 12 pages, filed January 2, 2001, App. Case No. C-990066. 33 pages.

**EXHIBIT G** CO-DEFENDANT RICHMOND'S FIRST MIRANDA WAIVER (1447 hours) pg. 1;
CO-DEFENDANT RICHMOND'S SECOND MIRANDA WAIVER (1915 hours) pg. 2;
CO-DEFENDANT RICHMOND'S THIRD MIRANDA WAIVER (2127 hours) pg. 3.

**EXHIBIT H** EXPERT WITNESSE'S BURN CHART.

**EXHIBIT I** January 3, 1997, Search Warrant and Police Inventory List pages 1 & 2;
January 8, 1997, Search Warrant & Poice Inventory List pages 3 & 4;
Alleged Apology Note page 5.

**EXHIBIT J** PETITIONER'S MIRANDA WAIVER.

**EXHIBIT K** Police Notes of Petitioner's Interrogation page 1 & 2.

**EXHIBIT L** PETITIONER'S PRO SE "NOTICE OF APPEAL TO THE OHIO SUPREME COURT" filed November 20, 2000. 2 pages.

**EXHIBIT M** Letter from the Clerk of Court of The Ohio Supreme Court.

**EXHIBIT N** PETITIONER'S PRO SE "APPELLANT'S MOTION TO OVERRULE APPELLEE'S MOTION TO STRIKE BRIEF" filed February 1, 2001. Case No. 00-2105. 5 pages.

**EXHIBIT O** PETITIONER'S PRO SE "APPELLANT'S MOTION FOR DELAYED RECONSIDERATION" 5 pages. filed May 4, 2001, Case No. 00-2105.

**EXHIBIT P** "APPELLEE'S MOTION FOR EXTENSION OF TIME" filed February 8, 2001, Case No. 00-2105. 5 pages.

**(I) FIRST GROUND FOR RELIEF:**

**OF COURT OF APPEALS STRUCK PETITIONER'S TIMELY FILED APPEAL BRIEF**

The First District Court of Appeals unreasonably struck Petitioner's timely filed pro se appeal brief and denied replacement appellate counsel which denied Petitioner Due Process, Equal Protection, an Adequate & Meaningful Review, Right of Access to the Courts, and Effective Assistance of Appellate Counsel.

**PETITIONER FORCED TO PROCEED PRO SE**

Petitioner was forced to proceed pro se on his first appeal as of right when he first discovered appellate counsel's deficiencies which was when Petitioner first received and read counsel's appeal brief filed June 14, 1999. (R. Exhibit 15). Counsel's brief violated Anders v. California, 386 U.S. 738, 87 S.Ct. 1396 (1967). And, counsel's brief was so factually deficient that it defeated it purpose as fully set forth in Petitioner's fourth ground for relief, "ineffective assistance of appellate counsel," which forced Petitioner to proceed pro se in the filing of a Motion to File Amended and Supplemental Brief.

**MOTION TO FILE AMENDED AND SUPPLEMENTAL BRIEF**

On July 27, 1999, Petitioner filed a pro se "MOTION TO FILE AN AMENDED AND SUPPLEMENTAL BRIEF" (P. Exhibit-A) which was based on ineffective assistance of counsel and contained a request for re-appointment of appellate counsel, specifically, to exhaust remedies on Petitioner's federal claims which are now presented in this petition. The purpose of this motion was to obtain re-appointment of appellate counsel, to cure the factual deficiencies in counsel's brief by amendment, and to supplement that brief with the additional federal claims that Petitioner's previously "retained attorney" and Petitioner had agreed upon. Appointed appellate counsel failed to incorporate any of those "federal" claims in his brief and failed to amend the factual and legal deficiencies in his brief. The motion to amend was general and did not completely detail all of counsel's factual and legal deficiencies, but it did point to some specifics and informed the Court to take a closer look at this brief, but, most importantly, it made the Court aware that Petitioner did not want this attorney because he was not paying attention to the facts and errors. In other words, counsel was not even attempting to "zealously represent his clients interests."

On August 13, 1999, the Court granted the motion to amend, (P. Exhibit B) and Motion to Exceed the Page Limit, (P. Exhibit C) but it did not re-appoint appellate counsel to amend the factual deficiencies in appointed counsel's brief

nor to perfect the federal claims for federal review, nor did it order appointed
counsel to fix, repair, or amend the factual deficiencies in his brief or order
counsel to perfect Petitioner's federal constitutional claims. There were
numerous factual and legal deficiencies that Petitioner did not set forth, but
Petitioner mistakenly believed that once he brought this to the Court's
attention then the Court would review the brief and record and see all of the
factual and legal deficiencies in counsel's assignments of error. The Court's
December 3, 1999, decision (R. Exhibit 22) demonstrates counsel's arguments
"were not supported by the record," were contrary to and in direct conflict with
the evidence and facts, and were not legally sound and arguable. Counsel's
performance was as though he was representing the State.

Instead, the Court unreasonably ordered Petitioner to fully prepare the
brief on his own within 30 days. Thus, forcing Petitioner to proceed pro se
against his will which was an unreasonable decision and amount of time because
both previous attorney's had received over a year to draft an appeal brief, and
Petitioner is not an attorney; therefore, 30 days was insufficient and
unreasonable application of law, as well as, an unreasonable determination of
the facts because Petitioner was entitled to adequate representation and an
accurate determination of the facts which he did not receive. The Court held
Petitioner to a higher standard than those required for professional attorneys.
The Court's order requiring Petitioner to draft his own brief pro se, providing
an insufficient amount of time, and its failure to provide counsel to perfect
and "exhaust" his federal claims violated Petitioner's enumerated rights listed
above. The motion to amend was not a request to proceed pro se, but, in fact,
was a specific request to either have counsel amend the factual deficiencies in
his arguments and perfect Petitioner's claims utilizing federal law to exhaust
remedies on those claims or to re-appoint an attorney who would. A specific
request was made in the motion, that, "...Defendant/Appellant respectfully
requests that this Court order permission for the filing of an [a]mended and
Supplemental brief to fulfill the prerequisite of exhaustion on the issues in
exhibit No. 5, and to correct the errors in facts in the existing brief filed
with this court on June 14, 1999. The Defendant/Appellant further requests this
Court to appoint competent counsel conforming to the Sixth Amendment." (P.
Exhibit A, pg. 3-4). Therefore, the motion to amend was not a request for
Petitioner to proceed pro se. It was specifically a request to cure the factual
deficiencies in counsel's arguments and to perfect Petitioner's federal

claims which are the only type of claims that require "exhaustion of state remedies." The Ohio Supreme Court does not require exhaustion of state remedies as a prerequisite. Additionally, since it was the trial court's fault that Petitioner lost his retained appellate attorney, who Petitioner paid ten thousand dollars to draft a brief asserting the federal claims now presented in this habeas corpus petition, then Petitioner was entitled to have those claims reiterated by the appointed attorney that the trial court appointed in his place. The first appeal as of right was dismissed after a 19 month delay because the trial court failed to ever file a judgment of conviction. This caused Petitioner to lose his retained attorney, and Petitioner was unable to re-retain the attorney of his choice due to indigency. That attorney fulfilled his obligation but required an additional retainer fee for the additional representation incurred due to the first appeal being dismissed because of the trial court's failure to ever file a judgment of conviction. Petitioner could not afford another retainer fee. Therefore, Petitioner was forced to proceed in forma pauperis. Nevertheless, Petitioner was entitled to have his federal claims, contained herein, that he paid his retained attorney ten thousand dollars to draft and assert in Petitioner's behalf, to be reiterated in the second appeal of right but this did not occur. Petitioner made an attempt to reiterate those federal claims, presented herein, pro se but to no avail.

Then on September 7, 1999, Petitioner filed his pro se appeal brief (R. Exhibit 18) by placing it in the prison's mailing system for filing because the Ohio Rules of Appellate procedure (App.R.) 13(A) provided in pertinent part, that, "...briefs are deemed filed on the date of mailing"; Therefore, the brief was, in fact, timely filed and should have been reviewed on its merits, or in alternate, the Court should have either ordered existing counsel to cure his factual deficiencies and perfect Petitioner's federal claims, or appointed an attorney to do it for him. Because, Petitioner was entitled to effective assistance of counsel on that appeal and was entitled to have his federal claims reiterated in that appeal by competent counsel. Note, that, Petitioner did not possess a copy of his retained attorney's brief to redraft those claims and he was unable to obtain it thereafter, but Petitioner was aware of the federal claims because he possessed this agreement with his attorney which are the same claims presented in this petition. Nevertheless, Petitioner suffered an extreme prejudicial effect because (1) he lost his attorney of choice due to judicial misconduct; (2) he had paid ten thousand dollars to have specific claims averred

-3-

in his behalf that were not reiterated on his appeal of right; (3) the Court refused to provide Petitioner with an attorney to do this; and (4) the court failed to provide sufficient time to draft the brief pro se; and (5) the Court failed to appoint an attorney to amend the factual and legal deficiencies in appointed counsel's arguments; thus, denying Petitioner an adequate and meaningful appeal on an appeal as of right. Because, Petitioner should not have had to file anything in the appeal in the first place.

### COURT OF APPEALS UNREASONABLY STRUCK PRO SE BRIEF

### MOTION FOR LEAVE TO FILE LATE AMENDED AND SUPPLEMENTAL BRIEF

On September 11, 1999, four (4) days after Petitioner filed his pro se brief, Petitioner filed a, "MOTION FOR LEAVE TO FILE LATE AMENDED AND SUPPLEMENTAL BRIEF." (R. Exhibit 17). Petitioner did this so that the Court would be fully aware that Petitioner did, in fact, timely file the pro se appeal brief and the reasons that it was mailed on its filing date. Petitioner mailed this motion on September 11, 1999, which is evident from the certificate of service, but Petitioner had no idea that the prison withheld sending Petitioner's legal mail, possibly due to it being the holidays, "labor day weekend." All of the mail was held in the mail room until September 17, 1999, before it was released. This is evident from another exhibit in Petitioner's MOTION FOR RECONSIDERATION FOR FILING AMENDED AND SUPPLEMENTAL BRIEF, (R. Exhibit 20). This is why the pro se brief has the same time stamp as the motion motion for leave which is September 21, 1999. The exhibit 2 of the motion for reconsideration contains two mailing receipts dated September 7, 1999, because on that date was the first time that Petitioner was permitted to have copies made. Then Petitioner notified legal services that he was in need of a notary to verify the date of filing. Petitioner attached this affidavit to the motion for leave to fully inform the Court as to what was transpiring, as to, why Petitioner was unable to obtain the copies at an earlier date, and why the filing was made at the last second. Additionally, this supervisor witnessed this filing as did the officer who signed the "PERSONAL A/C WITHDRAW" forms attached to the motion for reconsideration which are the mailing receipts in exhibit 2. Attached to the motion for leave is the affidavit from Petitioner notarized on September 7, 1999, by legal services supervisor Mary B. Hoover to verify the verity of the contents of the affidavit which establishes the date of filing. This affidavit had to have been approved by the legal services supervisor in

-4-

order to get the time stamp of the notary seal which was September 7, 1999.
Petitioner prematurely mailed the motion for leave containing the affidavit
which would have been better served if it were attached to the motion for
reconsideration. Petitioner mailed the motion for leave at that time to fully
inform the Court that the pro se brief was, in fact, filed according to the
affidavit attached which was verified by officials.

   The motion for leave establishes that both his retained attorney and
appointed attorney received over a year each to draft an appeal brief, that,
Petitioner was being held to a higher standard than those required by
professional attorneys. The Court unreasonably violated Petitioner's enumerated
rights listed above in (1) refusing to provide sufficient time for a pro se
litigant to learn law then draft an adequate appeal brief; (2) in failing to
provide the additional time necessary for Petitioner to comply with the rules
governing copies of documents; (3) in denying Petitioner of competent counsel of
his choice and "forcing" Petitioner to proceed pro se in the first instance; (4)
in not providing Petitioner with an adequate and meaningful review (Due Process)
on his first appeal as of right. Nevertheless, the pro se brief was not filed
late as proven below.

### MOTION FOR RECONSIDERATION

   On October 19, 1999, Petitioner filed his, "MOTION FOR RECONSIDERATION FOR
FILING AMENDED AND SUPPLEMENTAL BRIEF." (R. Exhibit 20). This document contains
evidence that Petitioner did initially file the pro se brief on its filing date
September 7, 1999, by placing it in the prison's mailing system because App.R.
13(A) provides in pertinent part, that, "...briefs are deemed filed on date of
mailing." This is the federal postal service in the prison. It is indisputable
that the document was "mailed" thus "filed" when in the possession of the
federal postal service in the prison. That is "mailed" and the Appellate Rules
of Procedure Rule 13(A) dictate that "...breefs are deemed [f]iled on the date
of mailing." This is all that Petitioner had to go by and all that was necessary
to constitute filing by Ohio law. Nevertheless, Petitioner  possessed the
federal right to have an attorney draft this brief in his behalf and Petitioner
paid ten thousand dollars previously to have this done, and it was the Court's
fault that Petitioner lost this attorney. Exhibit 2 of the motion for
reconsideration establishes that Petitioner did, in fact, place the brief in the
prison's mailing system on September 7, 1999. This postage receipt, "PERSONAL
A/C WITHDRAW," was signed by prison personnel on September 7, 1999, thus, it was

verified that Petitioner placed this document in the possession of the prison's federal postal service on September 7, 1999, for filing. The September 17, 1999, time stamp on the personal a/c withdraw further establishes that the prison delayed sending the brief until September 17, 1999, which was ten (10) days that the prison delayed. Since, the prison personnel "witnessed" this by signing the mailing receipt it is indisputable that Petitioner placed the original in the mail on that date, thus, it was considered filed according to rules. The fact that this exhibit 2 possesses two (2) receipts proves that Petitioner obtained the copies necessary to make the filing on September 7, 1999 which was the date that prison personnel signed thus witnessing the mailing (filing). The mail department's ten (10) day delay constitutes objective factors beyond Petitioner's control. "...the existence of cause for procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," or "...that 'some interference by officials,' Brown v. Allen, 344 U.S. 443, 486, 73 S.Ct. 397, 442 (1953), made compliance impractable, would constitute cause under this standard." Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645 (1986). The prison's failure to timely move Petitioner's pro se brief qualifies as an "objective factor" and "some interference by officials" under this standard because the prison's mail room is operated by prison personnel and this is outside of Petitioner's control. And, the prison's copying procedure and time elements are also controlled by prison personnel and also beyond Petitioner's control. Which is another objective factor beyond Petitioner's control. The 30 day period required by the Court was simply an unreasonable time frame to require a pro se litigant to research and draft an adequate and meaningful appeal brief and obtain the copies necessary for filing while in prison, especially, since, it was the court's fault in the first instance that Petitioner lost his retained counsel of choice. Nevertheless, Petitioner possessed the right to have the specific claims that he discussed with his retained attorney to be asserted on this appeal in his behalf by competent counsel, but that did not happen. The court's denial of additional time specifically requested further violated Petitioner's Due Process rights by denying Petitioner access to the court. Petitioner's right to access to the court was again denied because of the totality of the decisions resulted in precluding Petitioner from presenting his claims fairly. As the United States Supreme Court held in Bound v. Smith, 430 U.S. 817, 97 S.Ct. 1491 (1977), that,

"Prisoners have a constitutional right to access to the courts, First and Fourteenth Amendments." at 1493 "Constitutional principles of due process and equal protection form the basis for the requirement that states expand resources in support of a convicted defendant's right to appeal." at 1501." And, "It is fundamental that access of prisoners to the courts for the purpose of presenting their complaints may not be denied or obstructed." And, The Supreme Court held that 'the state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus." at 1495. The court's decisions on the facts presented denied Petitioner access to that court and may have cut off Petitioner's access to the habeas Court by simply creating a situation where Petitioner would lose his retained attorney and appointing counsel who presented factually deficient frivolous claims. Therefore, the "state" abridged and impaired Petitioner's ability to present his claims to this federal court by creating a procedural default then holding Petitioner to the default that the State created.

    The Court's decision to strike Petitioner's timely filed pro se brief, (R. Exhibit 19) and denial of replacement appellate counsel requested in the Motion to File Amended and Supplemental Brief, and the decision to overrule Petitioner's motion for reconsideration showing good (R. Exhibit 21) cause was "contrary to" and an "unreasonable application of clearly established Federal law as established by the United States Supreme Court," and unreasonable determination of the facts in light of the evidence presented to the state court, violating Petitioner's Due Process, Equal Protection, and Effective assistance of Counsel rights on a first appeal as of right. Evitts v. Lucey, 469, U.S. 387, 105 S.Ct. 830, (1985), as well as, clearly established right to a "meaningful appeal." Douglass v. California, 372 U.S., at 358, 83 S.Ct., at 817 (1963). Petitioner's "...claims should have been brought to the attention of the court of appeals by counsel but were not." White v. Schotten, 201 F.3d 743, 753 (6th Cir. 2000). Counsel's factual deficiencies and the Court's unreasonable application of clearly established Federal Law forced Petitioner into proceeding pro se in an attempt to obtain an adequate and meaningful review on a first appeal as of right. Petitioner should not have had to ever file a single document in the appeal in the first instance. Had Petitioner received the effective assistance of an attorney from the onset that he specifically requested, the result of the proceeding would have been dramatically different.

**(II) SECOND GROUND FOR RELIEF:**

### FAILURE TO GIVE NOTICE OF JUDGMENT

Appellate counsel and the clerk of courts failed to give proper notice of Appellate Court's December 3, 1999, judgment entry affirming conviction. The Court of Appeals, in denying Petitioner access to the courts, denied Petitioner Federally mandated Due Process, Equal Protection, an Adequate and Meaningful Appeal, and Effective Assistance of Appellate Counsel.

### MOTION TO REDUCE NUMBER OF COPIES

First, on December 3, 1999, the First District Court of Appeals affirmed conviction (R. Exhibit 22). Then on February 27, 2000, (86 days late) Petitioner received the only notice from appointed appellate counsel of the Court's entry, but by then the time had already expired for pursuing reconsideration pursuant to App.R. 26(A)(10 days), delayed reopening pursuant to App.R. 26(B)(90 days), and for appeal to the Ohio Supreme Court pursuant to Rule II, Section 2(A)(1)(a) of the Rules of Practice of the Ohio Supreme Court (45) days.

On May 18, 2000, within 90 days after receiving the late notice of judgment, Petitioner prepared and attempted to file two pro se applications for delayed reopening pursuant to App.R. 26(B). The first, "MOTION FOR DELAYED REOPENING APPEAl RULE 26(B)(2)(b)" (P. Exhibit F)(motion for leave showing good cause for the delay), and, the second, "APPLICATION FOR DELAYED REOPENING APPEAL RULE 26(B)(2)(b)" (alleging ineffective assistance of appellate counsel) again. Petitioner attempted filing the App.R. 26(B) motions, but the clerk of court refused filing based on Petitioner's indigency, that, not enough copies of the motion, exhibits, and parts of the transcript were supplied for filing which is what the clerk's letter said. When the clerk refused the filing, Petitioner sought judicial action by filing a "MOTION TO REDUCE NUMBER OF COPIES" filed June 15, 2000. (P. Exhibit D). In this motion Petitioner presented to the Court in Exhibit 1 (certified mailing receipts) to demonstrate the date that Petitioner attempted filing his App.R. 26(B) motions which was May 18, 2000. In exhibit 2 Petitioner presented the letter that Petitioner sent to the clerk requesting copies of the App.R. 26(B) motion, the exhibits, and transcripts required to make the filing with Petitioner's affidavit of indigency; exhibit 4 line one (1) also demonstrated that Petitioner's indigency status had already been established with the court. In exhibit 3 Petitioner demonstrated for the Court that the clerk's basis for refusing to timely file Petitioner's App.R. 26(B) motion was Petitioner's indigency. The Court's denial of the motion to

either reduce the number of copies of the documents necessary for the filing or order the clerk to make the additional copies denied Petitioner of the federal rights of access to the court, Due Process, Equal Protection, and Effective Assistance of Appellate Counsel because Petitioner was denied effective assistance of appellate counsel on the appeal of right. Nevertheless, the Sixth Circuit Court in White v. Schotten, 201 F.3d 743 (6th Cir. 2000) holds, that, "...an application for reopening the direct appeal in Ohio is part of the direct appeal process, and ... a defendant has a right to effective assistance of counsel during that stage of proceedings..." at 752-53, 754. And, "Those whose right to appeal has been frustrated ... should not be given an additional hurdle to clear just because their rights were violated at some earlier stage of the proceedings." at 752. Since, an App.R. 26(B) motion is part of the direct appeal process and Due Process Rights and Sixth Amendment effective assistance of counsel rights apply during that stage of the proceedings, Petitioner was entitled to the copies necessary to invoke the jurisdiction of the court to be permitted to present his claims fairly because he demonstrated to the Court that "objective factors external to Petitioner's control" precluded Petitioner from timely filing. Therefore, the Court denied Petitioner Due Process, Effective Assistance of Appellate Counsel, and Equal Protection of the Law in denying Petitioner's motion to reduce number of copies or in its failure to order the clerk to make the copies necessary for filing because Crim.R. 32(B) provides that indigent defendant's are entitled to copies of documents necessary to an appeal if they cannot afford them, as well as, Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, (1956). Crim.R. 32(B)(3)(c) obviously applies because the App.R. 26(B) is part of the direct appeal process, and because Due Process applies. Since, additional copies of the motion, exhibits, and the transcripts relied upon by the appellant are required by App.R. 26 and that many copies were beyond Petitioner's ability to afford, it made no logical sense to deny Petitioner the opportunity to demonstrate that he was denied ineffective assistance of appellate counsel on the appeal when his rights to effective assistance of counsel were "frustrated" at the earlier stage of the proceedings based on his ability to be able to afford copies. Especially when the appellant can demonstrate with some evidence that his efforts to comply with the procedural rules were precluded by government officials and appellate counsel himself. The motion for delayed reopening (motion for leave) contained the evidence that

Petitioner was precluded from the timely filing. Therefore, Petitioner suffered extreme prejudice because he lost the appeal and all post-appeal remedies due to ineffective assistance of appellate counsel.

(III) THIRD GROUND FOR RELIEF:

### DENIAL OF APPLICATION PURSUANT TO APP.R. 26(B)

The Court of Appeals, in denying Petitioner's application to reopen pursuant to App.R. 26(B), denied Petitioner of clearly established Federal Constitutional rights of Due Process, Equal Protection, Effective Assistance of Appellate Counsel, and the Right of Access to the Courts.

Petitioner's "MOTION FOR DELAYED REOPENING APPEAL RULE 26(B)(2)(b)" (P. Exhibit F)(motion for leave showing good cause) that Petitioner attempted to file on May 18, 2000, contained the evidence that Petitioner was not properly informed of the appellate court's December 3, 1999, entry affirming conviction until February 27, 2000. Exhibit 1 of that motion contains appellate counsel's certified mail envelope which possesses the post-mark on the front February 14, 2000, which is when counsel decided to inform Petitioner that there had been a judgment entry entered on record, but counsel sent it to the wrong prison. The envelope was sent to S.O.C.F (Southern Ohio Correctional Facility) then forwarded to Lebanon Correctional. This is evident from the "Lucasville" post-mark on the back of the envelope and the corrected address on the front. This demonstrates the additional time that it took the notice of judgment to reach Petitioner which was the first time that Petitioner became aware that his time had already expired for any other proceedings because Petitioner did not actually receive this mail until February 27, 2000, which was ten (10) days from the Lucasville post-mark. Appellate counsel and the clerk deprived Petitioner of the right to invoke the jurisdiction of the court of appeals to demonstrate ineffective assistance of appellate counsel, they deprived Petitioner of an opportunity to proceed to the Ohio Supreme Court with Petitioner's federal claims. Appellate counsel and/or the clerk of court of the court of appeals possessed the duty or obligation to timely inform Petitioner of the entry of judgment before the time limits expired. Since, the court of appeals forced Petitioner to proceed pro se, Petitioner was entitled to timely notice of that judgment by the clerk and not by forwarding mail from an ineffective attorney. Counsel successfully precluded Petitioner from pursuing the ineffective assistance of counsel claim against him by delaying mailing the notice of the

-10-

judgment and mailing it to the wrong prison. Nevertheless, petitioner presented this to the court of appeals who denied Petitioner of the opportunity to invoke its jurisdiction and present his claim of ineffective assistance of appellate counsel with his other federal claims. Thus, denying Petitioner Federally mandated Due Process, Equal Protection, Effective Assistance of Appellate Counsel, and the Right of Access to the Court which Bounds V. Smith, 430 U.S 817, 97 S.Ct. 1491 (1977) established is clearly established law as established by the United States Supreme Court which established that if a defendant's right of access to a court is abridged or impaired by the State or its officials this is violative of Fourteenth Amendment Due Process Rights. at 1493, 1495. The Court abridged and impaired Petitioner's ability to invoke its jurisdiction and the jurisdiction of federal court by it failure to provide the copies necessary for filing Petitioner's claims.

Then On January 2, 2001, Petitioner re-filed his motion for delayed reopening containing the evidence for the delay that Petitioner first attempted to present to the court on May 18, 2000. Petitioner paid a high dollar to obtain all of the copies necessary for that filing required by App.R. 26(B). Petitioner spent $200.00 just on one copy because the rule requires extra copies of the motion, the exhibits, and the transcripts relied upon, and it requires additional copies of the appeal brief containing the assignments of error that counsel did not present on the appeal. It took almost a year for Petitioner to obtain that kind of money because Petitioner is (1) unemployed; (2) has been unemployed since his incarceration; (3) Petitioner spent his last ten thousand dollars retaining an attorney to appeal for him; (4) the court was responsible for Petitioner's loss of his retained attorney who would have done it right because he was paid a high dollar; (5) because Petitioner is not an attorney; (6) because it is impossible for a pro se litigant to litigate anything "timely" while in prison and place an adequate and meaningful claim in front of a court from prison; (7) because Petitioner was entitled to an attorney equivalent to his retained attorney since it was the court's fault that Petitioner lost his retained attorney in the first place; and (8) Petitioner was Constitutionally entitled to the copies necessary, that, he specifically requested because it is Federally mandated upon the States through the United States Constitution and mandated by Crim.R. 32(B)(3)(c) as stated in Petitioner's Second Ground For Relief. Petitioner was forced to wait an additional year to be able to place

-11-

his claims before the court of appeals again just to exhaust remedies on the
claims. Since, Petitioner possessed all of these Federally mandated
Constitutional rights, and, since, the Ohio Rules of Appellate Procedure 26(B)
permits the filing of the motion outside the time limit for delayed reopening of
appeal, and Petitioner was entitled to the copies necessary to make that filing
in the first place, and Petitioner was entitled to effective assistance of
appellate counsel on his first appeal as of right, then Petitioner was entitled
to have his claims reviewed on the January 2, 2001, filing because all of
Petitioner's Federally mandated Constitutional rights were violated at the
earlier stages and Petitioner was indigent and could not afford the copies
necessary to invoke the jurisdiction of the court of appeals at any earlier
time. The Court of appeals violated Petitioner's enumerated rights when it
dismissed Petitioner's App.R. 26(B) motion for late filing because Petitioner
was entitled to that review at the earlier date, May 18, 2000.

**(IV) FOURTH GROUND FOR RELIEF:**

### INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Petitioner was denied Due Process, Equal Protection, and Effective
Assistance of Appellate Counsel on an appeal as of right.

Counsel filed an appeal brief on June 14, 1999. (R. Exhibit 15). Counsel's
brief violated Anders v. California, 386 U.S. 378, 744, 87 S.Ct. 1396 (1967), as
distinguished by Delgado v. Lewis, 181 F.3d 1087 (9th Cir. 1999), "When an
attorney believes an appeal would violate his or her ethical duty, to refrain
from making frivolous arguments, Anders requires counsel to 'advise the court
and request permission to withdraw.' " At, 1092. "Merely filing a no-merit brief
similarly leaves a petitioner without representation on appeal." At, 1093.

Counsel's arguments were deficient because: (1) The record contains numerous
errors of arguable Constitutional dimension; counsel is without justification
for filing a frivolous appeal brief because those claims were brought to
counsel's attention, by Petitioner, prior to his filing of the brief; (2)
counsel failed to draw attention to anything in the record that might arguably
support the appeal; (3) counsel asserted numerous frivolous arguments. His
arguments were in direct conflict with well established law; (4) counsel's
arguments were contrary to and in direct conflict with the evidence on record,
it is obvious counsel had not properly reviewed the trial transcript; (5)
counsel obfuscated the substance of two potentially Constitutionally

-12-

significant errors by failing to support these errors with appropriate evidence contained in the record, and by failing to apply appropriate arguments rendering potentially significant errors frivolous. (6) Counsel failed to raise pertinent Constitutional challenges that trial counsel preserved on record for appeal. (7) Counsel failed to present any of the numerous Federal Constitutional Constitutional claims that were brought to his attention by Petitioner prior to his filing of his appeal brief. (8) Counsel refused to amend his deficient appeal brief when the deficiencies in facts, evidence, arguments, and omissions were brought to his attention by Petitioner. (9) Counsel failed to notify Petitioner of the appellate court's December 3, 1999, judgment entry affirming conviction until the time had expired for reconsideration pursuant to App.R. 26(A) and (B) and for appeal to the Ohio Supreme Court pursuant to Rule II, Section 2(A)(1)(a) of the Rules of Practice of the Ohio Supreme Court. (10) Counsel left Petitioner without any issues to present on direct appeal, appeal to the Ohio Supreme Court, and Federal habeas Corpus review.

### COUNSEL'S DEFICIENCIES IN HIS FIRST ASSIGNMENT OF ERROR

### CO-DEFENDANT'S PLEA AGREEMENT

Counsel's first argument, that, the State withheld exculpatory evidence may have had arguable merit had counsel presented appropriate argument consistent with the record, and supported it with pertinent evidence contained on record.

First, counsel failed to cite and argue pertinent evidence on record from the post-trial hearing "Motion for New Trial" hearing where the prosecutor, by his own admission, confirmed on record that there was, in fact, a non-disclosed plea agreement between the State and the State's key witness co-defendant Sharon Richmond (T.P. 767, 2-9). The State's admission was pertinent and highly credible evidence of the existence of the plea agreement. The agreement was that they agreed to stand silent at Richmond's sentencing hearing and not pursue a prison term, and they granted Richmond immunity from prosecution of murder, involuntary manslaughter, felonious assault, and three counts of endangering children. Richmond was charged for one count of endangering children for her 12 hour delay in seeking medical treatment which expert testimony established was the actual cause of death. Even after Richmond confessed to being solely and independently responsible for causing the injury. She was only charged for, "...the resultant suffering by Matthew as a result of this charge is the reason she was charged in this." (T.P. 15-16). Nevertheless, the State admitted to it, and counsel failed to cite and argue this evidence.

Then counsel failed to cite the evidence and appropriately argue that the State's claim that this plea agreement came out at trial was a false claim violating Petitioner's Due Process rights because it was knowing presentation of false testimony. Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 342 (1935). The prosecutor testified that this question presented to Richmond at trial was disclosure of the plea agreement. (T.P. 761, 13-25; 378, 9-13). It was the State's position that this "question" was the equivalent of disclosing to the defense the existence, nature, and details of the plea agreement in time for counsel to investigate and formulate a significant trial strategy and conduct a tactical informed cross-examination, but this "question" was not disclosure of a plea agreement it was merely a statement of one of the Court's functions, to impose sentence. Trial counsel did not recognize this "question" as being a plea agreement; therefore, the jury could not have been expected to recognize it as being a plea agreement either, nor could it have been expected to reasonably infer witness bias, or motive to fabricate testimony favorable to the State to obtain a favorable sentence at her upcoming sentencing hearing, nor could it have inferred that Richmond was given immunity from the other counts that she continually and repeatedly confessed to being solely and independently responsible for causing the injury (T.P. 42; 485; 486; 487; 490; 491). The Court read the transcript (T.P. 750, 12-25; 751) and knew that the agreement did not come out at trial, it was not in the transcripts (T.P. 752, 24-25; 753). Therefore, the plea agreement was not disclosed during the trial and did not come out until after trial by the State's admission and affidavits from attorneys. (T.P. 753 attached to motion for new trial R. Exhibit 7). Petitioner presented more than enough evidence to establish the existence of a plea agreement. Additionally, Richmond's grant of immunity is evident from the record itself. At Richmond's plea hearing the Prosecutor testified, "Judge, it is important to note that after this burn was administered to Matthew Richmond, basically the dye was cast in terms of him dying. Her failure to seek medical treatment after the burn was administered would not have changed what would have happened to him." (T.P. 15, 19-23). Then at trial the State's expert witness testified that it was her 12 hour delay that caused sever damage to the lungs (T.P. 577; 578) that he possessed a 65 percent chance of survival (T.P. 575, 20-21) and this plummeted to ten (10) percent (T.P. 579, 15-16) due to her 12 hour delay which was what he died of "in actuality." (T.P. 578, 22-23). Therefore, it was indisputable that Richmond received immunity.

-14-

Prejudice occurred because the State obviously mislead the Court. First, they admitted that they had the agreement with Richmond, then all of a sudden the Court stated, that, "Prosecutor's alleging that they did not make that part of the plea bargain." (T.P. 793, 4-6). The prosecutors did not place this on record, the Court did. Where the Court got that impression is beyond the record. Prosecutors obviously mislead the Court because the Court stated, "So, we have no evidence to demonstrate that there were any other terms of the plea bargain other than speculation..." (T.P. 794, 12-14) but the prosecutor's admission on record is not speculation, nor is an attorney's affidavit which is overwhelming evidence of the existence of the plea agreement. The Court also stated, "There was another plea bargain. But it's simply not in the record..." (T.P. 794, 18-19). This was an unreasonable determination of the evidence because the Court knew it was in the record by the State's own admission. (T.P. 767, 4-9) and through credible affidavits (T.P. 753, 3-17; 773, 7-24) after the trial. The Court further denied Petitioner Due Process when it ruled because it was not in the trial transcript (T.P. 752, 24-25; 753). Counsel failed to argue the Court's unreasonable determination denying Petitioner Due Process when the Court ruled, "...Richmond states in the record when she testified at trial that she believed that the State's taking a position was the extent of the plea bargain. It's very important that we realize in ruling on what Ms. Richmond thought the plea bargain was, is that she stated it on the record, and it's what she thought at the time she testified was the deal..." (T.P. 794, 1-9). But, the Court had read the transcript (T.P. 750, 12-15; 751) and knew that "There's nothing in here that says they aren't going to say anything. Where is that statement that they are not going to say anything?" (T.P. 752, 24-25; 753). Therefore, Richmond never made any such testimony, that, "...the State's taking a position was the extent of the plea bargain..." (T.P. 794). The Court knew that the record was devoid of any testimony from Richmond regarding not being charged for causing the injury after she confessed or being charged for causing the death due to the 12 hour delay in seeking medical treatment for her son. The State's own words and actions demonstrate this. First, the prosecutors testify at Richmond's plea hearing that her 12 hour delay in seeking medical treatment for her son did not cause the death then at Petitioner's trial the State presents expert testimony who demonstrated that it was this 12 hour delay which caused the lung damage that her son died from. Richmond was indisputably granted immunity because she was only charged with one (1) charge for the pain and suffering she caused

-15-

from her 12 hour delay. Therefore, it is indisputable that Richmond caused the 12 hour delay (T.P. 15) and death.

Counsel's deficiencies mislead the court of appeals into believing that the State disclosed this plea agreement at trial in time for counsel to present an informed tactical cross-examination (R. Exhibit 22, pg. 5, para. 3). And, counsel's deficiencies permitted the court to be mislead into believing, that, "Richmond stated on record what she believed the deal to be." (R. Exhibit 22, pg. 5, para. 3). And, counsel "...failed to demonstrate how foreknowledge of the plea agreement would have aided trial counsel's ability to cross-examine Richmond." (R. Exhibit 22, pg. 5 para. 3). Apparently, what the court did not know was that impeachment evidence is exculpatory evidence, Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555 (1995), and "Material evidence required to be disclosed includes evidence bearing on the credibility of government witnesses." Carriger v. Stewart, 132 F.3d 463, 479 (9th Cir. 1997)(quoting United States v. Bagley, 473, U.S. 667, 676...). Because, "The need for disclosure is particularly acute where the government presents witnesses who have been granted immunity from prosecution in exchange for their testimony ... criminals who are rewarded by the government for their testimony are inherently untrustworthy, and their use triggers an obligation to disclose material information..." Carriger, at 479. Since, Richmond was the State's key witness, the only witness implicating Petitioner, the whole case came down to whether Richmond was telling the truth in implicating Petitioner, or whether she was testifying to evade responsibility and attempting to curry favor to obtain the probation that she became aware of at her plea hearing (T.P. 11, 7-11) or to obtain a minimal sentence, less than maximum. "...the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, ... and evidence is material if it might have been used to impeach a government witness because 'if disclosed and used effectively, it may make the difference between conviction and acquittal.' " Carriger, at 481. Counsel's mis-presentation of this assignment of error rendered it frivolous, and Petitioner was prejudiced because there is a reasonable probability that had the jury been properly informed of the influences operating on Richmond at the time, that, she was awaiting sentencing and was attempting to qualify herself to obtain probation or a nominal sentence the outcome of the trial probably would have been different and the outcome of the appeal would have been different had counsel not mis-presented the facts.

## MUNDY'S DEFICIENT APPEAL BRIEF

(1) First, Mundy writes, "...the Court found that Defendant/Appelant's plea agreement was nothing more than semantics." (R, Exhibit 15, pg. 8, para. 3). Wrong; Petitioner did not have any plea agreement Richmond did. Petitioner plead NOT GUILTY.

(2) Then Mundy writes, "The basis for the Court's finding that the plea agreement is just purely semantics can be found on page 378 of the transcript, lines 2-20. Wrong again, first, the Court was not saying that the plea agreement was just purely semantics. The Court was saying that the argument as to whether or not the question posed to Richmond at trial constitutes disclosure of the plea agreement was semantics. Second, it was not on "page 378" it was on page 797 which demonstrates that counsel failed to read the transcript and was not trying to represent Petitioner at all.

(3) Then counsel miss-argues that the State's argument that the question posed to Richmond at trial (at 378, 9-12) "...constitutes a reward of case consideration for hr cooperation." (R. Exhibit 15, pg. 8, para. 3). What counsel told the Court was that the question posed by the State to Richmond constitutes disclosure of the plea agreement at trial therefore it "constitutes a reward" which is not even close to what is in the transcript. What is in the transcript, the evidence of the plea agreement was in Petitioner's Motion for New Trial hearing when the State admitted that they made a plea agreement not to pursue a prison term for Richmond, (T.P. 767, 4-9) and through credible affidavits from attorney's, (T.P. 753, 11-17) and  Richmond was informed that her sole charge did not carry a mandatory prison term, (T.P. 11) The State's position was that this agreement came out at trial (T.P. 761, 13-25; 751, 1-9; 378, 9-12). The Court found that the transcript was devoid of any disclosure of this plea agreement (T.P. 750, 12-25; 752, 24-25; 753). The problem is that this "question" did not disclos anything about a plea bargain arrangement. It was merely a statement one of the Court's functions, to impose sentence." It said nothing about the "state standing silent" or the state "granting Richmond immunity from prosecution," as Petitioner set forth on page 14 and 15 of this petition. Appellate counsel's averment that the State's statement at 378 that "...it constitutes a reward of case consideration for hr cooperation" was a sever miss-representation that came from counsel's failure to read the transcript. "It" does not constitute a reward because the State's "question," at 378, said nothing even remotely resembling a plea agreement. Appellate counsel

-17-

obviously did not even touch this transcript with a ten foot pole.

(4) Then counsel miss-argues, "Ms. Richmond offered three different statements concerning how Matthew sustained his injuries. Two of the versions included inculpatory evidence as to Ms. Richmond." (R. Exhibit 15, pg. 8, para. 3). Wrong again, Richmond did not "offer three different statements," with "Two of the versions" including inculpatory evidence as to Ms. Richmond. Richmond continually and repeatedly confessed to being solely and independently responsible. First, she confessed to police in a tape recorded statement when she called 911 (T.P. 403, 13-25; 503, 12-17), then she confessed to the Captain of the Fire Department upon his arrival at the residence to take her son to the hospital (T.P. 439), then Richmond confessed to a doctor, chaplain, and child services investigator at the hospitals (T.P. 408), then Richmond waived her Miranda rights (P. Exhibit G, pg. 1) and voluntarily gave tape recorded confessions to detectives at Shriners burn Inst. (T.P. 410; 463; 490), then detectives took Richmond to CIS headquarters where she maintained that she was responsible (T.P. 467; 468), then detectives took Richmond to the residence, waived her Miranda rights a second time, (P. Exhibit G, pg. 2) and showed them what she had done (T.P. 468; 485; 490), then detectives took Richmond back to CIS headquarters where she waived her Miranda Rights a third time (P. Exhibit G, pg. 3) and maintained personal and independent responsibility (T.P. 486; 487; 490; 523), and Richmond told detectives that Petitioner was not there at the time the injury occurred. (T.P. 42). Appellate counsel obviously did not even touch these transcripts.

(5) Then counsel had the audacity to say, "The Defendant/Appellant also believes that the State arranged an agreement with Ms. Richmond wherein she would receive an OR bond in exchange for her cooperation and remain out of jail during the pendency of the case. Notwithstanding, the OR bond was placed of record at the arraignment on January 14, 1997, the State never disclosed bond negotiations as part of its agreement with Ms. Richmond (T.P. 8 lines 10-18)." First, the OR bond was not exculpatory because it was unlikely to have induced false testimony or have been viewed to establish witness bias because Richmond had already collected on that part of the plea agreement. Second, the OR bond was the part that was disclosed at trial (T.P. 423, 15-25). That much of the agreement had already been established. That was not the important part. The exculpatory part of the plea agreement did not come out at trial. It was the part where Richmond was granted immunity and was promised that the State would

-18-

not pursue a prison term at her upcoming sentencing hearing where she already knew she could get probation (T.P. 11, 7-11). The exculpatory part was where Richmond was trying to curry favor with the State in order to obtain a nominal sentence or probation. What she received after trial is immaterial because she had already testified. The important fact is that at Petitioner's trial she was still trying to evade further indictment from all the counts that Petitioner was charged with. Additionally, it is indisputable that Richmond received immunity from prosecution because after making numerous confessions as to being the individual solely and independently responsible the expert witness at trial testified that the damage caused from her 12 hour delay is what actually caused the death. And, it is indisputable that Richmond delayed medical treatment for 12 hours. (T.P. 15, 1-18). To grant Richmond immunity the prosecutor mislead the Court and testified at her plea hearing that her 12 hour delay did not cause the death, that, "...the dye was cast in terms of him dying." (T.P. 15, 18-25). This was intentional because the State knew what their expert witness was going to testify to at Petitioner's trial that it was the 12 hour delay that caused the sever irreversible damage to the lungs and caused the death, in all "actuality." (T.P. 56716-25; 578).

(6) Mundy's mis-argument mislead the Court of Appeals in its determination. The Court held, "During direct examination of Richmond, the assistant prosecuting attorney asked Richmond if it were true that she had been indicted for child endangering and that the state was going to take no position at the time of her sentencing. Richmond answered in the affirmative. Thus, the terms of the any agreement between Richmond and the state were placed before the jury and were subject to cross-examination. Klein (Mundy) failed to demonstrate how foreknowledge of this limited agreement would have aided his ability to cross-examine Richmond." (R. Exhibit 22, pg. 5, para. 3). Therefore, Mundy failed to establish in his argument that this agreement did not come out at trial and failed to demonstrate how foreknowledge of it would have impeached Richmond's testimony.

It is obvious that counsel did not so much as read the transcript once. He could not "zealously represent his clients interests" without reading the transcripts. He could not present any claims in Petitioner's behalf without reading the transcript. Mundy deprived Petitioner of an adequate and meaningful appeal.

## EVIDENCE OF CAUSE OF DEATH

Counsel factually mis-argued that the State withheld the significance of Richmond's 12 hour delay in seeking medical treatment. Counsel failed to establish its significance, failed to utilize evidence in record, and asserted argument that was contrary to the evidence; thus, misleading the court in its determination and causing prejudicial effect.

First, counsel's deficient argument mislead the court into believing that it was Petitioner's position, that, "...the delay in seeking medical treatment did not contribute to Matthew's death." (R. Exhibit 22, pg. 6, para. 2). But, the evidence in the record was contrary to his argument, and it was never Petitioner's position that the delay in seeking medical treatment did not cause the death. Because, it was Petitioner's position that it was Richmond's delay in seeking medical treatment that caused the death, "in actuality," (T.P. 578, 22-23) and, that, it was Richmond's delay not Petitioner's was Petitioner's only logical defense. Therefore, the only logical argument and evidence was that defense counsel was mislead prior to trial when the prosecutor testified at Richmond's plea hearing, that, the 12 hour delay in seeking medical treatment did not cause the death (T.P. 15, 13-25), and this was reaffirmed during a pre-trial hearing (T.P. 86, 16-20; 87, 11-14). The appropriate and only argument was that all of a sudden at the end of trial, after it was to late to cross-examine all of the witnesses necessary and establish a significant trial strategy concerning the delay in seeking medical treatment as being the cause of death, the State presented expert witness evidence establishing, that, it was this 12 hour delay which caused the death because this delay is what caused sever irreversible damage to the lungs (T.P. 577; 578, 5-7) which reduced the probability of survival from 65 percent (T.P. 575, 20-21) down to ten (10) percent (T.P. 579, 15-16) which "...was the reason he died in actuality." (T.P. 578, 22-23; and 583, 12-13). What counsel failed to demonstrate is that this delay in seeking medical treatment was exculpatory because it was Richmond's delay. Richmond controlled the outcome (T.P. 424; 425; 427; 491, 6-18; 549, 12-22) and Richmond was sole legal guardian (T.P. 345, 9-25; 346) Petitioner only knew Richmond about a month (T.P. 417, 22-24); therefore, Petitioner possessed no authority over Richmond or her son which makes it Richmond's sole responsibility. Richmond has been out of prison now for several years even though the entire incident was her fault. Petitioner was denied a very powerful defense and the only defense. Neither trial counsel or appellate counsel even

-20-

touched lightly on any of this. Mundy had another powerful assignment of error, ineffective assistance of trial counsel, for failure of counsel to pull all of these facts together for the jury because that is what jury summation is for which established materiality.

Prejudice occurred because defense was denied pertinent evidence, prior to trial, that, the delay caused the death, and trial counsel was mislead by the prosecutor's testimony at Richmond's plea hearing that the delay was not the cause of death (T.P. 15) which was false. Prejudice occurred because had trial counsel known, he would not have stipulated cause of death (T.P. 556, 1-4) because if Richmond's 12 hour delay caused the death then she was responsible for the death, and trial counsel obviously would have pursued the only logical trial strategy arguing throughout the entire trial that Richmond's control over the situation caused her son's death because she delayed treatment for 12 hours.

Additionally, prejudice occurred on appeal because the Court of Appeals held, "Klein contends that the state withhed evidence that the delay in seeking medical treatment did not contribute to Matthew's death." (R. Exhibit 22, pg. 6, para. 2). But, "Klein" did not contend this, Mundy did. This was not defense strategy it was the State's strategy that the 12 hour delay did not cause the death. Then the Court held, "Klein speculates that the state must have had information to support this contention, because of statements made by the ... prosecutor at the time of Richmond's plea." Again, "Klein" never speculated any such thing. The record clearly demonstrates that the 12 hour delay caused the death and Richmond was the sole cause of this delay. The actual withheld evidence was that the delay caused the death. That is what was exculpatory for Petitioner. Not the other way around. Mundy's mis-arguments caused the Court to conclude, "The state responds that the prosecuting attorney was simply in error and that the record does not support his conclusion that the delay was not a factor in Matthew's death." And, "Despite Klein's (Mundy's) suggestion that there must have been an evidentiary basis for the prosecutor's position at Richmond's plea hearing, there is no indication in the record that such evidence existed. ...Dr. Warner testified that the delay in seeking treatment for Matthew was a contributing factor in his death. Klein (Mundy) has not cited any evidence to the contrary..." (R. Exhibit 22, pg. 6). None of which had anything to do with a defense strategy because the only defensive strategy that Petitioner could have possessed was that Richmond caused her son's injury as she repeatedly

confessed then sealed his fate by her failure to seek immediate medical treatment which caused his death because it was not a contributing factor which is the only reasonable way the expert's testimony can be construed. Mundy's arguments beat Petitioner out of a pertinent, powerful defense.

Mundy beat Petitioner out of another powerful argument by his failure to establish materiality of Richmond's 12 hour delay. The essential element of R.C. 2919.22(A) requires Petitioner to have been a custodial parent, and "...omit a duty of care arising from that capacity, the omission of which caused serious physical harm." Counsel failed to even attempt to demonstrate that Petitioner neither possessed any such authority over Richmond or her son, and failed to establish that Richmond was her son's sole legal guardian, thus, solely responsible for his care and for seeking medical treatment, especially, due to the fact that she fully asserted that authority over her son at the time as she demonstrated to detectives. (T.P. 424; 425; 491; 549). And, having only known Richmond for about a month (T.P. 417, 22-24) gave Petitioner no power over Richmond or her authority over her son. Richmond is a college graduate (T.P. 344) and had been a mother for over 12 years, therefore, she knew what she was doing and she was solely responsible because Petitioner did not and could not have overridden her decisions or authority over any matter concerning her family. The the State compounded the prejudicial effect by presenting unsubstantiated accusations in closing that Petitioner was the father (T.P. 610, 17-25; 611) and by presenting false unsubstantiated accusations that Petitioner said that he wanted to be the father (T.P. 647, 16-21; 649, 14-15) which is not even what the alleged note said; therefore, the prosecutor lied to the jury.

### EXPERT WITNESS PRE-TRIAL REPORT

Mundy, entirely omitted argument on highly inflammatory, prejudicial, and inadmissible expert witness speculation that the State drove into the ground in closing argument to mislead and prejudice the jury.

State's witness Dr. Warden testified that Richmond's son had to have been held in the hot water. (T.P. 574, 19-22). It was extremely prejudicial for the State to advance this holding theory in closing argument (T.P. 607, 4-5; 610, 8-9; 623, 22-25; 624, 17-25). This "speculation" was not evidence that could be relied upon because it was an "assumption." (T.P. 574, 19-20). The expert failed to establish it by testifying with a reasonable degree of medical certainty therefore, the prosecutor could not have made the statements that "we know

-22-

he was "held" like he did in closing numerous times. Because, this is not what the expert's testimony amounted to; therefore, prosecutor's closing was highly inflammatory, prejudicial, contrary to the actual evidence, and blatantly false. The expert's burn chart (P. Exhibit H, and T.P. 567; 563, & State's exhibit No. 9, T.P. 566, 22-25) establishes that it would only take "one to five" seconds (T.P. 574, 14-18) for the water to cause the injury at the temperature that the water was presented as being, (T.P. 519, 6-11) and an individual of this size and weight (T.P. 350, 23-24) would have been instantly burned which supports Richmond's confessions as being solely responsible. It does not support prosecutor's closing testimony which amounted to intentional misleading of the facts to the jury. The facts, are that her son was mentally ill and had a seizure disorder described as a blank stare (T.P. 540, 16-19; 347, 19-25; 348; 304, 17-25; 305; 307, 13-20) and the water was hot enough to have burnt him in a matter of seconds. The expert disregarded the effects of this and the medications would have in slowing him down and the indisputable effect on his coordination, motor function, reflex speed, and ability to simply jump out in less than one to five seconds. Therefore, the expert's speculation had absolutely no evidentiary support and it was obvious that he was coached by prosecutors prior to testifying.

Additionally, trial counsel filed a "MOTION FOR DISCOVERY" specifically requesting any expert, scientific, or otherwise any pertinent facts pertaining to expert witness testimony. The State failed to disclose any such information which resulted in highly inflammatory, inadmissible, and prejudicial surprise expert witness testimony. And, the expert failed to establish that this unsubstantiated speculation was accurate through the presentation of evidence, facts, data, or that, "the witness has applied the principles and methods reliably to the facts and based his opinion on them." (Evid.R. 702 & 705). The statement was purely speculation because the question was stated in terms of "assumption"; the expert neither expressed this statement in terms of probabilities, nor with any degree of medical certainty, nor did he apply any principles, methods, facts, or data because he stated that he was unaware of the type of seizure disorder her son had. (T.P. 588; 348, 2-4). Therefore, the "holding" speculation was not reliable evidence that the State could use in closing as evidence to make the statements that "we know he was held" which was

-23-

highly prejudicial. Since, trial counsel specifically requested this information prior to trial Petitioner was denied the opportunity to seek limitations on the experts testimony regarding inadmissibility, inflammatory, or prejudicial matter. Therefore, Petitioner was denied preparation, trial strategy, and Due Process. The holding speculation was not evidence supported by any facts justifying its presentation at trial or in closing argument. Appellate counsel also denied Petitioner of a significant ineffective assistance of trial counsel claim because trial counsel failed to object, challenge, or proffer the unsubstantiated accusation in any way.

Trial and appellate counsel  had powerful arguments available that may well have altered the outcome of the trial or appeal; therefore, Petitioner's case was prejudiced by both attorney's deficiencies.

### APPELLATE COUNSEL'S SECOND DEFICIENT ASSIGNMENT OF ERROR
### HEARSAY TESTIMONY – INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Mundy argues that one misstep in failing to object to hearsay rendered trial counsel's entire performance deficient, but Mundy failed to establish how. The fact that it was hearsay did not cut it which renders Mundy's argument deficient and frivolous. Mundy failed to advance the only logical averment in conjunction with said testimony. Since, Mundy bears the burden of demonstrating that counsel's entire overall performance was deficient it is indisputable that Mundy again rendered deficient performance in raising this assignment of error without supporting it with sufficient evidence and argumet. Mundy's deficient performance lead the Court to be misinformed in its facts because the Court mistakenly held, "It was not until after the seriousness of Matthew's injuries became evident to her that Richmond implicated Klein. Thus, the initial statements were consistent with Klein's defense, and the subsequent inconsistent statements served to impeach Richmond's credibility and to cast doubt upon her trial testimony implicating Klein in the offense." (R. Exhibit 22, pg. 7). First, it is indisputable that Richmond knew the seriousness of the injuries from the onset because she testified to it as she viewed the photos of her son (T.P. 393; 394; 395). Therefore, that was no excuse for the Court of Appeals to provide Richmond with for implicating Petitioner. In fact, the State never presented any justification for Richmond to have diverted full blame to Petitioner. But, appellate counsel possessed "the duty and obligation of Constitutional magnitude" to counter it and factually remedy the false factual discrepancies. And, granted, the "initial statements were consistent with"

-24-

Petitioner's defense, but the "subsequent inconsistent statements" did not serve
to impeach Richmond's credibility at all or to cast doubt upon her trial
testimony implicating Klein. Contrary to the court of appeals determination, the
hearsay testimony did not "impeach" Richmond's credibility, but, instead,
bolstered and "vouched" for the verity of her testimony implicating Petitioner.
The jury did not get to weigh the evidence of Richmond's verity, they had it
weighed for them because detectives continually and repeatedly testified to
their opinion of her verity. Detective stated, "...that's when she broke down
and told us what actually happened," (T.P. 470, 14-15; 525, 19-20) and "...there
was no way the injuries occurred the way she told us," (T.P. 487, 14-15), and
"...three or four hours, examining whether or not there was any remote
possibility that, in fact, because the child was disabled and could somehow be
caught in this bathtub of hot water and be unable to get out," (T.P. 492, 20-23)
and "We spent a lot of time trying to make absolutely sure that nothing like
that could have happened," (T.P. 493, 22-24) and "...Richmond never stated that
she caused the injuries," (T.P. 493,16-18; 494, 24-25; 503, 18-19) and "...we
believed her. We believed those statements." (T.P. 503, 23-25; 492, 16-18; 493,
2-3). But, this was false testimony because they knew she found him in a pool of
water (T.P. 487, 7-8) with an expressionless face (T.P. 513, 21-22; 523, 10-11)
and they knew from doctors that the injury was an immersion burn (T.P. 544,
18-23) and they knew her son had a seizure disorder (T.P. 540, 15-18) therefore,
they knew Richmond's confessions were consistent with the nature of the injury,
"immersion," and consistent with her son's seizure disorder. They also knew that
her statements implicating Petitioner were lies when they were repeating them
(T.P. 543; 544; 545) which is the equivalent of lying to the jury a second time.
The detectives' testimony repeating Richmond's statements implicating Petitioner
only served to bolster Richmond's testimony implicating Petitioner which the
State knew were lies. The State's admission did not cure the lie because the
jury obviously relied upon the lies or Petitioner would not and could not have
been convicted. Police testimony continually re-phrasing and modifying
Richmond's statements mislead the jury in their determinaion. Detectives lied
because they knew Richmond continually and repeatedly confessed to full
responsibility (see pg. 18, at (4) of this petition). Detectives stated that
they knew Richmond's confessions were lies because she said they were lies (T.P.
526, 7-8). Nevertheless, Mundy's performance was severally deficient because

-25-

he failed to even come close to meeting the standard required by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984). Mundy had the burden to prove that counsel's overall performance was deficient and that prejudice resulted. Therefore, prejudice resulted from Mundy's deficient performance because he deprived Petitioner of an adequate and meaningful review on an appeal of right.

### MYNDY'S THIRD DEFICIENT ASSIGNMENT OF ERROR

### TRIAL COURT'S ABUSE OF DISCRETION IN DENYING MOTION FOR NEW TRIAL

Mundy babbled on about absolutely nothing that had anything to do with the facts on record. (R. Exhibit 15, pgs. 12 through 15). Mundy simply reiterated the same deficient argument that he presented in his first assignment of error. The issue is whether or not the Court violated Petitioner's federal Constitutional rights not whether or not it abused discretion. Mundy failed to cite any evidence supporting his averment, again, and failed to meet any burden of proof required to prevail on a discovery claim, again. Not that one did not exist because sufficient evidence on record supports the fact that the State failed to disclose exculpatory evidence by its own admission.

Mundy's lame averment left the Court with the false impression, that, "...Klein was aware of the nature of Richmond's plea at the time of trial, and he had ample opportunity to cross-examine her regarding it. Thus, the evidence cited by Klein cannot be deemed "newly discovered" within the meaning of Crim.R.33." (R. Exhibit 22, pg. 8). First, Mundy did not cite any evidence at all in his brief. So, where the Court got that from is an unreasonable determination of the facts. And, there was no evidence that "Klein" was aware of the nature of Richmond's plea agreement. Again, the Record demonstrate's that the State's question to Richmond was not disclosure of the plea agreement and the court read the transcript and demonstrated that the State's contention was not in there. (T.P. 750, 12-25; 751, 1-9; 752, 24-25; 753; 761, 13-25; 767, 1-9). Since, it was the State's admission that they did have that plea agreement and the Court found upon its reading of the transcript that it was not disclosed in time for trial, and the Court further found that there was another plea agreement that was not on record (T.P. 794, 18-20) and Richmond never testified about the significant parts of the agreement then Mundy failed in his duty and obligation of a Constitutional magnitude to adequately represent Petitioner's interests. Therefore, trail counsel was not aware of the nature of Richmond's plea agreement at trial and did not have ample opportunity to cross-examine her regarding it. Mundy's argument was not compatible with the evidence of record.

-26-