The Court pointed out that Mundy completely omitted another significant legal factor, possibly ineffective assistance of counsel. The Court stated, that, "More than three months had elapsed between the filing of Klein's motion for new trial and the date of the hearing..." "Klein had more than adequate time to either obtain Richmond's affidavit or subpoena her from the institution for the hearing. Having done neither, Klein cannot now complain, at this late date, that the lower court erred by not ordering Richmond's return from the institution..." (R. Exhibit 22, pg. 8-9). Since, counsel failed to conduct a meaningful investigation then secure the evidence necessary to present at the hearing, it is obvious that total neglect of counsel's duty occurred because counsel was entirely unprepared for Petitioner's hearing. Mundy could have touched on that one in his "ineffective assistance of counsel argument."

Then Mundy failed to point out that the attorney's affidavits both demonstrate that there was a non-disclosed agreement that did not come out at trial which correlates with the trial court's statements that there was another plea agreement that is not on the record (T.P. 794, 18-20) which is a fact, if it is not in the record then it did not come out in time for use at trial. How could it? Additionally, the Court misread Richmond's attorney's affidavits which attests to the existence of the non-disclosed plea agreement dealing with Richmond's grant of immunity. Richmond nor the State ever offered this information prior to, at, or after trial. Richmond's attorney did. This document is still being withheld by the State (Respondent) because it is evidence of the existence of the non-disclosed plea agreement not the disclosed parts which have no exculpatory value.

### MUNDY'S FOURTH DEFICIENT ASSIGNMENT OF ERROR
### WHETHER THE COURT ERRED BY IMPOSING CONSECUTIVE SENTENCES

Mundy's argument was whether the court erred to the prejudice of the Defendant when it imposed consecutive sentences on all but one count even though the offenses are allied offenses of similar import which merge for the purpose of sentence. (R. Exhibit 15, pgs. 15 through 17). First, it is reversible error to even "merge" allied offences which is clearly established law.

Mundy's argument possessed some arguable value but not much because he mis-presented the argument. What actually occurred is that the State upgraded the child endangering charges by including a serious physical harm finding which in turn upgraded the seriousness of the offense from a third degree felony to a second degree felony which in turn upgraded the sentence. What it additionally

upgraded was the essential element of those counts from reckless to knowingly. This was the significant factor that Mundy simply disregarded. Upgrading the felony degree upgrades the burden of proof, and since, now the burden of proof is "knowingy" for the endangering instead of "reckless" the endangering charges are now the decimal equivalent of the felonious assault count because its essential elements are knowingly causing serious physical harm. However the injury was inflicted is immaterial because the finding of guilty of any of the endangering charges will automatically result in the finding of guilty of the felonious assault and the Court already found counts four (4) and five (5) to be allied but count three (3) felonious assault is also allied under these particular circumstances. Because recklessly administering corporal punishment causing serious physical harm is felonious assault, and to recklessly torture or cruelly abuse causing serious physical harm is felonious assault. Therefore, it would be impossible to find guilt of one without finding guilt of all of them because recklessly torture or cruelly abuse and to recklessly administer corporal punishment causing serious physical harm is the same thing. Therefore, if the evidence shows knowingly causing serious physical harm it is immaterial how that serious physical harm occurred only that it was knowingly and it would be impossible to administer corporal punishment and causing serious physical harm unknowingly, or recklessly torture or cruelly abuse causing serious physical harm without knowingly causing serious physical harm. Therefore, counts (3), (4), (5), and (6) are all allied offenses of similar import. Changing the wording does not change what is necessary to establish the elements which is what has occurred. They are all the same charge with the same animus, causing a burn that caused a death, therefore, they are multiple punishments for one crime. Only one crime occurred, causing a burn which caused the death. Or, the death was caused by the 12 hour delay which was indisputably Richmond's 12 hour delay. (T.P. 15). Nevertheless, it would be impossible to find guilt of any one of counts 3, 4, 5, or 6, without finding guilt on all of them which violates double jeopardy.

Mundy rendered his fourth assignment of error entirely frivolous by his failure to assert argument and evidence necessary to a reliable determination. Then presented argument that is contrary to law. Mundy erroneously argues that that felonious assault in count three (3) and endangering children in counts four (4) and (6) are allied offenses of similar import. This was a frivolous argument because Mundy failed to establish how or why.

Then he erroneously argues that the involuntarily manslaughter and count six (6) are allied offenses. It was erroneous because it was blatantly obvious that a comparison of the elements of involuntary manslaughter are not even remotely similar to endangering children to justify presenting this argument. Involuntary manslaughter requires a showing that the individual caused the death of another "as a proximate result of committing or attempting to commit a felony..." and endangering children in count six (6) requires the individual to be the parent or legal guardian and omit a duty of care or protection arising from that capacity and causing serious physical harm. This argument lacked any sound legal theory, research, and competency. Mundy failed to conduct even enough investigation to review the statutory definition to compare the elements and formulate a sound arguable legal theory.

Then Mundy erroneously suggests that the allied offenses should be run concurrent when it is well established that "it is reversible error to run allied offenses concurrent" because a defendant can only be convicted and sentenced on one. Again, Mundy's argument lacks sound legal theory, research, investigation, and were void of any sound arguable legal merit.

Then Mundy omits all argument on endangering in count five (5) which was run concurrent with count four (4) by the Court which is obviously erroneous because allied offenses cannot be run concurrent.

Mundy failed to even attempt to explain how and why the endangering charges and felonious assault are allied offenses. And, he failed to explain how and why "knowingy causing serious physical harm" is the essential element of felonious assault and all of the endangering charges which renders them all allied offenses of similar import. As state above, the endangering charges were upgraded to second degree felonies which upgrades the burden of proof from reckless to knowingly because the prosecution tacked on the additional element of proof of a finding of serious physical harm. But, the elements of both endangering and felonious assault are identical anyhow because:

Knowingly as defined by R.C. 2901.22(B), "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist"; and Reckless as defined by R.C. 2901.22(C), "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a

certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, her perversely disregards a known risk that circumstances are likely to exist."

The Ohio Supreme Court holds, that, "...the culpable mental state of reckless is the essential element in the crime endangering children," pursuant to R.C. 2919.22(A), (B), and (C)." State v. McGhee, 79 Ohio St.3d 192, 195, 680 N.E.2d 975, 977 (1997)(construing all endangering counts).

Mundy failed to establish or even argue how the elements of the offences corresponded to such a degree that the commission of one would result in the commission of all of the offenses. First, the elements of knowingly that appear in reckless also appear in the definition of knowingly and when applied to this case having knowledge of the circumstances that a known risk exist and being aware that such circumstances probably exist are exactly the same thing. By allegedly placing Richmond's son in the tub of hot water with knowledge of the danger of the water the State is alleging that five offenses occurred. That five different animuses existed but the State failed to even allege more than one animus which was punishment. But, The essential elements correspond to such a degree that it would be impossible to have committed one offense without committing the others. Mundy failed to even point to the statutory elements and the test for allied offenses which requires a comparison of the elements. The inquiry is not whether the defined language is identical, by that the language bears meaning similar enough that the commission of one would have resulted in the conviction of all of them which is what has occurred. Or, the entire claim is wholly frivolous to begin with and not applicable to this case which also renders Mundy's performance deficient because he should have known. Nevertheless, Mundy's brief violates Anders v. California, as distinguished by Delgado v. Lewis, 181 F.3d 1087 (9th Cir. 1999) "Merely filing a no-merit brief leaves ... petitioner without representation on appeal." at 1093.

### MUNDY'S FIFTH DEFICIENT ASSIGNMENT OF ERROR
### INSUFFICIENCY OF THE EVIDENCE

Mundy's fifth assignment of error was deficient because he argues insufficiency of the evidence to support a conviction of felonious assault, but counsel failed to include any reference to any of the other charges which denied Petitioner of a reliable determination and review. Mundy failed to preserve in the record any arguments or evidence to exhaust remedies for any further reviews by the higher Courts. This demonstrates ineffective assistance of appellate

counsel, total neglect of duty. And, Mundy's averment did not amount to anything worthy of review because he failed to support it with the evidence in record and the necessary argument strategically formulated to zealously represent his client's interests. Mundy's averment was so vague it was frivolous and meritless.

Mundy attempts to establish the frivolous argument that a guilty verdict on felonious assault and a not guilty verdict on the murder charge "illustrates that the State presented insufficient evidence that the Defendant/Appellant knowingly caused the victim serious physical harm," (R. Exhibit 15, pg. 17) but this lacked all arguable legal theory because the elements of murder and felonious assault are not even remotely similar; therefore, Mundy knowingly presented a frivolous argument. This alleged "inconsistent" jury verdict theory supports nothing even remotely resembling an insufficiency of the evidence claim. Mundy deprived Petitioner of, and failed to properly exhaust remedies on, what would have been a powerful argument under the particular circumstances of this case. Regardless, Mundy's argument did not even possess a remote possibility of prevailing and was frivolous by it very definition, and Petitioner was denied effective assistance of appellate counsel.

### MUNDY'S SIXTH DEFICIENT ASSIGNMENT OF ERROR
### GRUSOM SLIDES AND PHOTOS

Mundy's entire assignment of error was deficient because those photos were favorable to Petitioner's case not prejudicial because they established that Richmond was fully aware of the severity of her son's injury from the onset; (T.P. 392; 393; 394; 395) therefore, the State's argument that Richmond recanted her confessions when she first discovered the severity of her son's injury, as the basis for her recantation, is without any arguable merit. (R. Exhibit 22, pg. 7, para. 3). These photos also were not prejudicial because it is reasonably impossible to believe that a mother would continually and repeatedly confess to being solely and independently responsible, after waiving her Miranda rights three (3) throughout police investigation, when the mother knew the severity of the injury just by looking. This argument was not presented to the jury directly, but this is what any reasonable rational mind would have to conclude, that, Richmond did not confess to such a sever injury for somebody she only knew a month (T.P. 417, 22-24). Thus, the photos supported defense strategy that Richmond caused her son's injury then delayed seeking medical treatment for 12 hours due to the consequences of the severity of the injury. Again, Mundy

-31-

presented a thoughtless argument. Most of Mundy's arguments support an
ineffective assistance of trial counsel claim for his failure to aver
significant and powerful facts in Petitioner's defense. It was as though both
attorneys were working for the State which is demonstrated by their actions,
omissions, and assertions of frivolous arguments and claims. The big question
was, where was trial counsel considering he possessed awareness of all this
evidence favorable to defense strategy to work with.

### MUNDY'S SEVENTH DEFICIENT ASSIGNMENT OF ERROR
### ERRONEOUS JURY INSTRUCTION

Myndy argues that the jury instruction on complicity was erroneous, but it
was Mundy's and trial counsel's argument that was actually erroneous. Because,
the jury could have found Petitioner complicitous to Richmond's one (1) count of
endangering for failure to seek immediate medical treatment. Therefore, the
State had a prema facia conviction to hang its hat on, but not Mundy. Mundy's
argument was so frivolous, so outside the universe of a plausible, meaningful,
and legally arguable averment that he denied Petitioner of a meaningful appeal.
Petitioner suffered sever prejudicial effect because not a single assignment of
error advance by Mundy possessed even a remote probability of success and the
record was full of errors of a very high Constitutional magnitude. Mundy simply
took no interest in representing Petitioner at all, and failed to exhaust State
remedies on claims of federal constitutional magnitude.

Mundy's arguments, research or the transcripts, and presentation was
severally deficient because he failed to present, argue, and establish any set
of facts to support his arguments. His deficiencies deprived Petitioner of an
adequate and meaningful appeal.

### MUNDY FAILED TO AMEND HIS DEFICIENT APPEAL BRIEF &
### FAILED TO AID PETITIONER IN PERFECTING THE AMENDED BRIEF

Mundy failed to amend his deficient appeal brief when the deficiencies in
evidence, argument, and omissions were brought to his attention by Petitioner,
and he failed to aid in the perfecting of the amended and supplemental brief as
fully set forth in Petitioner's First, Second, and Third Ground for Relief pages
1 through 12. Petitioner first four grounds for relief are based upon Mundy's
deficient performance as stated therein. Prejudice occurred because Petitioner
was entitled to the effective assistance of an attorney on a first appeal as of
right, and Petitioner should not have had to file a single document to obtain an
adequate and meaningful review.

On June 14, 1999, Mundy filed his deficient brief. Two weeks later Petitioner received a copy and discovered that Mundy's brief violated Anders v. California, 386 U.S. 738, 87 S.Ct. 1396 (1967), as distinguished by Delgadeo v. Lewis, 181 F.3d 1087 (9th Cir. 1999). "Merely filing a no-merit brief ... leaves a petitioner without representation on appeal." at, 1093. Mundy's deficient brief forced Petitioner to file a pro se "MOTION TO FILE AMENDED AND SUPPLEMENTAL BRIEF" on July 27, 1999, (P. Exhibit A)(fully set forth in Petitioner's First ground for Relief, pg. 1). Which was based on ineffective assistance of appellate counsel and specifically requested new counsel to be appointed to fix, repair, and amend Mundy's deficient brief and specifically to perfect Petitioner's claims and exhaust remedies on them for Federal review. The ineffective assistance of counsel claim was not fully set forth in this motion, but it should have been sufficient to alert the Court that something was severally wrong with Mundy's arguments in his brief because he did not even get the dates right, and Petitioner pointed out some significant mistakes in Mundy's facts and argument in his first assignment of error but not all of them. Petitioner did not think this was neither appropriate nor necessary since a judge could look over the brief and compare it to the transcripts and determine that counsel's brief was severally deficient in comparison to what is in the transcripts. The motion to amend contained rough drafts of some of Petitioner's claims so that the Court could make a preliminary determination as to whether or not the claims possessed enough merit to justify perfecting and amending and supplementing counsel's brief. It is apparent that they did because on August 13, 1999, the Court granted Petitioner's motion to amend (P. Exhibit B) but it failed to appoint new counsel to perfect Petitioner's federal claims, and it failed to either order Mundy to amend and cure the deficiencies in his claims or appoint an attorney who would. Petitioner specifically requested a replacement attorney to perfect Petitioner's claims to exhaust remedies on them and since a Federal action is the only action in which exhaustion of remedies in required it stands to reason that Petitioner was aware of the exhaustion requirement because he based his request upon it. The Court's granting of the motion to amend attests that Petitioner's claims possessed arguable merit or the Court would not have granted the motion. Nevertheless, Mundy was aware of all of the deficiencies in his brief, and Petitioner believed that the motion was sufficient to inform the Court that Mundy's entire brief was deficient which it should have been sufficient to cure the deficiencies once the Court became aware

-33-

that counsel was not even being factually correct in his arguments. The motion
to amend was not a motion requesting Petitioner to proceed pro se. That was
obviously not its purpose. The Court unreasonably ordered Petitioner to file a
pro se supplemental brief that Petitioner was in no way prepared to accomplish
in the 30 days provided which was an unreasonable amount of time since both the
previous attorney's were provided with over a year to draft appeal briefs.
Petitioner is not an attorney therefore the 30 days was insufficient to perfect
these claims on a federal level. Petitioner was entitled to effective assistance
of an attorney to pursue an adequate and meaningful appeal in his behalf.

Petitioner was forced to proceed pro se and the Court set the filing date
for September 7, 1999. Petitioner filed the pro se brief by placing it in the
prison's mailing system. The entire chain of events caused by Mundy's deficient
performance are fully set forth in Petitioner's First, Second, and Third ground
for relief herein pages 1 through 12 as if fully set forth in this argument. The
Court was aware that counsel's arguments were contrary to and in direct conflict
with the evidence in record, and the Court's December 3, 1999, decision agrees
that counsel's brief was either "not supported by the evidence," "contrary to
the evidence," "without merit," or wholly frivolous without supporting
explaination and/or legitimate argument, etc... Therefore, it was obvious that
Mundy did not reasonably review the transcript which is akin to failure to
investigate and establishes total neglect of duty. Petitioner was left
constructively without counsel on appeal which violated Petitioner's Sixth
Amendment rights to effective assistance of appellate counsel Evitts v. Lucey,
469 U.S. 387, 105 S.Ct. 830 (1985). Petitioner's "...claims should have been
brought to the attention of the court of appeals by counsel but were not." White
v. Schotten, 201 F.3d 743, 753 (6th Cir. 2000). This forced Petitioner,
unwillingly, into proceeding pro se in an attempt to obtain a "meaningful" and
"effective" appeal, to exhaust remedies, and to preserve rights. But, Petitioner
should not have had to proceed pro se in the first instance to receive an
adequate, meaningful, and effective appeal. Mundy left Petitioner without any
significant claims to present to the Ohio Supreme Court and to the Federal Court
because his arguments were to deficient to be used. Petitioner was prejudiced by
counsel's deficiencies because had Petitioner received the aid of counsel to
perfect those claims and meet filing deadlines there was a reasonable
probability that the outcome of the appeal would have been different.

## MUNDY FAILED TO TIMELY INFORM PETITIONER OF JUDGMENT ENTRY

As fully set forth in Petitioner's Second and Third Ground For Relief pages 8 through 12, Mundy failed to timely notify Petitioner of the Court of Appeals' December 3, 1999, judgment entry affirming conviction until after the time had expired for pursuing appeal to the Ohio Supreme Court, and the time had expired for filing for reconsideration pursuant to App.R. 26(A), and delayed reopening pursuant to App.R. 26(B). Mundy's failure to provide Petitioner with this notice in a timely manner deprived Petitioner of enumerated Constitutional rights and prejudiced the outcome of those proceedings as fully set forth in Petitioner's First through Third ground for relief. Mundy's deficiency here successfully precluded Petitioner from invoking the jurisdiction of the Court of Appeals to continue to pursue the claim of ineffective assistance of appellate counsel against him by his failure to properly inform Petitioner of the December 3, 1999, judgment. Appeal Rule 22(B) establishes that the clerk shall give notice of judgment by mail to counsel of record. Petitioner never received notice of judgment from the clerk, Mundy did. Therefore, Mundy possessed the duty and obligation to timely inform Petitioner of the entry so Petitioner could timely pursue other remedies consistent with direct appeal, "App.R. 26(B)."

## MUNDY FAILED TO ASSERT TRIAL COUNSEL'S INEFFECTIVENESS

Mundy raised the issue of ineffective assistance of trial counsel raising a sole frivolous argument that counsel failed to object to inadmissible hearsay statements by police, but that was not adequate nor sufficient to demonstrate trial counsel's ineffectiveness, as fully set forth on pages 24-26 of this petition. Additionally, Mundy failed to even touch lightly on trial counsel's actual deficiencies which had a prejudicial effect which are fully set forth in Petitioner's Eleventh Ground For Relief pages 82 through 100. These are the only claims against trial counsel that possessed a chance of success. But, Mundy is an attorney, he knew this which further demonstrates his total neglect of duty. Therefore, Mundy's performance was deficient for his failure to prepare adequate arguments supported by sufficient evidence to support the claim.

Mundy's appeal brief violated Anders v. California, as stated above, as distinguished by Delgado v. Lewis, that, "Merely filing a no-merit brief ... leaves a petitioner without representation on appeal." Delgado, at 1093. And, Mundy's overall performance is in violation of the standards established in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984).

-35-

**(V) FIFTH GROUND FOR RELIEF:**

### THE STATE FAILED TO DISCLOSE EXCULPATORY EVIDENCE

Petitioner was denied Due Process when the Prosecutor's failed to disclose three (3) forms of exculpatory evidence. Defense counsel filed a motion for discovery specifically requesting any evidence regarding: (1) Co-defendant's (Richmond's) plea bargain agreement with the State; (2) evidence of cause of death; and (3) any facts, data, or principles used to derive at expert witness testimony.

### CO-DEFENDANT'S PLEA BARGAIN AGREEMENT

[1] First, the State failed to disclose the plea bargain agreement it had with Richmond where the State granted her immunity from additional charges relating to causing the injury and cause of death, and where she was promised that the State would not pursue a prison term for Richmond at her upcoming sentencing hearing which was strategically scheduled for after Petitioner's trial as inducement. After Petitioner's trial and after Richmond's sentencing hearing it was discovered that she had entered into an extensive plea bargain agreement with the State. After Richmond's sentencing hearing her attorney Ann Fluhearty contacted Petitioner's attorney Anita Berding and informed defense counsel that there had been this non-disclosed plea agreement between Richmond and the State, (T.P. 753, 3-17) then defense counsel filed a Motion for New Trial (R. Exhibit 7) based on newly discovered evidence. During this hearing prosecutor's admitted to the existence of and some of the details of the non-disclosed plea agreement for the first time. (T.P. 767, 2-9). The State's admission here is the most pertinent, credible, and highly probative evidence of the existence of the deal. Therefore, three (3) things are indisputable, (1) the State had a non-disclosed plea agreement with Richmond; (2) the evidence did not come out until after trial; and (3) this is elementary Brady material because it is the type which establishes witness bias and motive to fabricate testimony favorable to the State, to curry favor with the state because she was awaiting sentencing and she was fully informed that her sole charge did not carry a mandatory prison term, (T.P. 11, 7-11) and that she could receive probation (T.P. 13, 18-19) which is among the other influences operating on her at the time. But, it is obvious that she knew that she would not receive probation or a nominal sentence if Petitioner were acquitted or if she told the truth and made full confessions on the witness stand at Petitioner's trial.

It is the State's position that this plea agreement came out at trial in

time for defense counsel to use it for impeachment when the prosecutor asked Richmond this <u>question</u>. (T.P. 378, 9-20; 751, 1-9; 761, 13-25). It is the State's position that this "question" was the equivalent of disclosing to the defense the existence, the exact nature, and the details of the deal, but this is not the equivalent of disclosure. The only thing that this "question" presented to defense and the jury was that Richmond had not been sentenced yet, and that she was going to be sentenced by a judge. It merely pointed out one of the judge's functions, "<u>to impose sentence</u>." Defense counsel did not recognize this "question" as disclosure of the nature and details of any deal or he would have cross examined her on it to demonstrate bias and further motive to fabricate testimony; therefore, the jury could not have been expected to have inferred witness bias or motive to fabricate testimony favorable to the State in an attempt to curry favor to obtain a favorable or nominal sentence at her upcoming sentencing hearing, nor to infer motive to fabricate testimony to continue to divert blame and evade additional charges. Trial counsel could not have been expected to have prepared and presented a strategical, informed, and tactical cross-examination based on that question. Richmond refused to talk to defense counsel, (T.P. 749, 4-7) and she testified that she had been promised nothing (T.P. 750, 2-11; 423, 15-25; 424) therefore, Richmond did not disclose the deal or any other part of the plea bargain other than the OR bond. The Court, at the Motion for New Trial hearing, had the transcript before it (T.P. 750, 12-25; 751) and determined, that, "There's nothing in here that says they aren't going to say anything." (T.P. 752, 24-25; 753, 1-9; 751, 1-9). In other words, the State's "question" presented to Richmond at trial was not disclosure and it did not disclose that the State "<u>is not going to say anything</u>," or "<u>is not going to take a position</u>," or "<u>is not going to pursue a prison term</u>," or that the State "<u>is not going to pursue additional charges in relation to causing the injury or causing the death</u>," even though she confessed to being solely responsible and it was her 12 hour delay that actually caused the death. The Court's determination here was correct, there was absolutely no evidence in the trial record to support the State's argument that it came out at trial. Nor, does the record demonstrate that the State promised not to pursue a prison term or additional charges which is a promise of immunity and the type of plea bargain that would induce an individual to fabricate testimony favorable to the State in an attempt to obtain probation or a nominal prison sentence, and further, induce Richmond to continue to fabricate testimony to divert full blame over to Petitioner.

Then, after a two week continuance, somehow the Court got the impression
that the prosecutor's new strategy was that suddenly the State did not make that
plea agreement with Richmond (T.P. 793, 4-6) which the record also does not
support in any way. And, it was a denial of Due Process for the State to,
"...take flatly inconsistent positions..." Jacobs v. Scotts,513 U.S. 1067, 115,
S.Ct. 711, 712 (1995). Not only was the State's new argument inconsistent, but
it was also knowing presentation of false and misleading testimony which also
"offends Due Process." Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 32
(1935). Prejudice occurred because it obviously mislead the Court in its
determination which is evident because the Court held, "...we have no evidence
to demonstrate that there were any other terms of the plea bargain other than
speculation..." (T.P. 794, 12-14). But, the State's admission on record was not
speculation, and it was, in fact, corroborated by both Richmond's attorney's
affidavit and Petitioner's attorney's affidavit.

The Court continued to deprive Petitioner of Due Process when in held, that,
"Ms. Richmond states in the record when she testified at trial that she believed
that the State's taking no position was the extent of the plea bargain. It's
very important that we realize in ruling on what Ms. Richmond thought the plea
bargain was, is that she stated it on record, and it's what she thought at the
time she testified was the deal..." (T.P. 794, 1-9; 796, 12-13 & 15-16; 797,
1-4). But, the record is devoid of any such testimony from Richmond. (T.P. 752,
24-25; 753). Even after defense counsel placed the transcripts before the Court
a second time. (T.P. 796, 1-8). Which proved three things, (1) there was a
non-disclosed plea agreement that was not in the record, (T.P. 794, 18-20) (2)
neither Richmond nor the State ever disclosed it in time for trial, and (3) the
State admitted to its existence and some of the details at the Motion for New
Trial hearing before the two week continuance. Then the Court further denied
Petitioner Due Process by not permitting Richmond to testify when it held,
"There was another plea bargain. But it's simply not in the record, so I am not
going to allow her to testify." (T.P. 794, 18-20). Of course it was not in the
trial record, that is why it was raised in the Motion for New Trial hearing as
"newly discovered evidence," but it was in the Motion for New Trial record by
the State's own admission (T.P. 767, 2-9) which was pointed out to the Court on
several occasions (T.P. 769, 1-2 & 7-8; 797, 5-8 & 12-14). The Court's
determination was unreasonable because the Court continually stated what
Richmond believed rather than allowing her to testify. By that time Richmond had

already been sentenced thus collecting on the agreement and the State had no more inducement power over her. The Court's final decision was in direct conflict with the evidence before it which denied Petitioner of a fundamentally fair hearing, reliable determination of the facts, Due Process, and "...resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented..." 28 U.S.C. 2254(d)(2).

**MATERIALITY**

The plea bargain was material because it was impeachment evidence affecting the credibility of the State's key witness and only witness implicating Petitioner. The State, through detectives' testimony, continually and falsely sought to vouch and bolster Richmond's credibility and verity throughout trial (as fully set forth in the Sixth Ground for Relief). Therefore, the need for disclosure of evidence affecting her credibility and the reliability of her testimony was even more critical. Because, "Material evidence required to be disclosed includes evidence bearing on the credibility of government witnesses." Carriger v. Stewart, 132 F.3d 463, 479 (9th Cir. 1997)(quoting United States v. Bagey, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380 (1985). Because, "The need for disclosure is particularly acute where the government presents witnesses who have been granted immunity from prosecution in exchange for their testimony. ...criminals who are rewarded by the government for their testimony are inherently untrustworthy, and their use triggers an obligation to disclose material information..." Carriger, at 479.

Richmond was neither charged in conjunction with causing the injury as she had confessed, nor for causing the death through her 12 hour delay in seeking medical treatment which turned out to be the actual cause of death. Therefore, Richmond received immunity from the other five counts of the indictment that Petitioner was charged with. At the end of trial was when the evidence was introduced that proved Richmond was granted immunity. The State presented expert testimony who established her son died of "Respiratory Distress Syndrom or shock lung." (T.P. 578, 13-14). The longer you wait before seeking medical treatment the more sever the problem will be. (T.P. 578, 5-7). His lungs became "so edematous and so full of fluid" which "was the reason he died, in actuality." (T.P. 578, 21-23; 583, 12-13). Her son possessed a 65 percent chance of survival (T.P. 575, 20-21) had he received immediate medical treatment, but this plummeted to ten (10) percent (T.P. 579, 15-16; 577, 9-13) due to her 12 hour delay. Therefore, it was this 12 hour delay in seeking medical treatment that

-39-

"actually" caused the death because he possessed a 65 percent probability of
living which is significantly high compared to ten (10) percent. It is
indisputable that she delayed obtaining medical treatment for her son for 12
hours (T.P. 15, 1-17). But, to enforce her immunity deal the prosecutor
presented false testimony at her plea hearing, "Judge it is important to note
that after this burn was administered to Matthew Richmond, basically the dye was
cast in terms of him dying. Her failure to seek medical treatment after the burn
was administered would not have changed what would have happened to him.
However, the resultant suffering by Matthew was a result of this charge is the
reason she was charged in this." (T.P. 15, 18-25; 16). The State continually
testified that there was absolutely no evidentiary support for this position,
(T.P. 86, 11-14; 90, 6-14; 91, 1-25) and the State knew her son died from the
lung damage caused by her 12 hour delay (T.P. 744, 2-10) because prosecutors
spoke to their expert witness "a number of times." (T.P. 743, 18-19). Which
demonstrates that they knew what Dr. Warden was going to testify to. The State
admits on record that the basis for the involuntary manslaughter charge against
Petitioner was the 12 hour delay, (T.P. 650, 19-25) and in the State's "RESPONSE
TO DEFENDANT'S MOTION FOR NEW TRIAL" (P. Exhibit Q) the State rigorously argues
that it possessed absolutely no evidence to support its statement  that the 12
hour delay did not cause the death. This is evidence that the State's position
at trial was that the 12 hour delay caused the death because it was the basis of
Petitioner's involuntary manslaughter charge, and it is evidence that Richmond
was granted immunity because, in addition to delaying medical attention, she
continually and repeatedly made confessions as to being solely and independently
responsible (T.P. 42; 403, 13-15; 404; 408; 463, 10-16; 468, 8-9; 485, 2-7; 487,
3-6; 490, 12-16). First, on the 911 call (T.P. 403, 13-15; 503, 12-17) then to
the Captain of the Fire Department upon arrival to the residence (T.P. 439) then
to a doctor, Chaplain, and Child Service Investigator upon arrival at the
hospital (T.P. 408) then to detectives numerous times after waiving her Miranda
rights three (3) times. And, Richmond deliberately delayed seeking medical
treatment controlling when, where, and how, (T.P. 424, 5-18; 425; 427; 491,
7-14; 549, 8-19). Richmond was a college graduate (T.P. 344) and had been a
mother for over 12 years; therefore, she knew what she was doing, and Petitioner
had only known her for a month (T.P. 417, 22-24) thus possessing no authority
over Richmond or her decisions concerning her son because she was her son's sole
legal guardian. (T.P. 345). But, she was not charged for causing the injury that
she continually and repeatedly confessed to, nor charged for causing the death

-40-

due to her 12 hour delay. Therefore, it is indisputable that she was granted
immunity. The State cannot even argue that they did not grant her immunity.
Nevertheless, Richmond was the State's key witness. The whole case came down to
whether she was telling the truth or was testifying to evade responsibility and
additional charges, and attempting to obtain the probation that she was aware of
(T.P. 11, 7-11), or a nominal prison sentence. "The jury's estimate of the
truthfulness and reliability of a given witness may well be determinative of
guilt or innocence," Carriger, at 481, and "...evidence is material if it might
have been used to impeach a government witness, because 'if disclosed and used
effectively, it may make the difference between conviction and acquittal.' "
Carriger, at 481. Additionally, the Supreme Court has "consistently recognized,"
that, "...a co-defendant's statements are presumptively unreliable as to the
passages detailing the defendants conduct or culpability because those passages
may well be the product of the co-defendant's desire to shift blame, ... curry
favor, ... or divert attention to another." Lee v. Illinois, 476 U.S. 530, 544,
106 S.Ct. 2064 (1986). Therefore, Richmond had a plea bargain and several
promises made by the State, and it was material to guilt or innocence, and
Petitioner was denied Due Process due to its non-disclosure and the Court's
unreasonable determination of the facts in light of the evidence presented.

### EVIDENCE OF CAUSE OF DEATH

[2] The State withheld the evidence that Richmond's 12 hour delay in seeking
medical treatment for her son is what actually caused the death.

Defense counsel was mislead prior to trial when the prosecutor presented
false testimony at Richmond's plea hearing, that, the 12 hour delay in seeking
medical did not contribute or cause her son's death (T.P. 15, 13-23). Then
prosecutor's reaffirmed this evidence during a pre-trial hearing (T.P. 86,
16-20; 87, 11-14). Then all of a sudden at the end of trial, after it was to
late for trial counsel to incorporate it into the entire trial strategy, the
State presents the evidence that it was this 12 hour delay that caused the
death, "in actuality," because it caused irreversible damage to the lungs and
this is what he died of, in "all actuality." At the end of trial the State
presented expert testimony who established her son died of "Respiratory Distress
Syndrom or shock lung." (T.P. 578, 13-14). Who testified the longer you wait
before seeking medical treatment the more sever the problem will be. (T.P. 578,
5-7). His lungs became "so edematous and so full of fluid" which "was the reason
he died, in actuality." (T.P. 578, 21-23; 583, 12-13). Her son possessed a

-41-

65 percent chance of survival (T.P. 575, 20-21) had he received immediate medical treatment, but this plummeted to ten (10) percent (T.P. 579, 15-16; 577, 9-13) due to her 12 hour delay. Therefore, it was this 12 hour delay in seeking medical treatment that "actually" caused the death. This was material because it was Richmond's delay not Petitioner's. Richmond deliberately and intentionally delayed seeking this medical treatment controlling when, where, and how (T.P. 424, 5-18; 425, 1-16; 427, 1-18; 491, 7-14; 549, 8-19). Petitioner had only known Richmond for about a month (T.P. 417, 22-24) and had only lived with her for two weeks (T.P. 545, 10-14). Richmond testified that "Ron Evans" (T.P. 345, 19-25; 346) was the only individual who ever served in the capacity of father. Therefore Petitioner possessed no authority over Richmond, her son, or Richmond's decisions because Richmond was sole legal guardian of her son and her fiance' "Ron Evans." Which were the only two who ever possessed any authority in the equation. Nevertheless, Richmond is a college graduate (T.P. 343, 24-25; 344) and a mother for over 12 years; therefore, she knew what she was doing and was sole authority in the equation.

### EXPERT WITNESS PRETRIAL REPORT

[3] Ohio Rules of Evidence 705 required disclosure of underlying facts or data prior to rendition of expert witness opinion. Defense counsel filed a Motion for Discovery specifically requesting any expert, scientific, or otherwise any pertinent facts pertaining to any expert witness testimony. The State failed to disclose any such information which resulted in surprise expert testimony which was inadmissible, highly inflammatory, and therefore prejudicial denying Petitioner Due Process because he was denied opportunity to have admissibility determined outside of the hearing of the jury.

The State's expert witness Doctor Warden presented surprise testimony that Richmond's son had to have been held in this tub of water (T.P. line 22) and the State relied heavily upon it in closing. (T.P. 706, 4-5; 610, 8-9; 624, 17-25). This was extremely prejudicial for the jury to hear that he had to have been held in this tub of water when there is absolutely no evidence corroborating it, and it was contrary to the evidence on record. Richmond's son was mentally retarded and had a seizure disorder described as a blank stare (T.P. 347, 16-25; 348; 304, 17-25; 305; 307, 13-20) and was heavily medicated (T.P. 307, 13-20; 308, 9-10). Therefore, the doctor's testimony was in direct conflict with the actual evidence which renders the State's use of it in closing false and misleading and prejudicial. The Doctor failed to present evidence that his

statement was accurate and reliable through the presentation of evidence, facts, or data, or, that, the testimony was the product of reliable "principles and methods," and "the witness has applied the principles and methods reliably to the facts..." and based his opinion on them which denied Petitioner Due Process. The testimony was purely speculation and highly prejudicial. The doctor neither stated his opinion in terms of probability, nor with any degree of medical certainty, nor did he apply or present any principles, methods, facts, or data because he testified that he was not aware of the seizure disorder or medications Richmond's son had. (T.P. 588, 348, 2-4). And, he was obviously not aware of the effects of the combinations of medications and mental disabilities that impair motor function. Therefore, the holding testimony was not reliable enough for the State to be able to justify making the statements to the jury that "we know he was held" because the statement was an unsubstantiated assumption (T.P. 574, line 19) not evidence. Petitioner was denied the opportunity to pursue limitations on the expert testimony regarding any inadmissible and inflammatory matter pursuant to Evid.R. 103, 104, and 403, and, therefore, was denied preparation of trial strategy which is a denial of Due Process. The highly inflammatory nature and prejudicial effect of the unsubstantiated accusation denied Petitioner of a fundamentally fair trial in violation of Due Process.

The unsubstantiated accusation had absolutely no evidentiary support in the record and was contrary to other evidence; therefore, it was unreliable, prejudicial, and should have been excluded. Even the Doctor's burn chart (P. Exhibit H; [T.P. 567, 16-25; 568 State's exhibit No. 9] or [T.P. 585, 1-9 State's exhibit No. 7]) established this unsubstantiated holding theory to be unreliable for re-presentation to the jury in closing because it is evidence of nothing. The chart shows it would only take "one to five seconds" for the injury to have occurred at the temperature that it was presented as being at the time of the injury, "140 degrees." (T.P. 519, 6-11). An individual his size and weight (T.P. 350, 23-24) who was fair skinned and bruised easily (T.P. 332, 19-20) would have been instantly burned which supports an accidental injury rather than holding and fully supports Richmond's confessions. Richmond's son's mental conditions and medication would have had a great impact on his coordination, motor function, reflex speed, and ability to simply jump out in less than one to five seconds. This would have also had a great impact on the jury's determination. Therefore, the unsubstantiated holding theory was contrary

to the evidence that the Doctor should have been aware of prior to his presentation of such a prejudicial testimony. The Doctor obviously did not properly inform trial counsel during counsel's investigation because that statement should have been the subject of extreme debate. Nevertheless, defense was not provided with the information forming the basis for the Doctor's highly prejudicial unsubstantiated accusation, neither prior to trial, nor at trial. And, the presentation of it at trial and during the State's closing argument was extremely prejudicial denying Petitioner of Due Process because expert testimony is given such great weight and the statement was to unreliable to establish the holding theory as a reasonable fact for the State to rely upon. Most importantly, trial counsel specifically made that request in the discovery motion and it was ignored by the State.

(VI) SIXTH GROUND FOR RELIEF:

THE STATE KNOWINGLY PRESENTED FALSE, PERJURED, AND VOUCHING TESTIMONY IN VIOLATION OF PETITIONER'S DUE PROCESS.

### FIRST FALSE AND MISLEADING TESTIMONY

Detectives knowingly presented false vouching testimony when he testified:

(a) "Sharon Richmond never stated that she caused these injuries to Matthew Richmond." (T.P. 493, 16-17);

(b) "She never stated she had anything to do with these injuries." (T.P. 494, 24-25);

(c) "She consistently stated, I have done nothing wrong." (T.P. 493, 2-3);

(d) "...she never said that she did it." "...we believed her. We believed those statements." (T.P. 503, 18-19 & 24-25).

Detectives knew this was false because Richmond did, in fact, continually and repeatedly confess to being solely and independently (T.P. 42) responsible for the injury. (T.P. 403, 13-25; 408, 1-10; & 15-25; 410, 3-25; 426, 4-10; 485, 4-7; 487, 4-11; 490, 14-16). Then Detectives took Richmond to the residence where she had shown them what she had done. (T.P. 468, 8-10; 485, 1-7; 487, 3-6; 490, 12-16; 491, 7-14). Richmond told detectives that she was solely and independently responsible, that, "I am an independent person, I have a brain, and I can make these decisions on my owne." (T.P. 424, 5-18; 425, 1-16; 427, 1-18; 491, 6-16; 549, 8-19). Therefore, she was solely and independently responsible because she continually and repeatedly confessed to being responsible after waiving her Miranda rights three (3) times (P. Exhibit G, pgs. 1 through 3). Which render her confessions trustworthy and reliable. Detectives

-44-

also <u>knew</u> that Richmond had continually and repeatedly maintained, throughout the day, that she was the individual <u>solely</u> giving the bath at the time the injury occurred (T.P. 503, 12-17). First, when she called 911 emergency at 9:34 am (T.P. 403, 12-25; 404, 1-6) then to the Captain of the Fire Department upon his arrival to the residence at 10:00 am (T.P. 435, 12-14; 439) then to doctors, the Chaplain, and Child Services Investigator upon arrival at the hospital (T.P. 408) then she confessed to detectives at Shriners Burn Inst. at approximately 2:30 pm (T.P. 463, 6-7; 409, 20-25; 410; 490, 14-25 [see P. Exhibit G, pg. 1, 1st. Miranda waiver 1447 hours]) then upon arrival at CIS headquarters at 4:30 pm (T.P. 467, 14-25; 468) then she was taken to the residence where she showed detectives what she had done as stated above, then she was returned to CIS headquarters where she continued to maintain that she was solely and independently responsible at approximately 7:00 pm (T.P. 486, 8-25; 487 [see P. Exhibit G pg. 2, 2d, Miranda waiver 1915 hours]) after waiving her Miranda rights three (3) times throughout the investigation and detectives knew it. Richmond had been in police custody from approximately 3:30 (T.P. 426, 19-24) and maintained responsibility until about 9:30 pm (T.P. 426, 11-14; 490, 23-25; 491; [see P. Exhibit G pg. 3, 3d Miranda waiver 2127 hours]) continually and repeatedly confessing. Therefore, detectives <u>knowingly</u> and intentionally presented false testimony to the jury which was calculated to mislead the jury, severally invading the province of the jury's determination, inducing the jury to defer to the detectives' decision which was not a position based on any fact. The jury was not permitted to weigh the evidence, they had it weighed for them then dictated to them what the it was. Rather, what the State wanted the outcome to be. The fact is that Richmond continually and repeatedly gave knowing and voluntary highly detailed confessions. Detectives knew of all the confessions that Richmond repeatedly gave before she was in their custody, (T.P. 503, 12-17) and they knew this places responsibility for the injury upon her because confessions of this magnitude, this heavily detailed, without any grant of immunity of any kind, is a strong indicator of reliability. "The fact that a confession is made without the grant of immunity and overwhelmingly against the individuals penal interest 'is a strong indicator of reliability.' " Carriger v. Stewart, 132 F.3d 463, 475 (9th Cir. 1994); "...[b]ecause confessions carry 'extreme probative weight,'..." Smith v. Zant, 887 F.2d 1407, 1435 (11th Cir. 1989). The jury was not permitted to calculate that weight it was calculated for them.

Richmond's statements implicating Petitioner were simply recanted confessions. Even Appellate Courts "...on direct review, look upon recantations with extreme suspicion." Carriger, at 483 n.1. Richmond was sole legal guardian, solely responsible for the care of her son, and she would not have given such lengthy detailed confessions for such a sever injury had she not been responsible, and she testified that she was fully aware of the severity of the injury from the onset. (T.P. 393, 10-25; 394; 395; 523, 5-17). To make her statements implicating Petitioner even more unreliable, is the fact that she delayed seeking medical treatment then lied about when the injury occurred (T.P. 495, 11-16) and she lied about how she filled the tub with water (T.P. 487, 12-25), and detectives knew that her statements implicating Petitioner were lies. (T.P. 543; 544; 545). Furthermore, Richmond continually and repeatedly told detectives that Petitioner was not there at the time the injury occurred (T.P. 42) which she would not have done had she not been solely responsible. Prejudice occurred because the jury obviously relied upon detectives' false testimonys, that, Richmond never said that she had anything to do with the injury, which is obvious or they would not and could not have found Petitioner guilty. They could not have found Petitioner guilty of complicity because Richmond was not charged with causing the injury nor the death; she was charged for, "...the resultant suffering by Matthew as a result of this charge is the reason she was charged in this." (T.P. 15, 24-25; 16).

Detectives add force to Richmond's recantation testimony implicating Petitioner; their testimony (a), (b), and (c) was not only false and misled the jury, but it was inadmissible vouching and opinion testimony. "...the city's police department represents the state no less than the prosecutor's office..." "...and the taint on the trial is not less if police, rather than the state's attorney are guilty of misrepresentations." State v. DeFronzo, 59 Ohio Misc. 113, 120, 394 N.E.2d 1027, 1032 (1978)(citing Barbee v. Warden, 331 F.2d 842 (C.A. 4, 1964). Petitioner was prejudiced by the false vouching opinion testimony by detectives because the jury obviously prescribed an incorrect weight to Richmond's recantations implicating Petitioner. Their testimony was an inadmissible expression of belief inducing the jury into deferring to the opinion of the detectives', that, Richmond did not make any confessions, which is akin to opinion of a prosecutor "...is apt to carry great weight in the minds of the jurors when it should properly carry none." United State v. Berger, 295 U.S. 78, 55 S.Ct. 629 (1935). Thus, Petitioner was prejudiced and denied Due

-46-

Process according to Augers v. United States, 427 U.S. 97, 96 S.Ct. 2392 (1976).

<u>SECOND FALSE AND MISLEADING TESTIMONY</u>

Detectives knowingly presented false vouching testimony when they testified:

(a) "We spent a lot of time trying to make absolutely sure nothing like that could have happened." (T.P. 492, 20-23; 493, 22-23);

(b) "...there was [no way] the injuries occurred as she showed us." (T.P. 487, 12-15);

(c) "...that the injury to Matthew sustained was an immersion burn and not a splash burn. That it couldn't have happened that way..." (T.P. 525, 8-10);

(d) And, they confronted Richmond with this information and "At that time she decided to tell the truth." (T.P. 525, 19-20);

(e) "...we know the injuries didn't occur as she had originally told us." (T.P. 477, 8-9).

[a] The detective's testimony that they spent a lot of time trying to make sure that absolutely nothing like what Richmond demonstrated could have happened was extremely false and misleading because, in fact, their investigation, the testing of the water, was extremely faulty, therefore they did not conduct a thorough investigation, and none of them possessed any specialized expertise, education, or training to be able to conduct an accurate and reliable investigation. First, the testing of the water only lasted for five (5) minutes (T.P. 547, 1-11). They failed to conduct pertinent tests to make pertinent determinations as to whether or not it could have happened the way Richmond demonstrated. (T.P. 540, 19-25; 541, 1-10; 546, 12-25; 547; 548; 549, 1-2 & 24-25; 550, 1-11). This detective testified that he was not even involved in the water tests (T.P. 483, 21-23; 485, 8-25; 486, 1-6; 489, 7-13) therefore he lied when he testified that he spent four hours testing the water to make absolutely sure that it could not have happened the way Richmond confessed. And, he knew he lied. The detectives were only at the residence or about an hour (T.P. 486, 8-14) which is obviously not three or four hours, and is not enough time to make absolutely sure that it could not have happened the way Richmond confessed. Most importantly, none of the detectives possessed any forensic, specialized training, or education to enable them to render an accurate reliable determination of this nature because that would require an expert in the field, possibly a doctor like Doctor Warden. Therefore, their testimony amounts to lies about a fabricated experiment with a meat thermometer. (T.P. 519, 6-11). This self created experiment did, in no way, render a reliable determination or

substantiate any facts other than the water heater in the apartment was set to make the water a 140 degrees. The detectives verified nothing about whether or not the injury could have occurred the way Richmond confessed because this self fabricated experiment did not prove anything other the water may have been 140 degrees coming out of the tap on that particular day which renders their entire testimony a false fabrication calculated to mislead the jury in pertinent facts. Realistically, the injury could not have occurred by filling the tub with water and holding Matthew in it. That would have been impossible under the particular set of circumstances that exist in that apartment with that tub and hot water heater because that water heater does not make water over 90 degrees. The land lord even stated this fact. But, Petitioner did not have to prove his innocence. He was assumed innocent until proven guilty beyond a reasonable doubt and these detectives' little water testing experiment was incompatible to the events that caused the injury at the time of the injury. Additionally, if detectives believed that Richmond was lying about the way she filled the tub or any other facts, that is indisputable evidence that she was merely making self-protective statements thus lying to evade responsibility. It does, in no way, render her confessions incompatible with the nature of the injury.

[b, e] The detective falsely testified that the injury could not have happened the way Richmond demonstrated, but he knew this was false because he knew from doctors that the injury was an immersion burn, (T.P. 525, 6-11; 544, 18-22) and he knew that Richmond never said she caused the injury by spraying. (T.P. 51, 6-11; 539, 12-16). He knew Richmond was saying that she, "...found him in a pool of water..." (T.P. 487, 7-8; 513, 16-22; 540, 1-5; 523, 10-11) with an "expressionless face." (T.P. 513, 21-22; 523, 10-11; 540, 7-8). Which is both consistent with the nature of the injury, "immersion," and consistent with her son's seizure disorder described as a, "blank stare." (T.P. 347, 19-25; 348; 304, 17-25; 305; 307, 13-20). And, detectives knew about the seizure disorder. (T.P. 540, 16-19 & 15-18). Therefore, detectives knew that the way Richmond demonstrated could very well have been the way the injury occurred. (T.P. 487, 19-25). Detectives also knew that Richmond's statements implicating Petitioner were lies. (T.P. 543; 544; 545). They also knew Petitioner was not there at the time the injury occurred. (T.P. 42). Therefore, the detective knew his testimony (a, and b) was a lie. And, this makes Richmond an even more likely suspect considering she just spent the earlier 15 hours confessing.

[c, d] The detective presented false testimony that they suddenly learned

-48-

from doctors that the injury was an immersion burn and not a splash burn, and
they confronted Richmond with this information which caused her to suddenly
recant her confessions and tell what they called "the truth." (T.P. 525). This
was a false fabrication and the detective knew it because he could not even
remember the lie that he just told and turned around and testified that Richmond
never said anything about spraying (T.P. 539, 12-13; 51, 1-11) and the issue of
spraying never even occurred to them that evening (T.P. 539, 10-18) at least
until Richmond recanted her confessions to divert full blame to Petitioner, but
detectives knew her statements implicating Petitioner were lies (T.P. 543; 544;
545) at least within the days following. Therefore, Richmond was not saying that
she caused the injury by spraying, and she could not have recant her confessions
based upon that information that they did not even possess that evening because,
in fact, there was never even a conversation with the hospital personnel that
evening about whether or not the injury was from being immersed (T.P. 539,
22-25) this conversation did not even occur until the next day or so. (T.P. 541,
12-17). Additionally, the detectives could not have confronted Petitioner with
any medical evidence either to cause him to make the alleged admission that
evening (T.P. 480, 24-25; 481, 1-4) because they possessed no such medical
evidence that evening. This was all false testimony fabricated by these
detectives and the record proves it beyond a reasonable doubt. The truth finding
process did not even find its way into that Court Room at that trial. It is
obvious the jury relied upon the false fabrications because if they did not; the
jury would not and could not have found Petitioner as being the individual
responsible for causing the injury and death. The false testimony at (T.P. 525)
mislead the jury into believing that detectives possessed medical information
that they did not possess, and, that, this information persuaded Richmond and
Petitioner to "tell the truth." And, the prejudicial effect was compounded by
the State's use of it on appeal which mislead the Court of Appeals into making a
decision based upon false testimony. The Court of Appeals held, that, "It was
not until the seriousness of Matthew's injuries became evident to her that
Richmond implicated Klein." (R. Exhibit 22, pg. 7, para. 3). Which possessed
absolutely no evidentiary support at all because Richmond herself testified
while viewing the photos of her son's body that she was fully aware of the
severity of the injury from the onset. (T.P. 393; 394; 395). The State never
possessed a leg to stand on with that averment because it is contrary to and in
direct conflict with the evidence on record which constitutes continual

-49-

falsification of evidence to a court and continual deprivation of Due Process of law and in direct violation of clearly established United States Supreme Court precedent, Agurs v. United States. The State conducted vouching exercises throughout the trial to give Richmond's statements implicating Petitioner validity which those statements never possessed. Even the State's admission (T.P. 543; 544; 545) did not cure the prejudicial effect of all the false vouching testimony that occurred.

### THIRD FALSE AND MISLEADING TESTIMONY

THE STATE KNOWINGLY PRESENTED FALSE AND MISLEADING EVIDENCE TO THE COURT AT THE SUPPRESSION HEARING AND AT TRIAL THROUGH THE DETECTIVES AND RICHMOND'S TESTIMONY.

Landseberg, Answer: "Yes, sir. Ms. Richmond had recovered notes that was hanging on the door." (T.P. 47, 12-18);

Prosecutor, Question: "Officer, if I can show you two, 3X5 cards marked on the back State's Exhibit 1, Can you identify those?" (T.P. 47, 16-18);

Landesberg, Answer: "These are the note cards. They were in an envelope that was given to me by Sharon Richmond." (T.P. 47, 19-20);

Prosecutor, Question: "Those were on the door of the residence?" (T.P. 47, line 21;

Landesberg, Answer: "That's correct." (T.P. 47, line 22).

Then at trial Richmond allegedly  obtained the alleged apology note from the mailbox, in a white envelope, written on 3X5 inch index cards (T.P. 400) and she allegedly turned this over to Detectives on the evening of January 2, 1999, when she was returned to the residence at the time of Petitioner's arrest, (T.P. 401) but the police search warrants and inventory lists attached demonstrate that the State's attorney knowingly solicited false testimony from both the detectives at the suppression hearing and from Richmond at trial. Since, the detectives wrote the information in the search warrants and inventory lists and the prosecutors possessed those documents which possess a time stamp from the court then it is indisputable that this was knowing presentation of a false fabrication by the state's authorities.

Detectives executed two search warrants. The first on January 3, 1997, (P. Exhibit I, pgs. 1 & 2) and the second, on January 8, 1997, (P. Exhibit I, pgs. 3 & 4). (see also T.P. 546, 17-25). The January 8, 1997, search warrant itself attests to where the "note" in the envelope came from, it came from the Kitchen trash (P. Exhibit I, pg. 3) along with its inventory lists attached, and the

January 3, 1997, search warrant's inventory list demonstrates that this "note" could have been found in the kitchen trash on that date too. (P. Exhibit I, pg. 2, line #9). The "note" itself (P. Exhibit I, pg. 5) possesses the detective's writing and bears the following, ("1/8/97- 297 Kitchen - Trash"). The 297 is an item number used by detectives to record this piece of evidence. Petitioner could not have placed that "note" in the "white envelope" in the "kitchen - Trash" at any time after the injury occurred which was allegedly January 1, 1997. Because, Petitioner left for work at 8:00 am on January 2, 1997, (T.P. 387, 21-25; 388). Richmond paged Petitioner at work and Petitioner came to the hospital from Trenton Ohio which is over a hundred miles away. (T.P. 404, 7-25; 405). By the time Petitioner arrived at the hospital Richmond had already confessed to the doctor, Chaplain, Child Services Investigator, and Detectives on tape after waiving Her Miranda rights. (T.P. 463, 464, 9-16; 513, 16-25). Richmond and Petitioner were taken to CIS headquarters and Petitioner was left out in the lobby until approximately 7:30 pm that evening. (T.P. 481, 18-25; 482, 20-21; 470, 5-8. Then Petitioner went back to the residence for the first time that day, but detectives had already been there with Richmond around 5 or 6 pm (T.P. 515, 6-8) so she could demonstrate what she had done (T.P. 485, 1-7) while Petitioner waited in the lobby, (T.P. 467, 24-25; 468; 481, 19-25). Petitioner had not been in the residence because the doors were bolted shut and there was yellow police tape taped to the residence with big bold lettering that said, "POLICE LINE-DO NOT CROSS." This is evident that Petitioner was unable to gain entry because when detectives returned a second time with Richmond at about 11:00 pm, (T.P. 473, 1-2)  Petitioner was out in the driveway (T.P. 473; 474, 21-23) and not barricaded in the residence and was unable to gain entry himself because, as it is logical to infer, detectives considered it a crime scene and secured it by changing the locks and draping yellow police tape around the building which is fundamental police procedure under such circumstances since they intended to obtain search warrants and return. The "note" was obviously written at a date earlier than the injury and discarded in the "kitchen - trash" at an earlier date which is the only logical and reasonable conclusion that a rational reasonable mind could deduce. The "note" itself possesses no reference to injury or what it was written about, and the detectives' and Richmond's statements as to its origin were false fabrications calculated to mislead the jury in pertinent facts. The State knew the "note" did not come from the front door or mailbox because detectives wrote the information on the search warrants

-51-

and inventory lists, and prosecutors possessed these documents which attests to
the "note's" origin which was in the "Kitchen – Trash." Nevertheless, the "note"
was not what it was presented to be. This testimony was false, misleading, and
highly prejudicial because it caused the jury to render the wrong inference that
it was an apology from Petitioner for causing the injury and the State knew is
was false.

FOURTH FALSE AND MISLEADING TESTIMONY

At trial, detectives falsely testified that Petitioner said:

(a) "...he was willing to talk." (T.P. 477, 6–7);

(b) "He readily admitted that he caused the injuries to Matthew Richmond."
(T.P. 477, 11–12);

(c) "He said he started to squirt him down with what he thought was a cold
mixture of water, and then Matthew's skin started peeling off." (T.P. 477,
15–17);

(d) "At one point he said he realized the water was hot when some of the
water splashed on him." (T.P. 478, 7–8);

(e) "Richard Klein never denied that he caused these injuries." (T.P. 502,
6–7).

This was false and misleading because Petitioner never made any such
statements. Petitioner was exercising his Fifth Amendment rights at that time,
the right to remain silent, and to have counsel present during the entire
interrogation. This is evident because, first, Petitioner refused to voluntarily
give tape recorded statements, (T.P. 62, 1–3) and refused to voluntarily give
written statements, (T.P. 61, 24–25) and refused to voluntarily sign detectives'
alleged notes of the alleged interrogation. (T.P. 498, 3–10). Therefore, it is
evident that Petitioner was asserting his right to remain silent until counsel
was present, and was, in fact, not making statements at all. This is evident
because if Petitioner was voluntarily offering statements then there would have
been no prohibition against giving taped statements to secure an accurate record
of what transpired, and Petitioner is intelligent enough to have known this.

Detectives had plenty of recording equipment readily available in the room,
(T.P. 32, 13–25) and it is never necessary for police to obtain a suspects
permission to make recordings of interrogations in a police station. And,
detectives had taken several tape recorded statements from Richmond that
evening, (T.P. 490, 17–25) therefore, there was no prohibition about recording.
Detectives failed to write down "verbatim" what was allegedly said, (T.P. 31,

-52-

3-5; 33, 15-18; 35, 13-14; 40, 7-10) and failed to write down or record
accurately anything significant. (T.P. 34, 23-25; 35, 13-14; 50, 3-7 & 14-16;
62, 4-12; 64, 11-15). And, detectives had memory loss because they kept
testifying that they "don't recall" a lot of the interrogation, (T.P. 31, 10-11;
40, 1-2; 493, 10-11; 494, 6-7) and they allegedly only wrote down a page and a
half of illegible notes in a thirty (30) minute interrogation. (T.P. 30, 19-22).
Therefore, detectives reserved themselves the liberty to say anything they
wanted. It is obvious that Petitioner always exercised his constitutional
rights. This is evident from the fact that Petitioner did not testify at trial.
What Petitioner did, in fact, say was, he was not there at the time the injuryy
occurred. (T.P. 42; 464, 9-16). If Petitioner was lying here, the State
possessed the burden of proof that Petitioner was there at the time and that he
caused the injury and that they failed to do.

    The detectives' testimony that Petitioner was refusing to voluntarily give
any statements is of a high probative value because it is an admission against
the State's interests in this case, and it demonstrates Petitioner's desire to
fully assert his Constitutional rights to remain silent and to have counsel at
the interrogation. The State presented no evidence rising to the requisite
standard of proof beyond a reasonable doubt that Petitioner voluntarily gave any
statements other than that he was not there at the time of the injury. Their
admission that Petitioner was refusing to give statements was overwhelmingly
against detectives' interests which is a strong indicator of reliability that
Petitioner was not giving any statements. The record simply does not support
that Petitioner made any inculpatory statements in the wake of the detectives'
admissions that Petitioner was refusing to voluntarily give them. The
detectives' testimony that Petitioner gave inculpatory statements was unreliable
and untrustworthy due to the fact that they continually presented false and
misleading testimony throughout the entire trial. Their testimony does not rise
to the requisite standard of proof beyond a reasonable doubt. Detective's
testimony that Petitioner readily admitted causing the injury loses its force in
light of all the false testimony presented by these detectives because it
renders their testimony questionable, unreliable, and untrustworthy.

(VII) SEVENTH GROUND FOR RELIEF:

### PETITIONER'S ALLEGED ADMISSION

    The State violated Petitioner's Fifth and Fourteenth Amendment rights when
it presented at trial detectives' testimony of alleged statements made by

-53-

Petitioner during interrogation, and Petitioner was denied a fair hearing and
reliable determination of voluntariness. Jackson v. Denno, 378 U.S. 368, 84
S.Ct. 1774, 1781 (1964).

First, the State possessed the burden of proving that Petitioner had made
confessions, and that any statements made were knowingly and voluntarily given.
At the suppression hearing detectives presented evidence that Petitioner was
refusing to voluntarily give tape recorded statements, (T.P. 50, 14-20) and
refused to voluntarily give written statements, (T.P. 61, 24-25) and refused to
voluntarily sign alleged notes of alleged interrogation. (T.P. 497, 20-25; 498,
1-5). Therefore, these totality of the circumstances demonstrate that it was
Petitioner's desire to assert his rights to remain silent until an attorney was
present. A motion to suppress was filed and the Court held a hearing on April
28, 1997 (T.P. 17 through 81).

The only evidence of the totality of the circumstances that have any
reliability or trustworthiness was that Petitioner was refusing to give
voluntary statements. If Petitioner was giving voluntary statements there would
have been no prohibition about giving tape recorded or video taped statements to
secure a verbatim transcript of what actually transpired and of what was said.
The United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct.
1602 (1966) established that "...[any] evidence that the accused was threatened,
tricked, or cajoled into a waiver will of course, show that the defendant did
not voluntarily waive his privilege." at 476, 1629. And, "If the individual
indicates in any manner, at any time prior to or during questioning, that he
wished to remain silent, the interrogation must cease." Petitioner obviously was
refusing to voluntarily give any statements or he would have had them recorded.
And, Petitioner has met his burden of proof established in Miranda of "any"
evidence that he was fully invoking his right to remain silent and have an
attorney present at the time of questioning. The detectives' admissions to the
fact that Petitioner was refusing to voluntarily give statements is proof rising
above this standard. Since, detectives possessed an inability to "recall"
pertinent information from the interrogation, (T.P. 31, 10-12; 40. 1-2; 493,
10-11; 494, 6-7) it is evident that their sudden memory loss works to the
State's detriment because it leaves the absence of accurate evidence to rely
upon. Detectives testified that they did not write down verbatim what was
allegedly said. (T.P. 31, 1-2 & 11-1240, 7-10) and failed to write down anything
of significance (T.P. 34, 23-25; 50, 3-7 & 14-16; 62, 4-12; 64, 11-15). And,

they only wrote down about a page and a half of illegible notes in a 30 to 40 minute period. (T.P. 30, 10-22). Detectives has plenty of recording equipment available, (T.P. 32, 13-25) and it is never necessary to obtain a suspect's permission to record, and the Miranda Court held, "...our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." At, 461-62, 1621. Detectives failed to conduct a meaningful investigation. If they did, Petitioner never would have been arrested in the first instance. They did not even possess evidence rising to the standard of some evidence necessary to establish probable cause to make the arrest because Richmond's statements implicating Petitioner they knew were lies. Nevertheless, the State's failure to collect trustworthy and reliable evidence of what actually transpired leaves the State without proof that out weighs Petitioner's refusals to make statements and it is always in Petitioner's better interests to have any statements recorded to secure an accurate record that is reliable.

## MORE TOTALITY OF THE CIRCUMSTANCES

The alleged admission was inconsistent with the facts as detectives knew them to be. Detectives testified that Petitioner allegedly said that the injury was caused by spraying. (T.P. 504, 16-25). But, detectives knew from doctors, at some point in time, that the injury could not have happened by spraying because they were immersion burns. (T.P. 51, 1-3; 544, 18-25). Therefore, the alleged admission was factually inconsistent with the nature of the injury thus unreliable. Detectives testified that they did not believe Richmond caused the injury because they say the injury could not have happened that way, (T.P. 525; 492, 18-25; 493, 22-23) therefore, they had no reason to believe Petitioner caused the injury since they knew the injury could not have happened that way either. In fact, detectives' testimonies that the injury could not have happened the way Richmond confessed and demonstrated (T.P. 485, 4-7) was false and misleading because he knew she stated she found him in "a pool of water," (T.P. 487, 7-11) with an "expressionless face," (T.P. 513, 21-22) which was both consistent with the nature of the injury "immersion," (T.P. 544) and consistent with her son's seizure disorder, (T.P. 347, 19-25; 348; 304, 17-25; 305; 307, 13-20) and detectives knew it. (T.P. 540, 16-19). Detectives knew Richmond lied about how she filled the tub with water, (T.P. 487, 12-18) and lied about what time the injury occurred, (T.P. 495, 11-12) and lied implicating Petitioner.

-55-

(T.P. 543; 544; 545). And, Richmond never said she caused the injury by spraying, (T.P. 51, 6-10; 539, 12-13) at least not until she diverted blame implicated Petitioner. And, they knew Petitioner was not there at the time of the injury. (T.P. 42; 464, 9-10; 476, 23-24).

### MORE TOTALITY OF THE CIRCUMSTANCES

Richmond's continual and repeated confessions overwhelmingly out weighed Petitioner's alleged admission not only because her confessions were factually consistent with the nature of the injury as stated above, but because she confessed to being solely and independently responsible. (T.P. 42; 464, 9-10; 476, 23-24). And, Richmond voluntarily waived her Miranda rights three (3) time throughout detectives' investigation while she was confessing. (P. Exhibit G, pgs. 1 through 3). Which renders her confessions reliable. Richmond's confessions were tape recorded after she waived her Miranda rights. (T.P. 490, 17-25; 491). Therefore, there is no question as to what Richmond confessed to, and no question that she did so knowingly and voluntarily because it was repetitively without immunity, threat, or coercion of any kind which is a strong indicator of reliability. Richmond did not make only one confession, she continually and repeatedly made the same inculpatory statements throughout the day, (T.P. 503, 12-17) and repeatedly throughout detectives' investigation, (T.P. 485, 1-7; 486, 8-25; 487, 1-6) which is another strong indicator of the reliability of Richmond's confessions. These totality of the circumstances surrounding the investigation demonstrates that detectives had no reason to believe that Petitioner caused the injury because confessions of this magnitude possess an extremely high probative value and by far out weigh the alleged admission that detectives claim Petitioner allegedly made during the course of a 30 minute alleged interrogation (T.P. 30, 17-21). Nevertheless, Petitioner denies ever making any such admission which is evident from the fact that he plead not guilty and went to trial which is a denial of the facts.

### MORE TOTALITY OF THE CIRCUMSTANCES

Richmond's statements implicating Petitioner were merely "recantations" of her confessions therefore subject to great scrutiny as being untrustworthy and unreliable. The fact that she, "...confessed without immunity and overwhelmingly against her own penal interest is a strong indicator of reliability," Carriger v. Stewart, 132 F.3d 463, 475 (9th Cir. 1997)(quoting Williamson v. United States, 512 U.S. 594, 599, 114 S.Ct. 2431, 2435 (1994), and even "Appellate courts on direct review, look upon recantations with extreme suspicion." Carriger, at 483.