There is no evidence that Richmond's trial testimony implicating Petitioner was more reliable than her confessions. The record simply does not support this theory. The state asserted that detectives confronted Richmond with evidence that they had just received from doctors that the injury was an immersion burn and not a spray burn (T.P. 525) and this is what caused her to recant her confessions and allegedly, "tell the truth." But, this fabrication dissipates in the weak of the admission, that, at that time detectives did not possess that information from doctors and. (T.P. 539, 21-25). That conversation did not even occur until the next day, (T.P. 541, 12-17) and Richmond was not saying that she caused the injury by spraying. (T.P. 539, 10-14; 51, 1-11). This is the evidence of the totality of the circumstances. It is obvious that detectives' cannot be relied upon to present truthful testimony about anything. Therefore, their testimony about what Petitioner allegedly said is not evidence. Nevertheless, Richmond's confessions are by far more reliable than her statements implicating Petitioner and more reliable than detectives' testimony implicating Petitioner. Therefore, the State failed to present any evidence of what was actually said at this alleged interrogation other than admissions by detectives against the State's interest, that, they knew Petitioner was not there at the time the injury occurred and they possessed indisputable evidence of it, (T.P. 42; 464, 9-10; 476, 23-24) and they admited Richmond's statements implicating Petitioner were lies. (T.P. 453; 544; 545).

## MORE TOTALITY OF THE CIRCUMSTANCES

When Petitioner was first interviewed by detectives as Shriners Burn Inst., Petitioner told detectives that he was not there at the time the injury occurred (T.P. 23, 19-25; 24; 464, 9-10; 476, 23-24) which was corroborated by Richmond's confessions that Petitioner was not there. (T.P. 42, 8-11). Which render Petitioner's alleged admission merely a recantation of the earlier statement; thus, rendering the alleged admission unreliable. Petitioner's statements at Shriners were indisputably more reliable and corroborated. It is indisputable that detectives immediately investigated Petitioner's alibi and verified it for both January 1, 1997, and January 2, 1997, because Petitioner was not a suspect. (T.P. 481, 19-25; 539, 3-5). This is why he was made to wait in the public lobby. Therefore, the alleged admission allegedly made in the 30 minute interrogation (T.P. 30, 15-22) was unreliable, untrustworthy, and its admission at trial was prejudicial "[b]ecause confessions carry 'extreme probative weight,' the admission of an unlawfully obtained confession is rarely harmless

-57-

error," Smith v. Zant, 887 F.2d 1407, 1435 (11th Cir. 1989), and " '...if upon
its reading of the trial record, ... the evidence of guilt was so overwhelming
that the trier of fact would have reached the same result without the tainted
evidence, then there is insufficient prejudice to mandate the invalidation of
the conviction.' " Cape v. Frances, 741, F.2d 1287, 1294 (11th Cir. 1984). There
was no evidence of guilt at all due to the fact that the only evidence presented
to demonstrate guilt was Richmond's testimony implicating Petitioner which the
State had already admitted were lies (T.P. 543; 544; 545) and the detectives'
testimony vouching and bolstering Richmond's testimony implicating Petitioner
and detectives' false testimony asserting the alleged admission.

The United States Supreme Court held, "...it was unconstitutional for a
court to prevent a defendent from challenging the credibility of his confession
by excluding all evidence of the circumstances under which the confession was
made," Crain v. Kentucky, 476 U.S. 683, 106, S.Ct.2142 (1986); Likewise, it is
therefore unconstitutional for the State to prevent Petitioner from challenging
the credibility of the alleged admission by not recording it to preserve it for
use at trial, that way there was no question as to what was said and actually
meant. Detectives' false testimony between the suppression hearing and trial
renders their testimony concerning the alleged admission even more unreliable.
Detectives' testified, that, Petitioner, "...readily admitted causing the
injuries..." (T.P. 477, 11-12) and "...Richard Klein never denied that he caused
these injuries..." (T.P. 502, 6-7) which was false because they testified at the
suppression hearing that both Richmond and Petitioner stated that Petitioner was
not even there at the time the injury occurred, (T.P. 42; 464, 9-10; 476, 23-24)
in addition to Petitioner refusing to voluntarily give written, tape recorded,
or verbal statements without the presence of an attorney. Petitioner denies ever
making any such admission but he did not have to prove this the State possessed
the burden of proof, and, that, the State failed to do. Therefore, it was
unconstitutional for the State to prevent Petitioner from challenging the
credibility of the alleged admission by excluding most of the evidence of the
circumstances under which the confession was made by its failure to render
recordings of what was actually said or to supply the presence of an attorney.
Harpster v. Ohio, 128 F.3d 322, 329 (6th Cir. 1997). Since, "...there is no
suggestion that different "arms" of the government are severable entities,
particularly when they are closely connected," United States v. Dutsch, 475 F.2d
55, 57..." and "...the city's police department represents the state no less

-58-

than the prosecutor's office, and the taint on the trial is not less if police, rather than the state's attorney, are guilty of misrepresentations. Barbee v. Warden, 331 F.2d 842 (C.A. 4, 1964)," State v. DeFronzo, 59 Ohio Misc. 113, 394 N.E.2d 1027, 1032, then the State's failure or the Detectives' failure to provide evidence of the circumstances surrounding the interrogation is also unconstitutional if they intended to use the alleged admission at trial because detectives represent the state equally. Petitioner was denied of a fair and reliable determination of whether or not he actually said what detectives alleged which did not adequately protect Petitioner's enumerated rights. Petitioner possessed a "...Constitutional right at some stage in the proceedings to object to the use of the confessions and to have a fair hearing and reliable determination on the issue of voluntariness..." Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 1681 (1964), but he was denied, by the State, the evidence of what actually transpired at this alleged interrogation because the detectives failed to disclose it. Therefore, the detectives' failure to collect and provide the evidence of the circumstances surrounding the interrogation deprived Petitioner and the State of critical evidence to establish voluntariness and reliability of the alleged admission; therefore, the State failed to establish with reliable evidence that Petitioner ever made any such admission. But, provided enough to establish that Petitioner was refusing to make statements outside of the presence of an attorney which meets the standard required by the Miranda Court of "any evidence" ... "will of course show that the defendant did not voluntarily waive his privilege." Miranda, at 476, 1629. Because, the State's failure to produce more than the fabrications from detectives is the decimal equivalent of withholding the evidence because they possessed more than adequate opportunity to render video recordings from the camera on the car that they transported Petitioner from the residence in, and to either tape record or video tape the alleged interrogation itself because there was a camera already mounted to the wall in the interrogation room. Therefore, the question is not why did they not record the interrogation, the real question it where are the videos from those cameras or who turned the camera off in the car and in the interrogation room. Nevertheless, it is more than a reasonable inference that Petitioner would not have been refusing to make written or tape recorded statements to secure the evidence if he was voluntarily giving such statements. And, when do the police need a suspects permission to tape record an interrogation in the first instance.

-59-

## MORE TOTALITY OF THE CIRCUMSTANCES

As trial counsel pointed out in the suppression hearing and trial, detectives could not have arrested Petitioner at the residence (St. Catherns Place) and drove all of the way back to CIS and began the interrogation at "11:50 pm." That would have been humanly impossible because it takes an hour of travel time to get from the residence to CIS headquarters. Therefore, Petitioner could not have been at CIS to sign the "11:57" pm alleged Miranda waiver. (P. Exhibit J). As trial counsel pointed out, Richmond was returned to the residence and Petitioner was arrested at 11:30 pm. (T.P. 35, 22-25). The alleged interrogation began at 11:50 pm. (T.P. 477, 6-7). Detectives somehow got Petitioner from the residence to CIS in twenty (20) minutes which is impossible since it takes an hour's drive to get there. Even more time elapsed because detectives waited on "...a uniform car to transport him." (T.P. 475, 6-9). What demonstrates this is that Richmond was brought to CIS at 4:00 pm (T.P. 512, 7-10) and stayed 20 to 30 minutes then left for the residence (T.P. 468, 6-10) which meant that they left CIS at 4:30 and arrived at the residence at 5:30 (T.P. 486, 10-11) stayed an hour thus leaving at 6:30 pm and arrived back at CIS at 7:30 pm (T.P. 60, 24-25). Then detectives resumed taping Richmond at 10:20 to 10:30 pm which was a five (5) minute tape recording (T.P. 549, 8-12) then took Richmond back to the residence and arrived there at 11:30 pm and arrested Petitioner. The only trip that detectives made to or from the residence to CIS headquarters that did not take about an hour was the 20 minute drive after arresting Petitioner and that was impossible because it does take at least one hour to make that trip, but detectives spent much time waiting on "...a uniform care to transport him" which caused even more time to elapse. This demonstrates the detectives willingness to fabricate evidence. The detectives had a camera mounted to their car windshield that records the time and date. They also have cameras mounted to the walls in these interrogation room that record the time and dates. The detectives journalize every encounter therefore there is no room for absent mindedness. The detectives' testimonies demonstrate their desire to be vague to modify the actual evidence. Petitioner has a right to accurate and reliable testimony from state's officials and that did not occur in this trial. Therefore, it is a reasonable inference, since, they could not have driven that distance in less than an hour especially after wasting time waiting on a "uniform car to transport him," it is indisputable that they fabricated and mushfaked the Miranda waiver because they wrote the time right on the form for

-60-

some reason as part of its fabrication, and, in addition, Petitioner's refusal
to make written statements, and refusals to voluntarily give tape recorded
statements, and refusals to voluntarily sign detective's alleged notes of the
alleged interrogation demonstrates that Petitioner had invoked his rights to
remain silent and to have an attorney present at the time of questioning. The
Miranda Court did not leave this open to debate when it held, "...[any] evidence
that the accused was threatened, tricked, or cojoled into a waiver will, of
course, show that the defendant did not voluntarily waive his privilege." 476,
1629. Petitioner possesses the right to federal protection from this type of
abuse by state officials. And, this evidence exceeds the "any" evidence
necessary to establish the involuntariness. The evidence was placed before the
Courts at both the suppression hearing and the trial. The detectives'
testimonies should have been accurate regarding dates and hours because if they
were not then Petitioner was denied the Constitutional protection of a
fundamentally fair hearing due to interference by state officials modifying the
evidence. Therefore, Petitioner was denied a "fair" and "reliable" determination
of voluntariness. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 1781 (1964) due
to the state's withholding of the video recordings from the car's and
interrogation room's cameras. Or at minimum, accurate testimony by the state's
officials, "detectives." Again, the nature of their testimony was vague thus
misleading and contradictory which is the decimal equivalent of falsification
and perjury trying to mislead the Courts. Since, detectives possessed an
inability to "recall" pertinent facts from the interrogation (T.P. 31, 10-12;
40, 1-2; 439, 10-11; 494, 6-7) it is evident that their sudden memory loss works
to Petitioner's detriment because it leaves an absence of accurate evidence to
rely upon. And, detectives failure to write down verbatim what was allegedly
said (T.P. 31, 1-2 & 11-12; 40, 7-10) and failure to write down anything of
significance, (T.P. 34, 23-25; 50, 3-7 & 14-16; 62, 4-12; 64, 11-15) and only
scribbling a page-and-a-half of illegible notes, (T.P. 30, 19-25) demonstrates
the detectives' desire to manufacture, fabricate, and falsify facts.
Nevertheless, it is indisputable that the detectives intentionally sought to
obfuscate the proceedings which is evidence through their vague contradictiary
testimonies and other falsifications.

As trial counsel demonstrated, detectives interrogated Richmond for seven
(7) hours beginning at "1447 hours" 2:47 pm at Shriners Burn Inst. (P. Exhibit
G, pg. 1, "1447 hours" "2:25 pm"; T.P. 23, 19-22; 426, 19-25) until 10:30 pm

that evening. (T.P. 425, 14-16; 549, 8-12). Richmond was in custody and waived
her Miranda rights on three (3) different occasions, first, at Shirners before
voluntarily confessing on tape to detectives at "1447 hours" "2:45 pm." (P.
Exhibit G, pg. 1, "1447 hours"; T.P. 23, 19-22; 409; 410; 490, 17-25). Then she
was taken to CIS headquarters at 4:30 where she maintained independent
responsibility for causing the injury.(T.P. 467, 9-20; 512. 7-12). Then she was
taken to the residence and arrived at 5:30 pm and stayed an hour showing
detectives how she caused the injury. (T.P. 468, 8-14; 485, 1-7; 487, 1-11; 490,
14-16). Then she was taken back to CIS headquarter and she maintained personal,
independent responsibility. (T.P. 486, 15-25; 487). They arrived back at CIS at
7:30 pm (T.P. 60, 24-25) where she waived her Miranda rights a second time and
maintained personal responsibility. (T.P. 486, 12-25; 487; P. Exhibit G, pg. 2
"1915 hours"). Then she was re-advised of her rights again at "2127 hours" (P.
Exhibit G, pg. 3 "2127 hours") detectives took another tape recorded confession
that she was solely responsible and controlled when and if her son received
medical attention stating, that, "I am an independent person, I have a brain,
and I can make these decisions on my own." (T.P. 424, 5-18; 425, 1-16; 427,
1-18; 491, 6-16; 549, 8-19). As demonstrated above, Richmond was taken to the
residence and dropped off at 11:30 pm and Petitioner was arrested on her
statements implicating him thus Richmond successfully evaded responsibility for
causing her son's injury and for causing his death through her 12 hour delay in
seeking medical treatment, and she was not charged for causing the injury or the
death, she was charged for, "...the resultant suffering by Matthew as a result
of this charge is the reason she was charged in this."(T.P. 15, 24-25). Then in
a record breaking thirty (30) minute interrogation (T.P. 30, 19-21) detectives
allegedly got a Miranda waiver and an admission from Petitioner then it was case
closed. This after a record breaking flight back from the residence as stated
above. Even though detectives knew Richmond's statements implicating Petitioner
were lies (T.P. 543; 544; 545) and after she had continually and repeatedly made
full confessions. And, after Petitioner specifically refused to make any
statements whether written, tape recorded, or otherwise.

The totality of the circumstances establish that detectives spent the day
from 1447 hours (2:47 pm) until 10:30 pm questioning and requestioning Richmond
(T.P. 494, 15-18) until she decided to divert the entire blame to Petitioner
without any justification or evidentiary basis and detectives dropped her off
and arrested Petitioner and closed the case with no evidentiary basis. They did

not even possess the evidence necessary to make the warrantless arrest because they were relying upon Richmond's recantations which establish her untrustworthy and unreliable because if detectives were saying that she lied in her confession then she is a liar and her statements implicating Petitioner do not possess the quality necessary to be evidence to establish probable cause to make the arrest. As a matter of fact, detective's admission that they knew at that time that Richmond's statements implicating Petitioner were lies (T.P. 543; 544; 545) cuts heavily against the basis for detective's arrest of Petitioner, and so does the fact that they knew her confessions were consistent with the nature of the injury, "immersion" because she confessed that she found him "in a pool of water" (T.P. 487, 7-8; 513. 21-23; 540, 1-5) with an expressionless face (T.P. 513, 21-22; 523, 10-11; 540, 6-10) which is both consistent with the nature of the injury as detectives knew from doctors was "immersion" (T.P. 544, 18-22) and consistent with her son's seizure disorder (T.P. 347, 19-25; 348; 304, 17-25; 305; 307, 13-20) and detectives knew about the seizure disorder. (T.P. 15-18). The detectives admissions cut heavily into their reasoning for arresting Petitioner in the first instance, especially, since, Petitioner was refusing to make any type of statements other than he was not there and he wants an attorney present at questioning. "The State has the burden of proving that the accused ... knowingly and voluntarily waived those rights, <u>including the decision to execute a written waiver</u> of his rights. The State has the burden to prove that the accused knowingly and voluntarily waived his privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966). " '...[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel *** is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case.' North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757 (1979)." Since, the issue is not whether or not Petitioner signed the form, it is indisputable that he was unwilling to voluntarily make any statements whether verbal, "written," "tape recorded." Nevertheless, the state failed to establish that Petitioner even signed the form or did so voluntarily which is why defense had the suppression hearing. The evidence demonstrates that Petitioner could not have even been there at 11:50 to sign the alleged Miranda waiver, much less, have done so voluntarily. The evidence also demonstrates police misconduct concerning the origin of the form itself.

**(IX) NINTH GROUND FOR RELIEF:**

### FOURTH AMENDMENT CLAIM

Detectives made an unlawful warrantless arrest without probable cause, and prosecutors presented alleged admission stemming from this unlawful arrest at trial in violation of Petitioner's Fourth and Fourteenth Amendment rights.

Petitioner was denied a full and fair hearing on the issue of warrantless arrest and admissibility of the alleged admission. Part of the reason Petitioner did not receive full and fair hearings are partially due to the circumstances set forth in Petitioner's first, second, third, and fourth grounds for relief, and because trial counsel asserted this issue in a pre-trial motion (T.P. 92, 3-8) and reiterated it after trial, (T.P. 604, 3-5) but failed to assert any argument or evidence in support of it. The evidence in support was heard by the Court at the suppression hearing and trial but this was not a fair assertion to demonstrate the evidence supporting the claim at the probable cause hearing (T.P. 92 & 604) thus denying Petitioner a full and fair hearing.

### TOTALITY OF THE CIRCUMSTANCES

In addition to the totality of the circumstances presented in Petitioner's Seventh Ground for Relief as if fully rewritten herein, Petitioner adds the following circumstances in support of this claim.

Detectives made a warrantless arrest based on Richmond's recanted confessions, but her statements implicating Petitioner did not possess the trustworthiness and reliability necessary to be evidence to establish probable cause to arrest Petitioner; therefore, the alleged admission made to detectives pursuant to the unlawful arrest was inadmissible at trial. The Supreme Court held, that, "...an informant's veracity, reliability and basis of knowledge are all highly relevant to a probable cause finding..." Gates v. Illinois, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328 (1983).

The Court knew that detectives knew Richmond's statements diverting full blame to Petitioner were not trustworthy or reliable because they knew she lied about when the injury occurred, (T.P. 495, 11-13) and lied about how she filled the tub with water. (T.P. 487, 18-12). Detectives knew Richmond had been making numerous admissions throughout the day of January 2, 1997. First, on the 911 call, (T.P. 403, 13-25; 503, 12-17) then to the Captain of the Fire Department upon his arrival to the residence, (T.P. 439) then to doctors, Child Service Investigator, and Chaplain at the hospital, (T.P. 408; 463; 513). Then she voluntarily gave continual and repeated confessions to detectives after waiving

her Miranda rights three (3) times, (T.P. 409, 20-25; 410; 468; 469, 9-10; 485; 486; 487; 490; 523; 540) and she confessed to being solely responsible for failure to seek immediate medical treatment for her son. (T.P. 424; 425; 427; 491; 549). Then she claimed that she had lied all day. (T.P. 543). Detectives admitted they knew Richmond's statements implicating Petitioner were lies. (T.P. 543; 544; 545). Detectives knew Richmond's confessions were consistent with the nature of the injury, "immersion" (T.P. 487, 7-11; 513, 16-17; 540, 23-25) because they knew from doctors the injury was an immersion burn (T.P. 544, 18-25) and consistent with her son's seizure disorder. (T.P. 540, 16-19; 347, 19-25; 348). And, detectives knew that Petitioner was not there at the time the injury occurred. (T.P. 42). Then Richmond claimed to have lied all day in her admissions and confessions. Therefore, detectives possessed no reasonable ground of suspicion to believe that Petitioner had anything to do with the injury. As far as they knew Richmond caused the injury alone then delayed treatment for 12 hours then confessed and then decided to divert full blame to Petitioner with no evidentiary basis. They admitted Richmond's statements implicating Petitioner were not trustworthy or reliable because they were lies. The Supreme Court holds, "Police officers can make a warrantless arrest as long as they act on the basis of probable cause. Probable cause 'to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' Michigan v. DeFillipo, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632 (1979)." U.S. v. Williams, 10 F.3d 1070, 1074 (4th Cir. 1993). The circumstances as detectives knew them to be did not amount to evidence necessary to establish a reasonable ground of suspicion to arrest Petitioner and set Richmond free. Richmond was returned to the residence and left there (T.P. 27, 3-16; 28, 4-6) after making numerous admissions and confessions, and after waiving her Miranda rights three (3) times, and after falsifying information throughout the investigation and detectives knew it. Detectives possessed no reasonable ground of suspicion to suspect that Petitioner had anything to do with the injury because Richmond's confessions, "...carry 'extreme probative weight,' Smith v. Zant, 887 F.2d 1407, 1435 (11th Cir. 1998), and the fact that the, "...confession is made without the grant of immunity and overwhelming against the individual's penal interests 'is a strong indicator of reliability.' " Carriger v. Stewart, 132 F.3d 463, 475 (th Cir. 1997).

**(X) TENTH GROUND FOR RELIEF:**

### INSUFFICIENCY OF THE EVIDENCE

"The relevant question is whether after viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt, Jackson v. Virginia, 443 U.S. 307, 308, 99 S.Ct. 2781 (1979), and the Constitution prohibits the criminal conviction of any person, "...except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073 (1970).

First, the State failed to prove any set of facts beyond a reasonable doubt to establish that Petitioner caused the injury, second, that Petitioner caused the death. Third, the State failed to present evidence of the essential elements of the crimes charged. Fourth, the jury was not properly instructed on the essential elements of the crimes charged. "...the very premise of Winship is that properly selected judge and properly instructed juries act rationally..." "...therefore that either factfinder will itself provide the necessary bulwark against erroneous factual determinations." Jackson, at 333, 2797. Since the jury was not properly instructed on the essential elements of the offenses, it was precluded from rendering a rational, reasonable, and reliable determination. Additionally, "...trial judges and juries will act rationally and honestly in applying the reasonable doubt standard, at least so long as the trial is free of..." Federal Constitutional (taint) and "...the record contains evidence tending to prove each of the elements of the offense." Jackson, at 334, 2792. The State failed to establish guilt with even substantial and credible evidence rising to the standard of a preponderance of the evidence, much less, rising to the requisite standard of proof beyond a reasonable doubt.

### FIRST CONSTITUTIONALLY TAINTED EVIDENCE
### RICHMOND'S PLEA AGREEMENT

In viewing the evidence in the light most favorable to the prosecution is Richmond's trial testimony implicating petitioner. Her testimony was Constitutionally tainted to such a degree that the jury was not functioning as a rational trier of fact, thus not returning a rational, reliable determination.

First, Richmond's pre-trial statements and trial testimony implicating Petitioner were severally tainted because she entered into a three tier plea bargain agreement, fully set forth in Petitioner's fifth ground for relief as if fully rewritten herein, which the jury did not factor into their decision; thus,

denying Petitioner Due Process and rendering the jury's determination unreliable because it was not functioning as a rational trier of fact.

Richmond received immunity. She was only charged with a single count of endangering children R.C. 2919.22(A) and not for causing the injury or the death of her son. She was charged for, "...the resultant suffering by Matthew as a result of this charge is the reason she was charged in this. (T.P. 15, 24-25). This is immunity because she continually and repeatedly gave full scale voluntary tape recorded confessions for causing the injury (T.P. 409, 20-25; 410, 425, 14-16; 490, 17-25; 491, 3-4; 549, 8-12) after waiving her Miranda rights three (3) times and after confessing to being solely and independently responsible for the 12 hour delay in seeking medical treatment too. (T.P. 42; 424, 5-18; 425, 1-16; 427, 1-18; 491, 6-16; 549, 8-19). She knew the full extent of the injury from the onset. (T.P. 393; 394; 395; 375). Richmond possesses a college degree (T.P. 344) therefore, she knew what she was doing. The State admitted that the 12 hour delay is what caused the death and that it was the basis of the involuntary manslaughter that Petitioner was charged with. (T.P. 650, 19-25). At Petitioner's trial, expert testimony established that her son died of "Adult Respiratory Distress Syndrome or Shock Lung" (T.P. 578, 12-18) which he said was caused by the 12 hour delay (T.P. 578, 5-7; 577, 11-13; 583, 12-13) which was the actual cause of death (T.P. 578, 13-14) because her son possessed a 65 percent probability of living had he received immediate medical treatment (T.P. 575, 20-21) but this plummeted to ten (10) percent (T.P. 579, 15-16) due to her delay. Then the State admitted that this delay was the basis of Petitioner's involuntary manslaughter charge. (T.P. 650, 19-25). Therefore, it is obvious that Richmond caused her son's death by her 12 hour delay and the State knew this because it was the State's expert witness. Richmond established that she was sole legal guardian, (T.P. 345; 346) and, that, Petitioner never possessed that capacity, (T.P. 370) and she had only known Petitioner for a month (T.P. 417, 22-24) and as she demonstrated to detectives, she stated, "I am an independent person, I have a brain, and I can make those decisions on my own," as cited above. Richmond established that Petitioner even attempted to persuade her to seek medical treatment (T.P. 425, 6-13) but she refused and asserted her full parental authority that Petitioner did not possess over Richmond or her son. The only rational determination that an intelligent mind can conclude is that Richmond not only caused her son's injury some how, but she was delaying seeking medical treatment to evade responsibility because

-67-

of the severity which ended up being the actual cause of death and she received
immunity from prosecution in exchange for her testimony implicating Petitioner.

Then Richmond was promised that the State would not pursue a prison sentence
at her upcoming sentencing hearing, and the State admitted that it told Richmond
that she could get probation (T.P. 117-11) and they would not pursue a prison
term for her if she testified against Petitioner, (T.P. 767, 1-9) which was
corroborated by affidavits from attorneys. (T.P. 753). And, as additional
inducement, the State strategically scheduled Richmond's sentencing hearing
after Petitioner's trial and delayed that sentencing for the entire year that
Petitioner was awaiting trial. But, this is not what the jury was permitted to
evaluate because this was all done very candidly and withheld by the State so
the jury could not factor into the equation that this establishes witness bias,
and motive to fabricate testimony favorable to the State. And, that Richmond was
attempting to curry favor with the State in an attempt to obtain that probation
or a nominal sentence at her upcoming sentencing hearing.

Richmond already possessed extreme motive to fabricate testimony to continue
to divert blame because she was in grave danger of re-indictment for causing the
injury as she previously confessed and for causing the death due to her 12 hour
delay, but the jury was not permitted to weigh the verity of Richmond's
confessions or testimony implicating Petitioner because of the State did it for
them through continual false testimony vouching for Richmond's verity, as fully
set forth in Petitioner's sixth ground for relief as if fully rewritten herein.
The detectives' false testimony continually and repeatedly stated to the jury
that Richmond's confessions were lies and her testimony implicating Petitioner
was the truth. (T.P. 525, 19-21; 503, 23-24; 504, 1-10). Detectives literally
told the jury that they spent three or four hours examining whether or not
Richmond's demonstrations were consistent with the nature of the injury (T.P.
492, 25; 493, 22-25) which is a lie since they were only there for an hour (T.P.
486, 8-12; 515, 6-8) and only tested the water for about five (5) minutes. (T.P.
547, 9-17). Then the detective falsely testified that there was no way the
injury occurred the way she showed them, (T.P. 487, 14-15; 492, 18-23) but they
knew this was a fabrication because they knew from doctors how the injury
occurred (T.P. 544) and that her statements were consistent with the nature of
the injury as they knew it to be, "immersion," (T.P. 487, 7-8; 513, 16-17; 540,
2-3) and consistent with her son's seizure disorder "expressionless face" (T.P.
513, 21-22; 523, 10-11) and detectives knew about the seizure disorder.

-68-

(T.P. 540, 7-8). Then they falsely testified that Richmond never said that she had anything to do with the injury and they believed those statements, (T.P. 493, 16-17; 503, 18-25) but Richmond had been continually and repeatedly voluntarily confessing in tape recorded statements all day long. (T.P. 490, 14-25; 523). Therefore, there is no doubt that they were falsifying information to bolster and vouch for Richmond's testimony implicating Petitioner which is a direct violation of Petitioner's Due Process rights for the State and its officers to present what they know is false testimony. Take out the false testimony and all that the State possessed was that Richmond voluntarily repeatedly confessed to causing the injury and the death because there was no other evidence presented that rose to the requisite standard of proof beyond a reasonable doubt.

## RICHMOND'S PERJURED TESTIMONY

Richmond's testimony was perjured, therefore, the State knowingly used perjured testimony to obtain the conviction. "The knowing use of perjured testimony is fundamentally unfair and the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Agurs v. United States, 427 U.S. 97, 103, 96 S.Ct. 2392 (1976). The State admitted that Richmond's statement implicating Petitioner were "lies" (T.P. 543; 544; 545) therefore, the State's testimony repeating her statements implicating Petitioner were also "lies;" "the knowing" presentation of false testimony thus Constitutionally tainting the trial. Therefore, the jury was not functioning as the "rational trier of fact" premised by Jackson v. Virginia, and the State failed to prove that it was Petitioner who caused the injury and the death with substantially reliable evidence which is the same as no evidence. It would have been impossible for the jury to have found Richmond's statements implicating Petitioner more reliable than her confessions. No reasonable rational mind could have made that conclusion. But, it obviously did rely upon the false Constitutionally tainted evidence or Petitioner would not have been convicted.

## RICHMOND'S ADMISSIONS

The State knew Richmond made numerous admissions throughout the day of January 2, 1997, (T.P. 503, 12-17) after delaying treatment for her son. First, on the 911 call at 9:30 am, (T.P. 403, 13-25; 404, 1-6) then to paramedics upon their arrival at the residence, (T.P. 435, 8-15; 439, 5-25) then to hospital personnel at Children's hospital, (T.P. 408, 1-10) then to the Chaplain and Child Service Investigator at Shriner's Burn Inst. (T.P. 408, 15-25).

## RICHMOND'S CONFESSIONS

Richmond made numerous extremely detailed confessions to detectives while in custody after waiving her Miranda rights three (3) times. First, she voluntarily waived her Miranda rights at 2:27 pm at Shriners Burn Inst. (P. Exhibit G, pg. 1; T.P. 23, 19-22; 409, 20-25; 410; 490, 17-23; 491, 1-5; 463; 10-16). Then she was taken to CIS headquarters (T.P. 467; 512) and questioned for 20 to 30 minutes then taken to the residence to show detectives what she had done at 5:30 pm where the stayed for an hour. (T.P 468, 6-10; 485, 4-6; 486, 8-11; 490, 12-16; 523, 2-17). Then she was returned to CIS headquarters at 7:30 where she continued to maintain personal and independent responsibility, (T.P. 60, 24-25; 486, 15-25; 487, 1-11) after waiving her Miranda rights at 7:15 (P. Exhibit G, pg. 2). Then at 9:27 pm she waived her Miranda rights a third time (P. Exhibit G. pg. 3) and at 10:30 pm she voluntarily gave another tape recorded confession (T.P. 425, 14-16; 549, 8-11) stating that she was solely responsible for the 12 hour delay in seeking medical treatment (T.P. 424, 5-18; 425, 1-16; 427, 1-18; 491, 6-16; 549, 8-19). At 9:30 pm Richmond diverted full blame to Petitioner. (T.P. 426, 11-25; 543, 7-25). But, detectives knew those statements were lies (T.P. 543; 544; 545). Then Richmond was given a ride back to the residence and dropped off at 11:30 pm and Petitioner was arrested. (T.P. 28, 4-6). The State knew two (2) things, first, that Richmond's statements implicating Petitioner were lies and that Richmond's confessions were consistent with the nature of the injury and her son's seizure disorder. The magnitude of Richmond's confessions do not out weigh her statements implicating Petitioner, and no evidence that was presented rose to the requisite standard of proof beyond a reasonable doubt because that would require it to be evidence that is trustworthy and reliable but that is not what the evidence presented amounted to. The State knew that she delayed treatment for 12 hours then lied about when the injury occurred, (T.P. 495, 11-16) and she lied about exactly how she filled the tub with water. (T.P. 487, 12-18). And, she told detectives in no uncertain terms that no one prevented her from seeking medical treatment for her son (T.P. 549, 8-20) and that Petitioner even told her to obtain medical treatment. (T.P. 425, 1-16; 427). Then for no justifiable reason, with no evidentiary support Richmond was permitted by the State to suddenly divert the entire blame to Petitioner. There is absolutely no evidentiary support that Richmond's confessions were lies or even less reliable than her statements implicating Petitioner. Distilled to its essence, Richmond's testimony was perjured to evade responsibility and the State

admitted it. (T.P. 543; 544; 545). The record strongly supports that her
confessions were more reliable than her testimony implicating Petitioner. "Under
28 U.S.C. 2254(d)(2) because the state court's credibility determination is not
fairly supported by the record as a whole, it is not entitled to a presumption
of correctness." Carriger, at 475-76. Because, Richmond's continual confessions
and admissions were of an extremely high magnitude not only because confessions
carry "extreme probative value," Smith v. Zant, 887 F.3d, at 1335, or only
because "...recantations are viewed with extreme suspicion by the courts,"
Spence v. Johnson, 80 F.3d 989, 997 (5th Cir. 1996), but more so because when
she viewed the photos taken at the hospital she testified that she was fully
aware of the severity of the injury (T.P. 393, 10-25; 394; 395) and a mother
would never have confessed to being solely and independently responsible for
this had she not been responsible. The Constitutional question is whether
Richmond's recanted confessions implicating Petitioner meet the Due Process
Clause's standard of proof beyond a reasonable doubt. It does not seem likely
that any rational trier of fact would accept that it does because the essence of
the evidence shows that Richmond was making a full scale effort in diverting
full blame and attempting to obtain probation or a nominal prison sentence at
her upcoming sentencing hearing that was strategically scheduled for after
Petitioner's trial and specifically delayed for a year so that it would occur
after Petitioner's trial and induce false testimony. What makes it even more
illogical is that she would not have assumed responsibility for the injury to
protect and individual that she had only known for a month (T.P. 417, 22-24)
which render her confessions even more reliable. Therefore, her confessions
carry an even higher probative value in light of both the amount of times she
repeated the confessions and in light of the magnitude of the severity of the
injury. The fact that she confessed without immunity and overwhelmingly against
her own legal interests is another strong indicator of their reliability, as
well as, the consistency of her confessions to the nature of the injury and her
12 hour deliberate delay is more than simply suspicious this is extremely
incriminating. Richmond's testimony implicating Petitioner is so devoid of
trustworthiness and Constitutionally tainted that it cannot be relied upon, and
the jury was not functioning as a rational trier of fact due to all the
Constitutional violations tainting the evidence.

There is more than a reasonable likelihood that Richmond's perjured
testimony and detective's testimony repeating Richmond's testimony implicating

-71-

Petitioner affected the judgment of the jury and it relied on those implications
which resulted an unreasonable determination of the facts in light of the
evidence presented. The fact that Detectives knew Richmond's statements
implicating Petitioner were lies (T.P. 543; 544; 545) establishes that the
Prosecutors also knew prior to trial that Richmond's testimony was going to be
perjured. And, the detectives presentation of false vouching testimony does not
support the conviction either. Since, testimony by police carries such extremely
high weight the jury was severely mislead when detectives presented the false
vouching testimony. There is no evidence and the record does not support that
"she never stated that she had nothing to do with these injuries," (T.P. 493,
16-17; 494, 24-25) and "...she never said that she did it," (T.P. 503, 18-19)
and "...we [know] the injuries didn't occur as she had originally told us,"
(T.P. 477, 8-9) and "...there was [no way] the injuries occurred as she showed
us, " (T.P. 487, 12-15) and "...we spent a lot time trying to make absolutely
sure nothing like that could have happened," (T.P. 493, 22-23; 492, 18-23) and
"...the injury to Matthew sustained was an immersion burn and not a splash burn.
That it couldn't have happened that way..." (T.P. 525, 8-10) and they confronted
Richmond with this information and "At that time she decided to tell the truth."
(T.P. 525, 19-20). All of which was false, fabricated to mislead the jury as
fully set forth in Petitioner's sixth ground for relief as if fully rewritten
herein, which mislead the jury into believing that Richmond never confessed,
that, the injury could not have occurred the way she indicated, and, that,
detectives conducted a thorough investigation to make these pre-determinations
for the jury. But, all of which possess no evidentiary support.

Detectives failed to conduct the thorough investigation that they claimed.
They failed to conduct pertinent tests into whether or not the injury could have
happened in a similar way described by Richmond. (T.P. 540, 19-25; 541, 1-10;
546, 12-25; 547; 548; 549, 1-2 & 24-25; 550, 1-11) and detective Landesberg was
not even there at the time the self created water experiment was being executed;
(T.P. 483, 21-23; 485, 8-25; 486, 1-6; 489, 7-13) therefore, he could not
testify that they made absolutely sure that the injury could not have happened
the way she demonstrated. In fact, the experiment involving the testing of the
water with the meat thermometer only lasted five (5) minutes (T.P. 547, 1-11)
and they were only at the apartment for about an hour (T.P. 486, 8-14) which is
obviously not enough time to conduct a thorough investigation to determine
whether or not the injury could have occurred the way Richmond demonstrated, and

none of the detectives possessed any forensic, specialized training, or technical education to qualify them as expert witness capable of enabling them to render a reliable determination of this nature based upon the self created experiment that they conjured up at that time. Therefore, detectives did not "...make absolutely sure nothing like that could have happened," or, that, "...there was [no way] the injuries occurred as she showed..." them. And, they claimed that they spent three or four hours conducting this self crated experiment at the apartment (T.P. 492, 19-20) when they were only there for an hour. (T.P. 486, 8-11). The State actually proved beyond a reasonable doubt that it was Richmond who caused the injury. No rational trier of fact would have been able to conclude that the detectives made a reliable investigation and determination based upon this evidence. Their testimony amounts to perjured testimony, vouching for Richmond's credibility and testimony.

The detective's testimony was perjured further when he testified that they knew from doctor that the injury was an immersion burn and they confronted Richmond with this information which caused her to suddenly to tell the truth. (T.P. 525). This was false and misleading because Richmond was not saying that she caused the injury by spraying, (T.P. 51, 1-11; 539, 10-18); therefore, confronting her with what they learned from doctors does not justify Richmond's recantations. The State failed to present any evidence to support and justify permitting Richmond to simply recant her confessions and divert full blame to Petitioner. The detective fabricated this testimony to falsely vouch and bolster Richmond's statements implicating Petitioner and to attempt to justify her recanting her confessions because they possessed absolutely no evidentiary justification; so, they simply made it up prior to trial.

Then the State presented false evidence that Richmond found an apology letter in the mailbox and turned it over to the detectives, but the letter was not found in the mailbox, it was found in the kitchen trash several days later by detectives during their execution of a search warrant of the apartment which is proven by the information in the search warrants and inventory lists, (P. Exhibit I, 1 through 5) and the "note" possesses absolutely no information connecting it to the injury. The "note" does not meet the burden of proof of beyond a reasonable doubt, but instead, was false, misleading, and perjured denying Petitioner Due Process, and again, the jury was not functioning as a rational trier of fact.

Detectives perjured themselves further when they testified, "...he was

-73-

willing to talk," (T.P. 477, 6-7) and "He readily admitted that he caused the
injuries to Matthew Richmond," (T.P. 477, 11-12) and "He said he started to
squirt him down with what he thought was a cold mixture of water, and then
Matthew's skin started peeling off," (T.P. 477, 15-17) and "At one point he said
he realized the water was hot when some of the water splashed on him," (T.P.
478, 7-8) and "Richard Klein never denied that he caused these injuries..."
(T.P. 502, 6-7). This was all very false and misleading and fails because
Petitioner was not giving any statements and for the other reasons set forth of
Petitioner's seventh ground for relief. Had the jury known that Petitioner was
refusing to make statements and that he was not even at CIS headquarters at the
time of the alleged interrogation, and, that, detectives' testimony regarding
this alleged interrogation was false it could not have found them reliable
enough to find Petitioner guilty. Additionally, even this alleged admission does
not support the conviction because it was allegedly inconsistent with the nature
of the injury, "immersion," and the State admitted it. (T.P. 504, 15-25; 505).
Therefore, the jury had no reason to believe it to be reliable, especially, in
light of the facts that Petitioner was refusing to make any statements, and if
detectives did not believe Richmond caused the injury due to the fact that they
knew from doctors that the injury was an immersion burn, likewise, they had no
reason to believe Petitioner caused the injury either because they admitted that
it could not have happened that way either. (T.P. 481, 1-4). Additionally, the
alleged admission further supports that the State failed to meet its burden of
proof of beyond a reasonable doubt because the alleged admission allegedly
contained the evidence of the absence of the culpable mental state of all the
charges, "knowingly." Petitioner allegedly said that he did not know that the
water was hot, (T.P. 477, 14-17 & 22-23; 478, 7-8 & 16-17; 479, 6-7; 480, 22-23)
and he allegedly repeatedly stated he did not even know that the water in the
apartment was hot enough to cause an injury because it was not his property and
not his hot water heater. (T.P. 465, 2-3; 466, 3-4). Knowingly is the essential
elements of counts three (3) through six (6). When the State upgraded the
endangering charges to second degree felonies with the additional finding of
serious physical harm this upgraded the burden of proof necessary to convict
from reckless to knowingly. This the state failed to establish with any
evidence. This is not an admission to the alleged admission, this is the only
reasonable evaluation of the alleged evidence. In fact, the alleged admission
can not even be construed as an admission because the detectives knew from

-74-

doctors that the injury was an immersion burn and it could not even have happened the way the detectives alleged it was stated. (T.P. 481, 1-4). Therefore, it does not even come anywhere near the proof beyond a reasonable doubt standard because it does not even come near the lesser evidence necessary to meet the "some substantial and credible" evidence necessary to establish to a preponderance of the evidence.

"...the City's police department represents the state no less than the prosecutor's office, and the taint on the trial is not less if the police, rather than the state's attorney, are guilty of misrepresentations. Barbee v. Warden, (C.A. 4, 1964) 331 F.2d 842." State v. DeFronzo, 59 Ohio Misc. 113, 394 N.E.2d 1027, 1032 (1978). "The dignity of the United States Government will not permit the conviction of any person on tainted testimony." Mesarosh v. United States, 352 U.S. 1, 9, 77 S.Ct. 1, 5 (1956). And, Petitioner requests that this Court does not permit a lesser standard.

### ESSENTIAL ELEMENTS OF THE CHARGES

The State failed to prove beyond a reasonable doubt the essential elements of the crimes charged.

Petitioner was convicted of, count (2) involuntary manslaughter R.C. 2903.04(A); count (3) felonious assault R.C. 2903.11(A)(1); count (4) endangering children R.C. 2019.22(B)(3); count (5) R.C. 2919.22(B)(2); and count (6) R.C. 2919.22(A).

Count six (6) endangering requires evidence that Petitioner was a legal parent or guardian and violated a duty of care, protection, or support <u>arising from that capacity</u> which resulted in serious physical harm. The State failed to prove that Petitioner possessed any such capacity of parent or guardian. But, in fact, proved just the opposite. Petitioner had only known Richmond for a month, (T.P. 417, 22-25) and had only lived with Richmond for two weeks, (T.P. 545, 10-14) which does not give Petitioner any authority over Richmond or her child. Richmond established that Petitioner never served in the capacity of parent, (T.P. 370, 6-9) that the only person who ever served in that capacity was Richmond's fiance' "Ron Evans," (T.P. 345, 19-25; 346) but Richmond was her son's <u>sole</u> legal guardian. (T.P. 345, 5-10). Once Richmond, the mother, established that Petitioner never served in the capacity of parent or guardian that struck that charge because Richmond was allegedly present in the apartment throughout the alleged incident. She was allegedly in the living room (T.P. 373, 14-25) with the door open. (T.P. 374, 1-2). Since, Richmond was allegedly in the

presence of the incident the entire time, "allegedly," then she possesses supreme authority in the equation and supreme responsibility for her son. Since, the record is devoid of any evidence to demonstrate that Petitioner possessed the capacity of guardian or parent, and Richmond confessed to being solely responsible for the injury and causing the 12 hour delay Petitioner cannot be convicted of this offense.

Knowingly is the essential element in count three (3), count four (4), and count five (5) because all these charges require proof of knowingly causing serious physical harm. And, the jury was not properly instructed on the elements of knowingly and reckless, therefore, it could not have made a rational determination because, "...properly instructed juries act rationally..." Jackson v. Virginia, at 333, 2979.

R.C. 2901.22(B) defines knowingly as, "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." And...

R.C. 2001.22(C) defines reckless as, "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that circumstances are likely to exist."

The Ohio Supreme Court holds, that, "...the existence of the culpable mental state of reckless is the essential element in the crime endangering children," pursuant to R.C. 2919.22(A), (B), and (C). State v. McGhee, 79 Ohio St.3d 192, 195, 680 N.E.2d 975, 977 (1997)(construing all counts of endangering). And, State v. O'Brien, 30 Ohio St.3d 122, 124, 508 N.E.2d 144, 146 (1987)(construing R.C. 2919.22(B)(3)). Due Process requires proof of knowingly and reckless to establish these charges, In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073 (1970), "...proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," and R.C. 2901.05(A) requires, that, "...the burden of proof for all elements of the offense is upon the prosecution."

Reckless requires that Petitioner possessed knowledge and disregarded the known risk that circumstances were likely to exist, and "knowingly" requires the exact same awareness of the exact same circumstances, and both require

disregarding the risk of the potential outcome. It is saying the same thing with a different choice of words. But, most importantly, due to the fact that the State upgraded the endangering charges to include a finding of serious physical harm which upgraded the felony degree from third to second degree, therefore, the upgrade upgraded the burden of proof because the endangering charges became second degree felonies thus upgrading the essential elements from reckless to knowingly for the endangering charges. But, the jury was not instructed on this upgrade, as well as, not being properly instructed on knowingly. (T.P. 667, 20). And, the jury was deliberately mislead on the definition of reckless (T.P. 671, 8-14) which is worse than providing no instruction at all. Nevertheless, the essential element in counts (3), (4), (5), and (6) was upgraded to knowingly causing serious physical harm because if someone recklessly tortures or cruelly abused with the necessary foreknowedge of the potential outcome he is in fact knowingly causing serious physical harm, especially, when the upgrade included a finding of serious physical harm which upgraded the degree of felony from third to a second degree felony in counts (3), (4), (5), and (6) all require the same finding so it would have been impossible to find Petitioner guilty of one without finding him guilty of all. Because, knowingly causing serious physical harm by placing her son in the tub of hot water is the same as recklessly torture or cruelly abusing and recklessly administering corporal punishment causing serious physical harm. In other words, felonious assault requires knowingly causing serious physical harm and you cannot recklessly abuse or cruelly torture causing serious physical harm without knowingly causing serious physical harm when that is a specific necessary finding because they all required the pre-knowledge of the element of the danger and having disregarded that danger and causing serious physical harm. The other charges require the same elements in the same way. Most importantly, in this particular set of circumstances, it is the State's position that Petitioner knowingly caused serious physical harm by recklessly torturing or cruelly abusing and recklessly administering corporal punishment. The State failed to prove that Petitioner possessed the requisite foreknowledge of the danger of the tap water in the apartment that evening. And, most importantly, that he was aware that serious physical harm was going to be the result. Additionally, Petitioner cannot be found guilty of all the above charges because that violated Petitioner's double jeopardy rights, thus, the Court violated Petitioner's Due Process rights.

The State failed to prove that Petitioner possessed the element of the

-77-

requisite culpable mental state of knowingly because the apartment and the hot
water heater was owened by the land owner who set and controlled it. Petitioner
was not the owner but was merely the renter, and it was not common knowledge
that the tap water was of any danger and nobody had ever been burned by it
before. In fact, the State proved that Petitioner possessed no such knowledge or
awareness of the potential danger because the detectives testified to this.
(T.P. 477, 14-17 & 22-23; 478, 7-8 & 16-17; 479, 6-7; 480, 22-23; 465, 2-3; 466,
3-4). The State failed to present "any" evidence otherwise. It is not common
knowledge to a lay person that tap water can cause serious physical harm of this
magnitude, therefore, Petitioner could not have known and the State failed to
prove otherwise and even admitted through its actions and presentation of
evidence that it was not "common knowledge." This was the very reason that the
State called upon an expert witness, specially educated and trained, to explain
to the jury, "lay persons," about water burns, temperature, and exposure time
because this is not common knowledge which is the same awareness of the danger
that Petitioner would have had to possess to knowingly cause serious physical
harm in counts (3), (4), (5), and (6). If it is common knowledge, then the
State's calling of the expert was severely prejudicial, and specifically
calculated to arouse the anger of the jury and make them bias; thus, the jury
cannot be considered a "rational trier of fact" and this conviction should be
vacated. Therefore, the State admits that this knowledge is not "common
knowledge" requiring expert opinion that Petitioner could not have possessed, or
the State's use of expert testimony to explain that tap water is dangerous was
over kill and prejudicial denying Petitioner of Federal Constitutional
protection. The State failed to present even circumstantial evidence of the
culpable mental state of knowingly and reckless to justify convictions on all of
these counts, assuming that Petitioner caused the injury. Petitioner's
statements that he was not aware of the danger, coupled with the the State's
admission that it was necessary to present expert testimony to demonstrate that
tap water is of that sever danger is sufficient to demonstrate that Petitioner
could not have been aware of the danger.

Count two (2) involuntary manslaughter requires showing that the death was
caused as a proximate result of committing or attempting to commit a felony
which requires the State to have proven a charge that the death was caused by.
The State proved through expert witness testimony that it was the 12 hour delay
in seeking medical treatment that caused the death because her son died of

-78-

"Adult Respiratory Distress Syndrome or Shock Lung" (T.P. 478, 12-25) which was the "actual" cause of death. Her son possessed a 65 percent chance of survival (T.P. 574, 20-21) had he received immediate medical treatment but this plummeted to ten (10) percent, due to her 12 hour delay which is virtually non-existent. The Doctor stated his in terms of probability and the probability was high that he would have lived had she obtained immediate medical treatment. Following the evidence to its only reasonable and logical conclusion, the only supporting charge for the involuntary manslaughter was R.C. 2919.22(A), but Petitioner was neither parent or guardian, nor omitted a duty of care, protection, or support arising from that capacity, and the State admitted that this was the charge supporting the manslaughter charge. (T.P. 650, 19-25). Therefore, the State failed to establish the essential elements of the involuntary manslaughter. To find Petitioner in complicity would have required a prima facie conviction of Richmond, but she was neither charged with, nor convicted of involuntary manslaughter, nor convicted on the other evidence. The State cannot say that it was the injury alone that caused the death because those are not the probabilities established by the State's expert witness. 65 percent is a high probability and 10 percent is almost non-existent.

In count four (4) endangering children R.C. 2919.22(B)(3) the State failed to establish recklessly administering corporal punishment and causing serious physical harm with any substantial credible evidence rising to the standard of a preponderance of the evidence, much less, to the requisite standard of proof beyond a reasonable doubt. For all of the reasons stated previously in this petition, and because Richmond's fabrication that Petitioner caused this injury as punishment, and the detectives' testimonies do not support the State's assertion that Petitioner caused this injury as punishment. This was taken from Richmond's fabricated statements implicating Petitioner which the State had admitted were "lies," (T.P. 543; 544; 545) therefore, it is not proof. The prosecutor's speculation that Richmond's son was "held" in this tub of water as punishment, (T.P. 607, 3-6; 623, 21-25; 610, 7-9; 624, 19-15) is not evidence but merely speculation which is not supported by any evidence of record, thus, violating Petitioner's Due Process rights by referencing facts not in record. U.S. v. White, 222 F.3d 363, 370 (7th Cir. 2000). This speculation was highly inflammatory, prejudicial, and misleading and does not establish any elements of any of the charges. It was contrary to evidence adduced at trial. The expert's burn chart (P. Exhibit H; T.P. 567; 568) established that the water, at the temperature it was presented to have been at the time, "140 degrees,"

(T.P. 519, 10-11) would have caused the injury within one (1) to five (5) seconds. (T.P. 568, 4-6; 574, 14-15). The evidence establishes that he could not have been held by anybody for any length of time without that individual having been severally burnt too, and Richmond claims that she was in the next room of the apartment next to the bathroom (T.P. 373, 14-25) with the bathroom door open (T.P. 374, 6-7) and she heard no splashing, no screaming, and no struggle (T.P. 374, 1-13; 415, 14-25; 416, 417) which establishes that this did not happen. Therefore, if Petitioner was giving this alleged bath, whatever happened, happened very quickly and noiselessly, or Richmond would have heard something to alert her attention, since, this was an extremely small apartment, and she would have been right in the bathroom investigating. Or, it is an even more reasonable inference that none of that ever happened. Nevertheless, if it did, it happened almost instantly which is the only logical inference based upon the evidence of record, and the State failed to prove otherwise with any type of evidence. Relying upon Petitioner's alleged admission, it was an accident and there is no evidence whatsoever of a culpable mental state even if Richmond's fabrications that Petitioner caused the injury are believed.

Then the trial court established that count five (5) was an allied offense of similar import and unlawfully ran it concurrent with count four (4). (T.P. 719; 720). Allied offenses of similar import cannot even be run concurrent.

Then the prosecutors, rather than place trustworthy and reliable evidence before the jury during trial resorted to presenting false prejudicial statements in closing which amount to the prosecutor testifying because the statements were not supported by the record in any way. The prosecutor testified, that, "Matthew didn't yell, he didn't scream" and that Petitioner allegedly placed his hands in certain positions to prevent him from screaming out (T.P. 624, 16-240 which could not have possibly happened because Richmond would have heard something suspicious and investigated because she was in the next room of a very small apartment and Richmond testified that she was close enough to have heard something. (T.P. 428, 14-25). Even expert testimony established that he would have screamed and struggled creating extreme noise even if his mouth was covered as prosecutors demonstrated during their testimony. (T.P. 574, 23-25; 575, 1-2; 587, 9-13). Therefore, it is indisputable that her son would have cried out, and if the injury occurred the way Richmond proclaimed then it is equally indisputable that the incident would have caused a tremendous amount of noise. The prosecutor's testimony was a three tier Constitutional violation. First, it

was false and misleading in violation of United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392 (1976), and Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340 (1935). Second, it was inadmissible and highly prejudicial personal opinion of Petitioner's guilt in violation of Berger v. United States, 295 U.S. 78, 55 S.Ct. 629 (1935). And, third, it was not supported by any evidence whatsoever thus highly prejudicial and inadmissible. United States v. Leon, 534 F.2d 667, 679 (6th Cir. 1976); United States v. Colins, 78 F.3d 1021, 1040 (6th Cir. 1996). All of which violated Petitioner's Due Process rights thus the jury did not render a rational determination due to the absence of evidence and Constitutional taint. The record simply does not support the jury's determination that Petitioner caused the injury or the death, nor that Richmond's statements implicating Petitioner were more reliable than her confessions, nor that detectives' testimonies were reliable on any set of facts.

The evidence adduced at trial overwhelming supports Richmond's confessions that it was accidental immersion that occurred while in Richmond's control. First, the how and cold water knobs at Richmond's previous residence where she had lived for 25 years were reversed (T.P. 414, 7-25; 415, 1-6; 546, 3-11) from the residence at St. Catherns Place. Therefore, there is an overwhelming probability that Richmond or her son turned the wrong knob and inadvertently filled the tub with hot water and she put him in it. Since, the State's expert witness established that the injury was capable of being sustained in one to five seconds which is almost instantly, coupled with the fact that her son was developmentally disabled (T.P. 347, 19-20) with a seizure disorder (T.P. 336, 19-25) and would have been heavily medicated because he took Dilanton for the seizure disorder and Deficote (Ritlain) for hyperactivity (T.P. 307, 13-25; 348, 19-25; 349, 1-4) in the evening which further impaired his coordination and motor function. And, Richmond said it was an accident and she was the individual in control. (T.P. 493, 17-18). The State presented overwhelming evidence that Richmond was giving the bath at the time the injury occurred and it was probably an accident, and that, Petitioner did not cause the injury and was not even there at the time the injury occurred. The State failed to present any evidence to establish any of the elements of the charges and failed to establish with any trustworthy or reliable evidence that it was Petitioner who caused the injury or death, thus, violating Petitioner's Due Process rights established in In re Winship.

-81-

**(XI) ELEVENTH GROUND FOR RELIEF:**

INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

COUNSEL FAILED TO CONDUCT A MEANINGFUL INVESTIGATION OF CAUSE OF DEATH

Trial counsel filed a pre-trial Motion to Dismiss (T.P. 85) asserting that the State failed to disclose exculpatory evidence that the cause of death was not the 12 hour delay in seeking medical treatment which is what the State established at Richmond's plea hearing. (T.P. 15, 13-23). Then at Petitioner's pre-trial Motion to Dismiss hearing the State re-affirmed, that, "That statement Judge, is true..." (T.P. 86, 16-20). Trial counsel failed to conduct a reasonable investigation and went to trial mislead as to the cause of death, and he was unprepared to conduct a tactical, informed, and meaningful trial strategy and cross-examination on cause of death. It was extremely critical for counsel to know what the "proximate" cause of death was because this is the essential element in the charge of involuntary manslaughter R.C. 2003.04(A)(which is to cause the death of another as a proximate result of committing or attempting to commit a felony). The evidence of cause of death was critical and material to guilt or innocence because it was Richmond's delay, (T.P. 15, 13-17) not Petitioner's, and it was established by the State's expert witness that this delay is what actually caused the death. Counsel went through the entire trial with the false understanding that this 12 hour delay had nothing to do with the death then all of a sudden at the end of the trial, after it was to late to reformulate another trial strategy incorporating that the delay is what actually caused the death, and, that, it was Richmond's delay and not Petitioner's, and, that, this was motive for her fabricated testimony because she was evading responsibility for the death of her son caused by her 12 hour delay, and, that, she received immunity for causing her son's death, and, that, Richmond was her son's sole legal guardian therefore personally responsible for the care of her son. Counsel's deficiencies denied Petitioner of what would have been a powerful trial strategy especially had counsel known prior to trial  because additional investigation would have revealed that her son might have had an even higher probability of life over death had she not rubbed "noxima" all over him and obtained immediate medical treatment; who knows what a thorough investigation would have uncovered. Medical records establish that this particular doctor was not even the doctor who had treated her son throughout the 11 day period that he was at Shriners, and counsel failed to stick that in their hat in addition to the expert's bias position which is obvious by his evasive responses to defense counsel's questioning most of which was false.

-82-

Nevertheless, at the end of trial expert witness testimony established that
Richmond's son died of "Adult Respiratory Distress Syndrome or Shock Lung" (T.P.
578, 13-14) "pulmonary failure." (T.P. 583, 12-13). The expert established,
first, that, "The longer you wait before you begin to give the fluids the more
sever the problem will be with the lungs," (T.P. 578, 5-7) and her son possessed
a 65 percent probability of living had he received immediate medical treatment,
but this plummeted to ten (10) percent (T.P. 579, 15-16) due to Richmond's 12
hour delay. The probability of his surviving was high but ten (10) percent is
next to nothing. Counsel failed to obtain this critical evidence and secure a
more definite statement at trial and produce a non-bias expert witnesses'
testimony and failed to formulate a significant trial strategy establishing who
was responsible for the causing the death. It was the State's false averment
that the 12 hour delay was not the cause of death so that Richmond would not be
responsible which is why she was only charged with one count of endangering
children R.C. 2919.22(A)(being a parent or guardian and omitting a duty of care,
protection, or support arising from that capacity). Richmond was only charged
for, "...the resultant suffering by Matthew was a result of this charge is the
reason she was charged in this." (T.P. 15, 24-25). It did not come out until the
end of trial that her 12 hour delay caused the damage to the lungs that caused
his death, "in actuality." The expert established through his testimony that had
he received immediate medical treatment then doctors could have controlled the
outcome by 55 percent, the difference between a 65 and 10 percent probability.
Additionally, Petitioner was not in any authority over Richmond or her son and
could not "omit a duty of care Arising from that capacity" because he did not
possess that capacity nor anything even remotely resembling that capacity.
Richmond established three significant things, first, that she was fully aware
of the severity of the injury from the beginning, (T.P. 393, 10-25; 394; 395)
that, she controlled whether or not her son received immediate medical
treatment, (T.P. 409, 20-25; 410; 490, 17-25; 425, 14-16; 491; 549, 8-12) and,
that, she was sole legal guardian (T.P. 345, 9-15) and "Ron Evans" was the only
person who ever served in the capacity of father (T.P. 345, 18-25, 346) and
Petitioner never possessed the capacity of father in the equation (T.P. 370,
6-12) because he had only known Richmond a month (T.P. 417, 22-24) and they had
only lived together for two weeks. (T.P. 545, 10-14). And, that Petitioner was
not even there at the time of the injury. (T.P. 42). This is material because
these are the essential elements of two of the charges. First, R.C. 2919.22(A)

that Petitioner was charged with which requires that he possess the capacity of parent or guardian and omit an essential duty of care arising from that capacity, and in this case, this was the offense supporting the involuntary manslaughter since the State's expert witness established that the 12 hour delay was the cause of death, "in actuality." Nevertheless, counsel's failure to conduct a thorough investigation deprived Petitioner of even more evidence that may have been uncovered, as well as, depriving Petitioner of the only logical defense based upon the evidence. And, additionally, counsel failed to do anything with the evidence once he discovered at trial that the probabilities establish that the 12 hour delay was the cause of death. Counsel's cross--examination had absolutely no exculpatory probative value. Counsel had to have known that this doctor was not the one who had treated Richmond's son over the 11 day period, and, that, his only involvement was in the initial transfer of her son from Children's hospital to Shriners Burn Inst. Counsel failed to do anything with this evidence, as well as, failing to knock holes in the State's deliberate deception that the 12 hour delay had nothing to do with causing the death.

Petitioner's case was prejudiced by counsel's failure to conduct a meaningful investigation and obtain critical evidence prior to trial to formulate a significant trial strategy and failed to conduct a meaningful cross-examination after the evidence of cause of death came out.

### APOLOGY LETTER

Counsel failed to object or challenge in any way the admission of the alleged apology "note." (T.P. 47, 12-22; 400; 401). Petitioner was prejudiced by counsel's deficient performance which permitted the jury to render the wrong inference that this was an apology for causing the injury when counsel possessed the evidence that the State's presentation was knowing presentation of false evidence because the notes had nothing to do with anything involving the injury.

Counsel failed to conduct even a nominal investigation and prepare for trial. During trial, counsel placed on record, "We didn't get this one." (T.P. 402, 9-10). Counsel was obviously unprepared for trial because this alleged apology "note" was given to defense in discovery and presented at Petitioner's suppression hearing. (T.P. 47). Counsel failed to even review the discovery evidence and stated on record, "We were given a packet of material, I guess I could have gone ahead and looked at it all." (T.P. 403, 3-4). Therefore, it is indisputable that counsel failed to prepare for trial by conducting a reasonable

-84-

investigation in reviewing the evidence provided in discovery. Then many years
after the trial and appeal were over Petitioner received copies of the search
warrants and inventory lists which contained evidence that the State knowingly
presented false evidence concerning the alleged apology notes. At trial the
notes were presented as being Petitioner's apology for causing the injury and
these notes were allegedly found on the front door and the alleged apology note
was allegedly found by Richmond in the mailbox and turned over to detectives by
Richmond in a white envelope. But, this was all false and misleading because all
of the notes were found in the kitchen trash by detectives during execution of
two search warrants. The first on January 3, 1997, and the second on January 8,
1997. (P. Exhibit I, pgs. 1 through 5). The detectives' January 8, 1997, search
warrant (P. Exhibit I, pg. 3 and 4) bears the inscription, " '4X6' index cards
with notes written by Richard Klein - taken from kitchen 1 Letter Size White
Envelope with Note Written by Richard Klein - Taken from Kitchen...See attached
inventory list." The inventory list attached (P. Exhibit I, pg, 3) also shows
the index card with the other index cards taken primarily from the kitchen
trash. The index card itself bears detective's inscription, "1/8/97- 297
Kitchen-Trash." (P. Exhibit I, pg. 5). In order for the notes to have been in
the kitchen trash they would have had to have been written and disregarded on a
previous date because nobody was at the residence between those dates except
detectives due to the fact that it was secured by them as a crime scene. But,
most importantly, this demonstrates police misconduct, prosecutorial misconduct,
and ineffective assistance of trial counsel because they all possessed copies of
these search warrants, therefore, they all knew where the index notes came from
and that the detectives' testimony at the suppression hearing and Richmond's
testimony at trial was a fabrication calculated to falsify information and
mislead the jury at trial and that it did because the only inference that could
have been made at trial was that these notes were an apology for causing the
injury which is a false inference. Since, they all possessed the search warrants
and inventory lists the prosecutors, detectives, Richmond, and trial counsel
indisputably knew that they were presenting false testimony. Most importantly,
the State chose to lie to the Court at the suppression hearing and trial, and
counsel did and said absolutely nothing as detectives falsely testified, that,
"These are the note cards. They were in an envelope that was given to me by
Sharon Richmond. Question: "Those were on the door of the residence?" Answer:

-85-

e

"That's correct." (T.P. 47). Then at trial prosecutors knowingly presented false testimony through Richmond's testimony when she testified that these were the notes hanging on the front door (T.P. 400, 10-12) and that she found a note in the mailbox with the same State's exhibit number on it from the suppression hearing (T.P. 400, 14-25; 401) which are the same notes found in the kitchen trash by detectives during execution of the two search warrants, and counsel did not even squeak when the State presented this false information to the jury at trial which severally prejudice the outcome of the entire trial because it mislead the jury into the inference that Petitioner was apologizing for causing the injury when it is obvious that both testimonies were perjured. In other words, the door was not nailed shut and if it was detectives did it to secure the crime scene, and the notes were not found on the front door or in the mailbox as the State presented therefore they were not connected to the injury in any way because they had to have been placed in the kitchen trash on a date prior to the injury because Petitioner was never in the apartment. Petitioner left for work at 8:00 am on January 2, 1997, (T.P. 405, 14-25) then Richmond paged Petitioner at work to come to the hospital after work (T.P. 405, 2-13) Petitioner arrived at the hospital at about 3:30 pm (T.P. 463, 3-8) and did not return to the residence until 11:00 pm on January 2, 1997, and he was in the driveway (T.P. 474, 21-23) when detectives arrived allegedly at 11:30 pm (T.P. 35, 22-25; 36, 1-4) to arrest him, therefore, Petitioner could not have been in the apartment because it was barricaded (T.P. 474, 17) which is evident because Petitioner was in the driveway when detectives arrived. Petitioner had no knowledge of the evidence contained in the search warrants and inventory lists but it is indisputable the State and detectives did. Counsel probably did not because he failed to even investigate the discovery packet. Therefore, the false presentation of the alleged apology note and the note allegedly hanging on the door was extremely prejudicial. Additionally, none of the notes contain any statement connecting them to the injury. Counsel's performance was severally deficient for failure to conduct a reasonable investigation and review pertinent evidence and for his failure to mount any type of challenge to the false presentation of evidence.

### RICHMOND'S PLEA BARGAIN AGREEMENT

Counsel failed to conduct a reasonable investigation into Richmond's plea bargain agreement and obtain critical exculpatory impeachment evidence, failed to make an informed tactical cross-examination to establish the influences

B