operating on Richmond at the time of trial, and failed to establish witness bias, motive to fabricate testimony favorable to the State to impeach her credibility and to establish the reliability and trustworthiness of Richmond's testimony implicating Petitioner.

Counsel began cross-examining Richmond on her plea bargain agreement, (T.P. 423, 15-25; 424, 1-4) but the cross-examination was vague and inconclusive. Counsel failed to bring out any pertinent and significant details of the grant of immunity, or the promise of leniency which would have established witness bias. The only part of the plea bargain that was established was Richmond's OR bond which was of no impeachment value because Richmond had already collected on that part of the plea bargain; therefore, it could not have established witness bias because it was unlikely to have much influence over Richmond at that time. But, the grant of immunity and promise of leniency at her upcoming sentencing hearing was, in fact, extremely inducing would have establish witness bias. The evidence that Richmond was granted immunity was partially established in her plea hearing when the prosecutor testified that her 12 hour delay in seeking medical treatment had nothing to do with the death (T.P. 15, 18-23) when, in fact, it was the actual cause of death thus Richmond was not being prosecuted for her 12 hour delay even though it was the actual cause of death. The second part came out at trial when expert witness testimony established that her son died of the lung damage caused by her 12 hour delay. Since, the 12 hour delay is what caused the death and Petitioner was charged for it and Richmond was not, it is indisputable that she was granted immunity. The State does not have to confess to it. The evidence is in its actions, words, and presentation of evidence. The fact is that it was the State's expert witness and they knew what their expert was going to testify to, therefore, they knew that the delay caused the damage that actually caused the death, and they knew the probabilities established by their expert prove that this because it is the only logical conclusion based upon this evidence. The State simply did not want Richmond's 12 hour delay to have been the cause of death because the State was providing her immunity.

The promise of leniency came out after trial when Richmond's attorney contacted Petitioner's attorney and told her that Richmond entered into a plea bargain agreement where she was promised that the State would not pursue a prison term at her upcoming sentencing hearing, and Richmond was aware that she could receive probation (T.P. 11, 7-11) on her sole charge which is inducement

in its extreme. The State admitted on record that it made this promise to
Richmond. (T.P. 767, 1-9). And, the Court even recognized that this promise did
not come out at trial. (T.P. 752, 24-25; 753; 794, 18-20). Most importantly, the
jury did not factor this into their credibility determination. The probative
value of this promise was extremely high and counsel's deficiencies in
cross-examination and investigation was extremely prejudicial.

<u>SUPPRESSION HEARING</u>

Counsel filed a motion to suppress an alleged admission allegedly made to
detectives while in custody on January 2, 1997. On April 28, 1997, the Court
held a suppression hearing. (T.P. 17).

First, counsel's performance was deficient because he presented a sole
frivolous averment that detectives read the Miranda notification of rights to
fast. (T.P. 79, 11-25; 80). This averment was frivolous because the record
demonstrates that detectives took four (4) minutes in reading Petitioner's
rights (T.P. 53, 8-18) which was more than adequate time to read Miranda
warnings, and "...Miranda warnings themselves are not required by the
Constitution, and that an inadequate warning is not a Constitutional violation
per se." O'Guinn v. Dutton, 88 F.3d 1409, 1445 (6th Cir. 1996)(citing Duckworth
v. United States, 492 U.S., at 209, 109 S.Ct., at 2883-84).

Second, "The Constitutional question is whether..." Petitioner "...was
'compelled' to be a witness against himself, meaning that in order to be
admissible, ... confessions must have been voluntary." And, the State possessed
the burden of proof that Petitioner voluntarily waived his rights. As stated
previously, counsel knew that Petitioner could not have been at CIS at the time
the alleged Miranda waiver was allegedly signed. Counsel knew that Petitioner
did not sign any Miranda waiver, nor did he waive his rights or make any
statements. At trial and in closing argument, counsel failed to challenge the
alleged Miranda waiver and failed to even cross-examine detectives on their
testimony regarding the alleged admission and the signing of the alleged Miranda
waiver. Counsel simply did and said nothing. Counsel's averment should have
encompassed the issues of voluntariness, reliability, the totality of the
circumstances surrounding the interrogation, and the detectives' investigation
at the time. Because, the Supreme Court holds, that, "...the totality of the
circumstances approach when addressing a claim that the introduction of the
involuntary confession had violated due process," Withro v. Williams, 507 U.S.
860, 113 S.Ct. 1745, 1751 (1993), and "[b]ecause confessions carry 'extreme

-88-

probative weight, the admission of an unlawfully obtained confession rarely is harmless error.' " Smith v. Zant, 887 F.2d 1407, 1434 (11th Cir. 1989). Most importantly, counsel's sole argument at the suppression hearing and failure to even cross-examine detectives at the trial, in no way asserted the necessary argument and evidence nor adequately protected Petitioner's rights. Petitioner's conviction is invalid because it was founded on the allegation of a confession "not properly determined to be voluntary." Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 1777 (1964). And, the alleged admission was simply an unsubstantiated allegation and a false one at that. Counsel possessed the detectives' admission that Petitioner was refusing to make any statements, but counsel failed to utilize this evidence at the suppression hearing or at trial. The only reasonable inference based upon the evidence of Petitioner's refusing to voluntarily give written and tape recorded statements, and refusals to sign detectives alleged notes of the alleged interrogation is that Petitioner was invoking his Constitutional rights to remain silent until counsel was present. Counsel also possessed the knowledge that Petitioner was not arrested at 11:30 pm as detectives proclaim, therefore, he was not at CIS headquarters at 11:50 pm and could not have signed the Miranda waiver because he was not there at 11:57 pm which is the time that detectives placed on the waiver as the time it was allegedly signed. Therefore, the detectives' entire testimony about the alleged admission, arrest, and waiver was a false unsubstantiated allegation because Petitioner simply was not there. Counsel's failed to conduct a meaningful cross-examination at the suppression hearing and failed to conduct any cross-examination at all at trial, the omission of which compromised the outcome of both. And again, counsel failed to conduct a reasonable investigation and obtain both the camera in the detectives' car and the camera in the interrogation room, both of which possessed the date and time. Since, counsel knew from the times written on the Miranda form (11:50 and 11:57)(P. Exhibit J) and the time that detectives testified that Petitioner was arrested (11:30) he knew that there was no way that they could have gotten Petitioner to CIS in 27 minutes that it would have taken an hour. The cameras would have demonstrated the falsity of the detectives' testimonies. Counsel came to the suppression hearing and trial unprepared because counsel knew about the time element and he knew that he could prove this with these video tapes. Petitioner possessed a "clearly established ... Constitutional right to at some stage in the proceedings to object to the use of the confessions and to have a <u>fair hearing</u>

and reliable determination on the issue of voluntariness..." Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 1781 (1964), Petitioner was denied a fair hearing, reliable determination, and effective assistance of counsel. In addition to the availability of the cameras mentioned above and other omissions, counsel possessed the following challenges at that time:

[1] "...a reliable and true confession need not be rejected as involuntary and that evidence corroborating the truth or falsity of the confession and the guilt or innocence of the accused is indeed pertinent to the determination..." Jackson v. Denno, at 1784. Counsel possessed evidence that the alleged admission was unreliable. Counsel knew that the detectives knew that the injury was an immersion burn, not caused by spraying, and could not have happened the way detectives proclaim Petitioner described. (T.P. 51, 1-10; 481, 1-4). Counsel also knew that detectives' reasoning why Richmond did not cause the injury was that it allegedly could not have happened the way she described. (T.P. 487, 12-18; 492, 16-25; 493, 22-23; 494, 23-24; 503, 18-25). Therefore, they could not have found that Petitioner had anything to do with it either. And, because Petitioner said that he was not there which was corroborated by Richmond. (T.P. 42; 464, 9-10; 467, 23-24). But, the injury was, in fact, consistent with Richmond's confessions because she confessed that she found him in a pool of water, (T.P. 487, 1-11; 513, 22-23; 523, 10-17; 450, 1-10; 490, 13-16) with an expressionless face (T.P. 513, 21-22; 523, 10-11; 540, 7-8) which is both consistent with what detective's knew from doctors that it was an immersion burn, and consistent with what detectives knew as her son's seizure disorder. (T.P. 540, 7-8). Since, evidence corroborating the truth of falsity of the confession and the guilt or innocence of the accused is indeed pertinent to the determination..." of voluntariness, Jackson v. Denno, at 1784, just the fact that the injury could not have occurred the way Petitioner allegedly described was evidence, that, if properly presented by counsel it would have carried a high probative weight and affected the jury's determination regarding the reliability of the alleged admission. Most importantly, again Petitioner was denied a "fair trial" and "reliable, accurate determination." Petitioner was unavoidably prevented from challenging the alleged admission at any point in any of the state hearings due to counsel's deficient performance; thus, counsel's performance was not adequate to protect Petitioner's right to be free of a conviction based upon an unreliable and unsubstantiated confession. "...it is the trier of fact who must determine the truth of the testimony of prisoner and

-90-

official alike and resolve conflicts..." Jackson v. Denno, at 1777. Counsel's failure to present any challenges deprived Petitioner of a reliable and accurate determination.

[2] Second, counsel knew Petitioner refused to give any statements during this alleged interrogation without counsel present. This is evidence because detectives admitted that Petitioner refused to voluntarily give written statements, (T.P. 61, 24-25) and refused to voluntarily give tape recorded statements, (T.P. 62, 1-3) and refused to sign detectives' alleged notes of the alleged interrogation. (T.P. 498, 3-10). This was highly probative evidence of the totality of the circumstances surrounding the interrogation because in conjunction with the fact that the alleged admission was severally inconsistent with the nature of the injury and detectives admitted that it could not have happened that way (T.P. 504, 16-25; 505) and detectives knew it could not have happened the way Richmond implicated Petitioner (T.P. 543; 544; 545) and the injury was extremely consistent with the way Richmond confessed and they knew it because she confessed that she found him in a pool of water with an expressionless face. Is all very strong evidence of the totality of the circumstances surrounding the alleged interrogation. Counsel failed to challenge in any way the detectives' false accusations, that, "...he was willing to talk, (T.P. 477, 6-7) and "He readily admitted that he caused the injuries..." (T.P. 477, 11-12) and "...he never denied that he caused the injuries..." (T.P. 502, 6-7). Counsel failed to challenge these false statements with evidence from the suppression hearing that Petitioner was refusing to voluntarily give any statements outside the presence of the an attorney, and that Petitioner could not have been at CIS at the times written on the Miranda forms. Counsel had a duty and obligation of a constitutional magnitude to conduct a reasonable investigation and obtain the film from the cameras in the police car and interrogation room or find out why detectives turned off all the cameras. Counsel failed to conduct any cross-examination at all leaving Petitioner without the aid of an attorney.

[3] On June 4, 1997, prior to trial, counsel filed a Motion to Dismiss (T.P. 85) that asserted an extremely vague averment of Fourth Amendment right violation, (T.P. 92) but counsel failed to present any argument at the hearing and simply relied upon what the Court heard at the hearing and the previous suppression hearing. Counsel reasserted this motion again after trial (T.P. 604, 1-9) but he failed to say or argue anything. Pursuant to Stone v. Powell, 428

U                                                    -91-

.S. 465, 96 S.Ct. 3037, 3043 (9176), if "...the State had failed to provide adequate 'corrective process' for the full and fair litigation of federal claims, whether or not "jurisdictional,' the court could inquire into the merits to determine whether a detention was lawful." Petitioner did not receive a full and fair hearing on the issues because the appropriate evidence and arguments were not presented to the court by counsel. Counsel's no argument no evidence strategy failed to provide adequate constitutional protection that Petitioner was entitled to which denied Petitioner of effective assistance of counsel.

Counsel failed to assert that detectives possessed possessed no reasonable ground of suspicion that Petitioner committed a crime. They were relying on Richmond's statements implicating Petitioner and detectives knew these were lies. (T.P. 543; 544; 545). They knew the injury could not have happened that way. They knew Richmond had told them several lies because she lied about what when the injury occurred (T.P. 495, 11-13) she lied about how she filled the tub with water (T.P. 487, 12-18) then she claimed to have lied in all of her numerous admissions and confessions. (T.P. 543, 7-15). "If police are going to rely on hearsay to establish probable cause , that hearsay must be both factual and reliable." Gates v. Illinois, 462 U.S. 213, 103 S.Ct. 2317 (1983), because "...a co-defendant's statements are presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the co-defendant's desire to shift blame or spread blame, curry favor, ... or divert attention to another," Lee v. Illinois, 476 U.S. 530, 544, 106 S.Ct. 2064 (1986), and the "...informants veracity, reliability, and basis of knowledge are all highly relevant to probable cause..." U.S. v. Williams, 10 F.3d 1070, 1074 (4th Cir. 1993); Gates v. Illinois, at 230, 2329.

Since, detectives knew Richmond's statements implicating Petitioner were lies and they knew her confessions were factually consistent with the nature of the injury, immersion, and consistent with her son's seizure disorder, and because they knew her statements implicating Petitioner were factually inconsistent with the facts of the injury detectives never possessed any ground of suspicion, especially, in light of the fact that both Richmond and Petitioner had told them that Petitioner was not there at the time of the injury (T.P. 42; 464, 10-16) and they indisputably investigated that right away for verity because Petitioner was not a suspect. (T.P. 463, 6-9; 482, 19-25). Richmond's statements implicating Petitioner do not meet the requisite trustworthiness and reliability to establish probable cause for detectives to make a warrantless

arrest. And, the alleged admission resulting from this arrest was inadmissible on these grounds and counsel failed to even say a single word. In addition, counsel failed to assert that Richmond's confessions were reliable based upon her three (3) voluntary Miranda waivers which create a high presumption of reliability. Counsel failed to even mention this argument.

### FAILURE TO OBJECT TO PROSECUTOR'S CLOSING ARGUMENTS

Counsel failed to object to Prosecutor's testimony in closing argument, and failed to request curative instruction and failed to challenge the false statements in any way.

The prosecutor testified to the jury that the elements in count six (6) endangering children R.C. 2919.22(A) is not limited to a parent (T.P. 610, 17-25), and, that, because Petitioner, "...had accepted that relationship..." (T.P. 610, 23-24) that, this made Matthew Petitioner's "stepson," (T.P. 611, line 1) and, that, "Anyone in that [c]ustody who creates substantial risk to the health or safety of the child by violating a duty of care, protection, or support is guilty of this offense." (T.P. 611, 2-6). This was false, misleading, and highly prejudicial for the reasons stated previously on page 83 that Petitioner never possessed that authority or control over Richmond or her family. Richmond was the individual in full control over the entire situation and she demonstrated this to detectives when she told them "I am an independent person, I have a brain, and I can make these decisions on my own." (T.P. 409, 20-25; 410; 490, 17-25; 491, 3-5; 549, 8-12; 425, 14-16). She was equally overbearing on the evening of January 1, 1997. The prosecutor was, in fact, testifying and doing so falsely because his testimony was contrary to and in direct conflict with the evidence adduced at trial. The evidence demonstrates that Petitioner possessed no authority or control over the situation. The prosecutor made unsupported factual claims because there was no evidence to substantiate his accusation. Moreover, since it was the omission of medical treatment that the State admits was the basis for the involuntary manslaughter charge (T.P. 650, 19-25) and her son died as a direct result of this omission then it stands to reason if the State is going to pursue charges against Petitioner then it must have pursued involuntary manslaughter charges against Richmond because it is indisputable she was her son's sole guardian and she delayed seeking medical treatment for 12 hours. (T.P. 15). "When an attorney asserts that something not in the record is true, he is, in effect, testifying. He is telling the jury: 'look, I know more about this case than you, so believe

me when I tell you X is a fact.' This definitely is improper." U.S. v. Kojaun, 8 F.3d 1315, 1321 (9th Cir. 1993). The prosecutor's testimony that Petitioner was the parent and the false jury instruction denied Petitioner a fundamentally fair trial, Due Process, and counsel's performance was deficient in his failure to protect Petitioner's rights.

Then, without any objection or challenge, the prosecutor presented more false testimony, that, "He's told you right here, I was like a dad. He's acknowledged that much." (T.P. 649, 14-15). And, "He's in loco parentis" (T.P. 649, line 23). All of this testimony was false and unsupported by any facts, especially, due to the fact that Petitioner did not testify at all. Therefore, Petitioner could not have said that to the jury, "He was like a dad," nor was Petitioner in loco parentis because that means legal custody that someone obtains when they adopt. It is not custody that a person possesses when the natural parent is present in the room, nor when a person is dating someone. Most importantly, counsel failed to do anything or say anything to cure the prejudicial effect which denied Petitioner effective assistance of counsel.

### FAILURE TO OBJECT TO PROSECUTOR'S AND DETECTIVES' OPINION TESTIMONY

Counsel failed to object or somehow cure the inadmissible opinion testimony of detectives and prosecutors who continually and repeatedly asserted their opinion of what was the truth and what was a lie, and continually, without objection or any challenge, were permitted by counsel to assert their opinion of Richmond's innocence, truthfulness, and that Petitioner was guilty. The jury was not permitted to make these determinations, but prosecutors and detectives infringed on the province of the jury and made these determinations for them.

First, prosecutors told the jury what was a lie and the truth, and told Richmond what to express as a lie. (T.P. 390, 7-8; 391, 9-10; 396, 11-12 & 15-16). Then detectives continually told the jury what was the truth or lie, and literally that Richmond was innocent and that Petitioner was guilty without any word from counsel. The detective testified, "...that's when she broke down and told us what actually happened," (T.P. 470, 14-15) and "My conclusion would be that Richard Klein did it because he told me he did it." (T.P. 492, 10-11). Then counsel added a highly prejudicial agreement statement, "He told you that later..." (T.P. 492, line 12). Then detectives testified to what they believed the truth to be, "No, we didn't believe --..." (T.P. 492, line 18) and "Well she never said that she did it. ... We believed her. We believed those statements," (T.P. 503, 18-24) and again, "To get the truth," "...do you feel that was the

t                                    -94-

truth," (T.P. 504, 1-12) and "We know the injuries didn't occur as she had originally told us," (T.P. 477, 8-9) and they testified to what they believed the "truth" to be. (T.P. 504, 2-10). Counsel's most obvious, elementary, and fundamental line of questioning should have been how did you make absolutely sure nothing like that could have happened because you failed to ever, during the entire investigation, to conduct adequate water tests because you have absolutely no forensic training, education, or experience, and you do not possess the equipment capable of rendering a reliable determination of this nature, and furthermore, you testified that while "they" were testing the water you, "...proceeded to canvass neighbors..." (T.P. 484, 2-3). And, you did not even measure the water temperature. (T.P. 485, 8-10 & 18-19). In fact, counsel knew that nobody conducted pertinent water tests or a reasonable investigation to determine whether or not the injury could have occurred the way Richmond demonstrated, (T.P. 540, 24-25; 541, 1-17; 546, 12-25; 547; 550, 1-5) and the water tests were conducted with a meat thermometer which is inadequate to make the types of determinations that the detectives claimed to had made. (T.P. 519, 6-7). There is no evidence that this thermometer was accurate or calibrated for accuracy or adequate to render these types of determinations because this self created water experiment was created by individuals who possessed no scientific training or education. And, neither detective possessed any type of forensic expertise, (T.P. 542, 14-16) and they only tested the water for five (5) minutes, (T.P. 547, 9-17) and all this testimony about how these detectives made, "ABSOLUTELY SURE THAT NOTHING LIKE THAT COULD HAVE HAPPENED" and "IT COULDN'T HAVE HAPPENED THE WAY RICHMOND DEMONSTRATED" (T.P. 492, 18-25; 493, 22-24; 487, 14-15) was all false and misleading. Counsel failed to even mention any of this "exculpatory impeachment evidence" in closing argument; he failed to impeach detectives' false testimony in any way, and Landesberg lied and testified that his partner "Heinlein" was specifically placed on this case because he possessed specific experience with these types of burn injuries, (T.P. 483, 23-25) but Heinlein established that he possessed no such expertise (T.P. 542, 14-16) and the record is devoid of any type of evidence that this detective was an expert in burn cases. In fact, an expert would have conducted the significant testing state above and would have done so with a specially calibrated instruments to obtain an accurate and reliable determination, but no one ever conducted any such tests. Therefore, the only logical conclusion is that this testimony was simply another fabrication calculated to mislead the

j

-95-

jury and counsel failed to use any of this impeachment evidence.

Now that detectives have testified that they have made absolutely sure the injury could not have happened the way Richmond demonstrated because they have specialized training and expertise, and now that they have testified that Richmond's statements implicating Petitioner were the truthful statements, (T.P. 525) and that her confessions were all lies and that they believed her, then they testified that Richmond never said that she had anything to do with the injury and they believed her. (T.P. 526, 8-9; 544, 1-9; 493, 16-17; 494, 24-25; 503, 18-19 & 22-14). This was significant for counsel to inquire into because if Richmond never said that she was the individual giving the bath at the time the injury occurred then who did she give all of these admissions and tape recorded confessions to? (T.P. 409, 20-25; 410; 425, 14-16; 490, 17-25; 491, 3-4; 549, 8-12). The jury obviously relied upon the false testimony because they found Petitioner guilty based upon false testimony. The investigation must have been too "dynamic" (T.P. 499, 15-22) for detectives to conduct a reasonable, accurate, and reliable investigation and to render a determination based upon some substantial and credible evidence instead of simply fabricating stories about what they wanted the truth to be. Trial counsel failed to even conduct a "nominal" cross-examination or investigation because the detectives' testimonies were primarily fabrication, and no rational juror would have been able to conclude that Richmond or the detectives testimony was truthful, trustworthy, or reliable. No rational juror could have concluded that Richmond's confessions were inconsistent with immersion, or that the detectives conducted a reliable investigation and made reasonable determination based upon facts, nor that Richmond's statements or trial testimony implicating Petitioner was more reliable than her confessions, nor that Richmond's son could not have been caught in this tub for one (1) to five (5) seconds while having a seizure, nor that he had to have been held in this tub, nor would any rational juror be able to conclude that these detectives answered every query put to them truthfully and fully. That, these officers failed to do. Counsel had an ethical duty of a Constitutional magnitude to place accurate and truthful evidence before the jury and protect Petitioner's rights which included conducting a full scale cross-examination and investigation using all the evidence, especially, all of the available and plentiful impeachment evidence.

Then counsel made incriminating statements against Petitioner on record. First, counsel states, "That may well be that she had nothing to do with the

injury," (T.P. 495, 4-5) and "He told you that later," (T.P. 492, 10-12) which
is the equivalent of an admission. Then counsel makes reference to alleged
"discipline baths" that never occurred (T.P. 488, 20-25) because they came from
Richmond's fabrications. Then he asks detective's personal opinion of
Petitioner's guilt. (T.P. 492, 7-15). All of which was highly prejudicial coming
from defense because these statements were the equivalent of admissions by
defense. Therefore, counsel was not acting as defense counsel, but was acting a
second prosecutor.

Then counsel's cross-examination aided the State in proving its case,
enforcing the State's theory by continually reaffirming to the jury that
Richmond's confessions were the lies and her statements implicating Petitioner
were the truth, (T.P. 408, 11-13 & 14-17; 409, 1-2 & 14-15; 426, 7-10; 430,
10-12; 543, 7-14) which is not sound trial strategy since defense was supposed
to be asserting actual innocence. And, counsel's remarks during
cross-examination (T.P. 492, line 12; 493, 11-13; 495, 4-5) repeatedly showed
contempt for Petitioner and had a prejudicial effect. Counsel simply caused the
jury to continually and repeatedly hear that Richmond's confessions were lies
and her testimony implicating Petitioner were the truthful statements.

Then counsel failed to object or challenge or obtain curative instruction
when the Prosecutors testified , "We know that he was held in that hot water..."
(T.P. 607, 4-5) and "...to be not just placed in the tub but actually held in
that bathtub..." (T.P. 610, 8-9; 607, 4-5) and "...the person that put him in
there was going to make his point. The person that put him in there held him in
there ... That's the only explanation that we can offer..." (T.P. 623, 22-25),
and "That's the only explanation that explains why Matthew stayed in that tub
long enough to sustain these burns..." (T.P. 624, 3-4). This was false,
misleading, highly prejudicial, and amounts to testifying about his opinion
which possesses absolutely no evidentiary support in the record. Counsel stood
by and did absolutely nothing at all.

Then the prosecutor asserted his personal opinion of Petitioner's guilt and
testified, "...The person that scalded that child is sitting right here today.
Let me tell you why I think that, (T.P. 614, 16-22 and "...the evidence doesn't
show that she's the one that scalded Matthew. It points to him," (T.P. 614,
16-17) and "It's because it's the truth. (T.P. 620, 1-2). Finally, and most
importantly, the prosecutor fully asserts his personal opinion of guilt and
testifies, "Folks, he's guilty and he's guilty of everyone of those counts. All

six of them," (T.P. 625, 23-24) and his opinion of what was the truth. (T.P. 620, 1-2). All of which was highly prejudicial because none of it was supported by evidence of record it was his personal opinion contrary to the facts.

Then counsel failed to object or challenge prosecutor's fabrications that Petitioner put his hands in certain positions to stop any yelling or screaming (T.P. 624, 17-25) which was contrary to and in direct conflict with the evidence adduced at trial because neighbors heard the screams. (T.P. 502, 16-24). Had this actually occurred, Petitioner would have been severally burned. This again amounts to prosecutor testifying about things that are not in the record, thus, falsifying information to the jury. Counsel failed to ever say or do anything to correct or cure the falsification.

Then again, counsel failed to cure prosecutor's testifying. The prosecutor actually told Richmond what to testify to on several occasions. First, "...you had a duty at that point to, despite what you felt about this Klein individual, to get him medical attention..." and "And in fact, at that point in time you chose that individual over your own son; isn't that correct?" (T.P. 377, 15-17 & 23-25). The prosecutor supplied Richmond with an excuse for suddenly diverting blame to Petitioner. Richmond never thought of that excuse. In fact, the record is devoid of any justification for Richmond's failure to obtain immediate medical treatment for her son other than she was scared about the consequences (T.P. 427, 16-25; 428) nor for permitting Richmond to recant her confessions and diverting full blame to Petitioner. Trial counsel sat idoly by and failed to request curative instruction and his cross-examination was deficient because he failed to permit her to answer the question; he answered the question for her. These were obvious leading questions that went beyond permissibility because the question supplied the answer. Nevertheless, Richmond never presented any testimony that the reason she failed to obtain immediate medical treatment for her son was because of "how she felt about that individual." This amounts to false prosecutrial testimony because it was never even considered by Richmond as an excuse. The prosecutor's question supplied the excuse for her. Then again the prosecutor tells Richmond what to say, "...and you are trying to get treatment for him, yet you are saying things that aren't true;..." (T.P. 391, 9-12) and "That your inclination was to call 911, and that the defendant Klein told you that he didn't think that was necessary; is that correct?" Answer: "Yes, it is." (T.P. 382, 15-18). But, the prosecutor's testimony was falsification because Richmond was not trying to get medical treatment for her son; it was Petitioner who told Richmond to assert her sole parental authority and obtain medical

-98-

treatment. (T.P. 425, 6-13). And, nobody stopped her, (T.P. 424) and Richmond "Is an independent person, she has a brain and she can make those decisions on her own." (T.P. 427). The jury obviously relied upon the false testimony or they could not have convicted Petitioner. Counsel failed to reiterate and cure the false testimony. Counsel failed to emphasize the facts that Petitioner possessed absolutely no authority over Richmond, that he was not the parent, that he had only known Richmond for a month, that Richmond controlled the entire incident, and that Richmond prevented Petitioner from seeking medical treatment by not permitting him to see the severity of the injury; this would have required Petitioner to disrobe her son and that is not something that an individual does who had only known a woman for a month. Counsel failed to cure the falsities.

Then counsel failed to cure detective's false testimony, that, they had just received information from doctors and learned that the injury was an immersion burn and not a spray burn that it couldn't have happened that way, and they confronted Richmond with this information and at that time she decided to tell the truth, (T.P. 252) implying that the reason Richmond diverted blame was because detectives possessed medical evidence which demonstrated Richmond's confessions to be lies which was severally false and misleading. But, counsel knew from the suppression hearing that Richmond was not saying that the injury was caused by spraying, (T.P. 51, 6-11) but this was never presented to the jury to cure the detective's false testimony. And, detectives did not have that information (T.P. 539, 21-25) until the next day (T.P. 541, 12-17) therefore, they could not have confronted Richmond with this evidence to cause her to divert blame to Petitioner because that simply would not have been the truth. Counsel failed to cure the false testimony and implications thereof.

Counsel failed to assert evidence from the suppression hearing that detectives admitted that they possessed evidence that Petitioner was not there at the time of the injury and this was corroborated by Richmond's confessions, (T.P. 42) and, most importantly, that detectives immediately investigated this to verify it which is why Petitioner was not a suspect. (T.P. 463, 6-16). Elementary police procedure would have been to investigate an alibi which counsel also failed to investigate and present. Petitioner was not there on January 1, or 2, 1997. Had the jury heard this in conjunction with adequate presentation of evidence, argument, and impeachment evidence there is a reasonable probability that the outcome of the trial would have been different.

Counsel knew that detectives were continually misleading the jury making it

factually complex. So, factually complex that it would require counsel to
specifically utilize the testimonies for impeachment purposes to correct false
and misleading testimonies to alter the course that the false testimonies were
taking the outcome of the trial. This counsel failed to do. Counsel, being fully
aware of the facts and the truth, failed to conduct sound, strategical, and
meaningful cross-examinations that pulled the mess of facts together into an
understandable conclusion because the detectives' continual and repetitive lying
and altering testimonies created an extremely factually complex and misleading
trial which was severally prejudicial because it was extremely confusing and
counsel failed to utilize what was at his disposable to cure the deficiencies.

**(XII) TWELFTH GROUND FOR RELIEF:**

THE STATE TOOK TWO DRAMATICALLY OPPOSED POSITIONS ON EVIDENCE AGAINST PETITIONER
AND CO-DEFENDANT RICHMOND IN VIOLATION OF PETITIONER'S DUE PROCESS RIGHTS.

First, at Richmond plea hearing the prosecutor presented personal testimony
evidence that Richmond's 12 hour delay in seeking medical treatment for her son
had nothing to do with the death. (T.P. 15, 13-23). Then at Petitioner's trial
the State presented expert witness testimony that it was this 12 hour delay
which caused the damage to the lungs that caused the death, "in actuality."
(T.P. 578). He died of pulmonary failure (T.P. 583, 12-13) caused by her 12 hour
delay. The expert testified, that, "The longer you wait before you begin to give
fluids the more ever the problem will be with the lungs, (T.P. 578, 5-7) and
Matthew had a 65 percent probability of life had he received immediate medical
treatment, (T.P. 575, 20-21) but this plummeted to ten (10) percent (T.P. 579,
15-16) due to Richmond's 12 hour delay which is nearly nonexistent. Then the
State admitted on record that this 12 hour delay (omission of duty arising from
the capacity of parent R.C. 2919.22(A)) was the basis for Petitioner's
involuntary manslaughter charge, (T.P. 650, 19-25) thus, admitting that the 12
hour delay was the cause of death. But, Richmond was not charged for the damage
done by her 12 hour delay, nor for the resulting death. She was charged with a
single count of endangering children (T.P. 10, 7-11) which did not even require
a prison term (T.P. 11, 7-11) and she was only charged for, "...the resultant
suffering by Matthew as a result of this charge is the reason she was charged in
this. (T.P. 15, 24-25; 16). The State violated Petitioner's Due Process rights
by taking two dramatically opposed positions against co-defendant's in the same
case. The United States Supreme Court established that this is "...a serious
question of prosecutorial misconduct," Jacobs v. Scott, 513 U.S. 1067, 115 S.Ct.

-100-

711 (1995), and a serious violation of Due Process. Prejudice occurred because the Prosecutor's testimony was false and mislead trial counsel prior to trial in pertinent facts that it was not the delay that caused the death, and because Petitioner was held solely and independently responsible for the result of Richmond's 12 hour delay. The State's admission, that, this omission of duty was the basis for the involuntary manslaughter because the supporting offense was chid endangering R.C. 2919.22(A)(which requires the individual to be parent or guardian and omit a duty of care arising from that capacity), is evidence that the State knew that this 12 hour delay is what caused the death, but more importantly, Richmond possessed supreme authority and responsibility in the equation because she was the mother and sole guardian and Petitioner had only been part of the equation for two or three weeks. And, the State knew the only testimony against Petitioner it admitted were lies. (T.P. 543; 544; 545). Since, the State knew that it was presenting false information to the Court at both this plea hearing and at trial Petitioner's conviction should be vacated because no competent evidence remains to support the conviction. The State itself has formally vouched that Petitioner's alleged admission they knew was false. (T.P. 481; 504; 505). That is not competent evidence. Most importantly, the prosecutor's testimony at the plea hearing he knew to be false because he had expert witness evidence to the contrary. "It is well settled that to obtain a conviction by the use of testimony known by the prosecution to be perjured offends due process." Jacob v. Scott, at 712. Since, the State knew that Richmond was lying in her statements implicating Petitioner, and it knew she controlled the situation, and it knew she was her son's sole legal guardian, and it knew Petitioner possessed no authority that supersedes Richmond's, and it was logical that Petitioner did not know the severity of the injury when he found out about it, and it knew Richmond's confessions were consistent with the nature of the injury, and because it knew that Richmond deliberately delayed seeking medical treatment and she was of a significant intelligence with a college degree and with 12 years of mother experience then it is indisputable that Petitioner was not guilty of any of the offenses. The State held Petitioner responsible for Richmond's crime which is obvious from all the evidence which is the resulting prejudicial effect.

**(XIII) THIRTEENTH GROUND FOR RELIEF:**

By imposing multiple punishment for what is indisputably one offense, the trial court violated the Fifth Amendment Double Jeopardy Clause.

Petitioner was convicted then sentenced to four (4) maximum consecutive sentences totalling 31 years for the single offense of allegedly placing Richmond's son in this tub of water. The State failed to establish separate culpable mental states (animus') for each offense. Nevertheless, Petitioner was quadri punished for what is indisputably a single offense.

It is the State's position, based upon one of Richmond's numerous fairy tails, that, Petitioner placed her son in this tub of water, which was allegedly supposed to have been cold water (T.P. 372, 373, 4-5) as punishment. Not only did the State fail to support this with any competent evidence that this was a credible fact, but also failed to establish with competent evidence that it was Petitioner who placed him in there. Richmond's testimony implicating Petitioner was made up of unsubstantiated accusations that the State knew were lies, therefore, the State failed to prove that separate crimes occurred. The United States Supreme Court holds, that, "...no man can be twice punished for the same offense." North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 2076 (1969). Therefore, the State by its failure to present competent evidence to establish separate animus' has, in fact, imposed unlawful multiple punishments for what indisputably could only have been a single offense.

**(XIV) FOURTEENTH GROUND FOR RELIEF:**

Unjustified and lengthy delay between the finding of guilty and the court of appeal's resolution of appeal denied Petitioner of Due Process and Speedy Trial and Appeal rights.

Petitioner raised this issue on direct appeal in the First District Court of Appeals in his pro se appeal brief filed September 21, 1999. (R. Exhibit 18, pgs. 4 through 6). But, the First District Court of Appeals was without jurisdiction, as set forth below, thus Petitioner was without an adequate remedy at law of appeal so petitioner filed for a writ of habeas corpus pursuant to R.C. 2725.01 in the Twelfth District Court of Appeals on August 2, 2000. (R. Exhibit 25). Then on direct appeal of right to the Ohio Supreme Court on (November 20, 2000, notice of appeal date (P. Exhibit L))(merit brief January 16, 2001 (R. Exhibit 29)).

First, the reasons that Petitioner pursued the remedy of habeas corpus pursuant to R.C. 2725.01 was because after the First District Court dismissed Petitioner's direct appeal without a hearing on December 4, 1998, on the grounds that it lacked jurisdiction in the absence of a valid judgment of conviction on record (R. Exhibit 13) the trial court placed an invalid nunc pro tunc

-102-

judgment on record on December 29, 1998. (R. Exhibit 14). The only logical reasoning that the court filed judgment nunc pro tunc was to leave the door open for invalidation of Petitioner's appeal if he prevailed because the nunc pro tunc is invalid and the trial court knew what it was doing. The First District Court relied upon State v. Breedlove, 46 Ohio St.3d 78, 546 N.E.2d 420 (1988) in dismissing the first appeal; therefore, the only conclusion that is legally sound is that the law of Breedlove renders the nunc pro tunc order invaid too and the First District Court was still without jurisdiction to "entertain" an appeal thus the court of appeal's decision is invalid. The reason for this is that Breedlove establishes a nunc pro tunc order invalid when it is used to (1) "correct an error in the judgment," (2) "modify a judgment," or (3) "enter a judgment when none was entered in the first instance." Breedlove, at 423. The First District Court was clear that there was no judgment entered in the first instance and even the judge's sheet, if it could be construed to be a judgment entry, still does not permit the trial court to enter judgment nunc pro tunc due to the same law of Breedlove, but the Court established that this SENTENCING FINDING SHEET did not constitute a judgment entry. (R. Exhibit 13, pg. 6, para. 2-3). Therefore, there either was no judgment "in the first instance" or the nunc pro tunc was invalid because it was used to correct or modify the original judgement. Either way, the nunc pro tunc is invalid. Breedlove establishes that the purpose of a nunc pro tunc order is simply to record on the journal the exact judgment that was filed in the first instance on the basis that the clerk failed to dully record it, that is all. Since, the law of Breedlove was powerful enough to walk all over Petitioner's Federally Mandated Due Process Constitutional rights on an appeal as of right and deny Petitioner speedy appeal, and Equal Protection of the Law, it stands to reason that it is powerful enough law to render the appellate court's decision invalid had Petitioner prevailed, and in the same sense, it is powerful enough to invalidate the nunc pro tunc order, as well as, the appellate court's December 3, 1999, judgment because that court possessed no jurisdiction in the absence of a valid judgment of conviction and the nunc pro tunc order is invalid. The First District Court of Appeals made perfectly clear that an appellate court is without jurisdiction "to entertain an appeal in the absence of a valid judgment of conviction." (R. Exhibit 13, pg. 2, para. 1; pg. 5, para. 2; pg. 6, para. 2; pg. 7, para. 2). Since, the law of Breedlove "precluded Petitioner from invoking the jurisdiction

of" the court of appeal (R. Exhibit 13, pg. 5, para. 2) in the first instance
the only same, sound, logical legal basis renders the nunc pro tunc invalid and
non-appealable. Additionally, the trial court was without jurisdiction to render
judgment nunc pro tunc or in any other way because clearly established law
divest that court of jurisdiction to do so. Clearly established law in Ohio
holds, that, "An unjustified and lengthy delay (of 13 months) between the
finding of guilt and sentencing divests a court of jurisdiction to sentence the
defendant," Willoughby v. Lukehart, 39 Ohio App.3d 74, 529 N.E.2d 606, syllabus.
Crim.R. 32(C) establishes that a judgment does not go into effect until it is
"journalized by the cerk." The Ohio Supreme Court holds that "a court speaks
only through its journal entries." Schenly v. Kauth, 160 Ohio St. 109, 113
N.E.2d 625, and the announcement of a sentence cannot serve as a judgment of
conviction (R. Exhibit 13, pg. 3, para. 4) or it would be appealable. Rule 7 of
the Ohio Rules of Superintendence requires the trial court in a criminal case to
enter judgment of conviction within 60 days to have complied with Cirm.R 32(B).
Therefore, the trial court has not complied with Crim.R. 32(B) and the First
District made perfectly clear in its December 4, 1998, decision that the rule of
Breedlove requires "strict conformity with Crim.R. 32(B)" and "scrupulous
adherence to Cirm.R. 32(B) is one of long standing in this jurisdiction." (R.
Exhibit 13, pg. 4, para. 2). Since, the Law of Breedlove requires strict
conformity and scrupulous adherence to Crim.R. 32(B) and in order to comply with
Crim.R. 32(B) the judgment has to have been filed within 60 days pursuant to
Supp.R. 7, and because the trial court is divest of jurisdiction, the only same,
sound, logical legal conclusion is that the trial court was divest of
jurisdiction which divest the court of appeals of jurisdiction thus rendering
the court of appeals December 4, 1999, judgment and decision invalid. Therefore,
Petitioner did not legally possess an adequate remedy at law on appeal because
there is still no valid judgment of conviction conforming to Crim.R. 32(B) on
record because in order to have complied with Crim.R. 32(B) Rule 7 of the Ohio
Rules of Superintendence require that judgment to have been filed within 60 days
from the verdict. Rule 7 has been revised from Supp.R. 5 as pointed out in the
Wiloughby Court. Since, the trial court's "announcement" of sentence at the
sentencing hearing is not a judgment and non-appealable (R. Exhibit 13, pg. 3,
para. 3-4) it carries no authority to transfer Petitioner to prison; therefore,
Petitioner has been imprisoned on a judgment rendered by a court that was divest
of competent jurisdiction thus Petitioner is unlawfully restrained of his
liberty in the absence of a valid judgment of conviction and the only remedy at

law was an extraordinary writ due to the extraordinary circumstances which was
the reason Petitioner pursued the only logical, sound, legal remedy of an
original action in habeas corpus pursuant to R.C. 2725.01. Respondent chose to
evade this issue, instead, Respondent chose to falsify information to the Court
by re-casting Petitioner's claims in Petitioner's habeas corpus petition (R.C.
2725.01) and failed to explain where the State Courts got their jurisdiction
from in the first instance to enter the judgments which Petitioner possesses the
First Amendment right to inquire into pursuant to R.C. 2725.01 which is its very
definition. By definition of clearly established law Petitioner is "unlawfully
restrained of his liberty" R.C. 2725.01 without a valid judgment of conviction
authorizing such detention from a court divest of jurisdiction which divests any
appellate court to "entertain" an appeal (R. Exhibit 13, pg. 7) absent a valid
judgment of conviction which violates Petitioner's Enumerated Federal
Constitutional Rights. Respondent's "DEFENDANT'S MOTION TO DISMISS" (R. Exhibit
26) simply evaded the entire claims essence and redrafted it as an attempt to
appeal which is obviously not what Petitioner's habeas corpus R.C. 2725.01
petition was about. The trial court's failure to place of record a valid
judgment that could be appealed denied Petitioner of numerous Federal
Constitutional rights and Protections and caused the mess fully set forth in
Petitioner's First, Second, Third, and Fourth Ground for Relief which would not
have occurred had the trial court rendered a valid judgment that could be
appealed. In addition, it denied Petitioner of speedy appeal rights as stated
below.

The jury returned its verdicts on June 11, 1997, On September 12, 1997,
Petitioner attempted to appeal. On December 4, 1998, the Court of Appeals
dismissed the appeal without review of the claims on the grounds that it was
without jurisdiction absent a judgment of conviction. (R. Exhibit 13). A span of
15 months past then the trial court, which was divest of jurisdiction at the
time, entered the nunc pro tunc order on December 29, 1998, fired Petitioner's
attorney then appointed its prosecutor to act as attorney who failed to provide
Petitioner with adequate and effective Federal Constitutional protection from
the unlawful conviction. It is unlawful because Petitioner is innocent and was
denied enumerated Federally Mandated Constitutional rights at trial and on the
first appeal as of right. Petitioner was seeking an "immediate" or "more speedy
release," U.S. v. Smith, 94 F.3d 204 (6th Cir. 1996) but possessed no adequate
remedy at law on appeal because the court of appeals was divest of jurisdiction
to legally "entertain" an appeal absent a valid judgment of conviction.

Petitioner, still has not received an adequate and meaningful review on appeal by a court of competent jurisdiction which violates Petitioner Due Process, Equal Protection, and Speedy Appeal rights. Pursuant to U.S. v. Smith, 94 F.3d 204 (6th Cir. 1996):

(A) REASON FOR THE DELAY: Petitioner was arrested on January 2, 1997, and the jury returned its verdicts June 11, 1997. The Court of Appeals affirmed conviction on December 3, 1999. (R. Exhibit 22). From arrest to the Court's December 3, 1999, entry affirming conviction was 35 months, and from the finding of guilty to that the Court's entry was 29 months and 19 days. In Burkett v. Fulcomer, 951, F.2d 1431 (3d Cir. 1991) an 18 month delay was sufficient to trigger Due Process and Speedy Appeal rights violations, and the record is devoid of justification for the trial court's failure to place of record a valid judgment of conviction or for filing what it knew was an invalid nunc pro tunc judgment after the appellate court's 1998 dismissal.

(B) DEFENDANT'S ASSERTION OF RIGHT: Petitioner fully asserted his right to a speedy appeal at its earliest possible time. First, in his September 21, 1999, pro se appeal brief; Second, in his State habeas corpus filed pursuant to R.C. 2725.01; then again to the Ohio Supreme Court. Federal Due Process Rights are involved.

(C) PREJUDICE TO PETITIONER: (1) Petitioner suffered prejudice in six (6) ways. First, the court's failure to file a judgment of conviction causing dismissal of the appeal as of right caused Petitioner to lose his ten thousand dollar retained attorney as fully set forth in Petitioner's first four grounds for relief which caused all of the procedural problems in those grounds for relief that would not have occurred otherwise. Petitioner was forced to proceed pro se against his will due to ineffective assistance of the appointed appellate counsel. Had Petitioner's appeal not been dismissed and his retained attorney's appeal brief been reviewed which contained the claims and argument herein the result of the proceedings would have been different because the claims would have been presented by a seasoned professional, Judge Gains and Associates. Petitioner would have had his attorney who had Petitioner's best interests and claims fully presented and Petitioner would not have had to proceed pro se at all in an attempt to obtain an adequate and meaningful appeal. Counsel felt that he was not responsible for the dismissal and that he had fulfilled his obligations at that point. It was the trial court's fault for the dismissal. Its appointed attorney was ineffective and was in no way the equivalent of

-106-

Petitioner's retained attorney because Judge Gains represented that Law Firm.
Therefore, Petitioner suffered an extreme prejudicial effect. (2) Second, as
established in Fulcomer, Petitioner likewise suffered oppressive incarceration
because he is innocent of all of the charges that he was convicted and has not
received an adequate and meaningful review of that conviction to date. (3)
Petitioner has been precluded from asserting pertinent claims on appeal that
possess a reasonable probability of success had appointed counsel took interest
in this case. (4) The delay will impair Petitioner's defense in the event of a
retrial because the length of time between arrest will result in loss of
pertinent evidence, witness' of alibi, and witnesses' ability to accurately
recall, and prevent ascertainment of other evidence not obtained at the first
trial will have been lost or destroyed. (5) Here as in Fulcomer, Petitioner has
suffered sever distress due to the unlawful incarceration and delay in
resolution of Petitioner's claims that the State has cleverly evaded reviewing.
(6) Petitioner has suffered undue expense and undue burden of purchasing legal
materials for the additional litigation of Petitioner's claims which has
amounted to thousands of dollars extra. This expense is considered prejudice
pursuant to U.S. v. Smith, 94 F.3d 204 (6th Cir. 1996), in addition to loss of
retained counsel's expertise, loss of that retainers fees, and loss of an
adequate and meaningful review on an appeal as of right. Retained counsel's
brief was never reviewed on appeal because the appointed attorney failed to
raise those claims which are similar to the claims presented herein, only, with
the additional expertise of a an individual who was a Judge. Therefore, the
trial court's failure to place of record a valid judgment of conviction without
any justification for the delay prevented Petitioner from receiving an adequate
and meaningful review and effective assistance of counsel on appeal of right and
delayed the appeal process for seven years. At this late of a date Petitioner
still has not received review on the claims therefore he was denied Due Process
of Law in enumerated ways.

**(XV) FIFTEENTH GROUND FOR RELIEF:**

PETITIONER WAS DENIED DUE PROCESS ON APPEAL AS OF RIGHT TO THE OHIO SUPREME
COURT WHEN THE COURT DISMISSED PETITIONER'S TIMELY  FILED MERIT BRIEF.

On November 20, 2000, Petitioner filed notice of appeal (as of right) to the
Ohio Supreme Court (P. Exhibit L) from the Court of Appeal's dismissal or
Petitioner's habeas corpus petition R.C. 2725.01. (R. Exhibit 28). The Ohio
Supreme Court dismissed the appeal as of right without a hearing on the merits
due to Petitioner's alleged failure to serve a copy of his Merit brief on

opposing counsel. On January 23, 2001, Appellee (who is the same Assistant Ohio Attorney General who is representing Respondent in this case) filed "APPELLEE'S MOTION TO STRIKE APPELLANT'S BRIEF" (R. Exhibit 30) based on the claim that Petitioner failed to serve a copy of his merit brief pursuant to Rule XIV 2(D)(1) of the Rules of Practice of the Supreme Court of Ohio.

(1) First, the Rules of Practice of the Supreme Court of Ohio do not provide any time limit to serve the brief, and Petitioner did, in fact, serve the brief upon opposing counsel. The evidence of this is, on February 8, 2001, Respondent filed "APPELLEE'S MOTION FOR EXTENSION OF TIME." (P. Exhibit P). Attached to this motion for extension of time Respondent attached a copy of Petitioner's certified mail receipt and post-marked envelope that demonstrate that service was made before the deadline for filing Appellee's brief. Therefore, service was made, and, since, there are no time limits for service and this was an appeal as of right, as fully set forth below, the Ohio Supreme Court violated Petitioner's Due Process rights by dismissing the case based on this issue.

(2) Second, due to the particular set of circumstances it was the State's fault for that the brief was not served earlier: Petitioner possessed an "appeal as of right" pursuant to Rule II, Section (1)(A)(1) of the Ohio Supreme Court Rules of Procedure, provides, "(A) Appeals from courts of appeals. (1) Appeals of Right. An appeal of a case ... that originated in the court of appeal invokes the appellate jurisdiction of the Supreme Court and shall be designated an appeal of right." This portion of this rule applies to original actions that originate in the court of appeals, and R.C. 2725.02 gives the court of appeals and the Ohio Supreme Court original jurisdiction to grant the writ, and R.C. 2725.03 gives only those courts in the jurisdiction in which the institution is located jurisdiction to grant the writ. Therefore, the Ohio Supreme Court violated Petitioner's Federally Mandated Due Process rights and these rights applied in Petitioner's appeal to the Ohio Supreme Court because it was an appeal as of right from an original action specified in Rule II, Section (1)(A)(1) which is known as a "collateral attack" on the judgment of conviction which is what that was all about due to the clearly established fact that the court of appeals was without jurisdiction from the nunc pro tunc order based upon the same law of Breedlove that it relied upon to dismiss Petitioner's first appreal as of right.

On January 3, 2001, Respondent filed, "APPELLEE'S MOTION TO STRIKE APPELLANT'S BRIEF" (R. Exhibit 30) on the grounds that Petitioner failed to

provide service, but this was extremely false under the particular set of circumstances because Petitioner was proceeding "in forma pauperis" and the clerk's duty was to provide the copy to Petitioner for service. Petitioner's father came to Lebanon Corr. Inst. on January 16, 2001, to ensure that the brief was timely filed and served he picked up the brief and took it to the clerk's office and filed it personally acting as carrier. Since, Petitioner was proceeding "in forma pauperis" (P. Exhibit M) Petitioner was again entitled to a copy made by the Clerk, as they always supplied under these circumstances, for service, and, additionally, Petitioner's carrier (father) personally requested the necessary copy for service but the clerk misinformed him that the clerk's office would make the necessary copy and forward it to Respondent. Thereafter, Petitioner filed "APPELLANT'S MOTION TO OVERRULE APPELLEE'S MOTION TO STRIKE BRIEF" (P. Exhibit N) which demonstrated that Respondent had been served with a copy of the brief, and contained objective factors external to Petitioner's control that prevented earlier service, that, Petitioner was completely unaware that the Clerk failed to provide the copy for service, that, they had always supplied in the past, and Petitioner demonstrated objective factors external to his control that unavoidablly prevented him from timely service. Most importantly, the Ohio Supreme Court Rules of Procedure did not provide any time limit for service and still does not provide any deadline for service, but Respondent did not assert that it was not timely filed, Respondent averment was that Petitioner did not serve the brief at all which is false and not grounds for dismissal of the appeal as of right. Therefore, Petitioner's alleged failure to serve the brief at an earlier date was not justifiable grounds for dismissal of the appeal of right because the brief was served. Nevertheless, Petitioner acquired an affidavit to establish that the Clerk failed to provide the necessary copy for service then on May 4, 2001, Petitioner filed a "MOTION FOR RECONSIDERATION" (P. Exhibit O) containing that affidavit to demonstrate an additional objective factor external to Petitioner's control. Nevertheless, Petitioner did, in fact, serve a copy of the brief on Respondent because on February 8, 2001, Respondent filed his "APPELLEE'S MOTION FOR EXTENSION OF TIME" (P. Exhibit P) in which Respondent attached a copy made from Petitioner's certified mail envelope and receipt demonstrating that Respondent had been served a copy of the brief. Since, the Rules of The Ohio Supreme Court did not provide any set time limit for service, and, because, Petitioner was proceeding in forma pauperis and the clerk failed to provide Petitioner's carrier with the

copy necessary for service, and, because, Respondent was, in fact, served with a copy in time for him to obtain an extension of time and prepare a response brief, (which was failed on February 26, 2001, (R. Exhibit 33)) therefore, Petitioner was denied Due Process on an appeal as of right when the Court struck Petitioner's brief on March 21, 2001, (R. Exhibit 35) and dismissed the appeal as of right which was based upon Respondent's motion to strike rather than on the merits of the claims. Because, this was an appeal as of right and Petitioner was entitled to Due Process of Law on this appeal which means that Petitioner was entitled to those copies of his brief for service, and due to the objective factors external to Petitioner's control that he was unavoidably prevented from earlier service of the brief, and due to the fact that there is no set time limit for service Petitioner was entitled to review of the claims and a full scale appeal. Therefore, Petitioner was denied a full and fair hearing and his Due Process rights were violated.

(3) Third, Petitioner was denied Federal Due Process when that Court dismissed Petitioner's "appeal as of right" on frivolous non-meritorious grounds that Petitioner allegedly failed to serve a copy of his merit brief upon Respondent, that, was, in fact, served as demonstrated above. "...if a State has created appellate courts as 'an integral part of the ... system for finally adjudicating the guilt or innocence of a defendant,' Griffin... the procedures used in deciding appeals must comport with the demands of Due Process and Equal Protection Clauses of the Constitution." 469 U.S., at 393, 105 S.Ct., at 834. Since, the Ohio Supreme Court Rules designated an appeal from the court of appeals on an original action as an appeal as of right then the same Due Process rights apply because it is an appeal as of right and Petitioner was entitled to fundamentally fair proceedings, as well as, the copy of the merit brief at State's expense.

## PRAYER FOR RELIEF

Petitioner is actually innocent of all of the charges. It was Richmond who caused the injury and death of her son. Due to the numerous Constitutional violations contained herein Petitioner respectfully requests unconditional discharge from incarceration, or relief to which this Courts deems appropriate

I Richard Joseph Kein 350-022 pro se declares under penalty of perjury that the information in the foregoing document is true and correct to the best of my knowledge.

Respectfully submitted,

-110-

Respectfully submitted,

Richard J. Klein 350-022

Petitioner/pro se

R.C.I. P.O. Box 7010

Chillicothe, Ohio 45601

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been served upon counsel for respondent Assistant Ohio Attorney General Diane Malory at 150 East Gay Street, Columbus, Ohio 43215 on this 15ᵗʰ day of July, 2004.

Richard J. Klein

-111-