FILED
JAMES BONINI
CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO 05 JUL 22 PM 12: 13
WESTERN DIVISION

Richard J. Klein III, pro se,
R.C.I. P.O. Box 7010
Chillicothe, Ohio 45601
    Petitioner/Appellant,

    vs.                          CASE NO. 1:01-cv-794

Harold Carter, Warden
Ohio Attorney General
150 East Gay Street
Columbus, Ohio 43215,
    Repondant/Appellee.

## MOTION FOR CERTIFICATE OF APPEALABILITY

    Petitioner/Appellant Richard J. Klein III, pro se, respectfully requests issuance of a certificate of appeability from the judgment of the United States District Court Southern District of Ohio entered in this action on the 27th day of June, 2005, (Doc. 82-83) dismissing with prejudice Petitioner/Appellant's habeas corpus application on procedural grounds. Petitioner/Appellant requests to appeal on the grounds set forth herein.

Respectfully submitted

Richard J. Klein III 350-022
PETITIONER/APPELLANT, PRO SE
R.C.I P.O. Box 7010
Chillicothe, Ohio 45601

## STATEMENT OF FACTS

(Transcript of Proceedings, hereinafter cited as (T.P. page No., Lines)).

The facts proven beyond a reasonable doubt are, on January 2, 1997, Sharon Richmond (Richmond) mother of deceased and co-defendant continually, repeatedly and "voluntarily" confessed to being solely and independently responsible for causing the injury that caused the death of her son during Richard Klein's (Appellant's) absence from the residence, (T.P. 42) three of which were tape recorded. (as fully set forth below). Therefore, Appellant could not have caused the injury or the death. Richmond's confessions possessed an extremely high probative force for several reasons, first, because Richmond knowingly, intelligently, and voluntarily waived her Miranda rights on three (3) different occasions. (See Doc. 53, [Appendix of exhibits] Petitioner's Exhibit- "G" Richmond's three (3) Miranda waivers; (hereinafter P.Exhibit G)) (See also T.P. 410, 6-10; 486, 8-25) which render her confessions valid, trustworthy, and reliable. The jury was not provided the evidence or information to render a fully informed determination of the validity, trustworthiness, and reliability of Richmond's confessions because the proof that she did so knowingly, intelligently, and voluntarily is the determinative factor in rendering the determination. All the jury heard was vaguely that she waived them. The difference is in the probative force of a written and signed waver that is knowingly, intelligently, and voluntarily submitted, and three of them is overwhelmingly powerful evidence.

Prior to police interrogation that rendered Richmond's numerous confessions, Richmond voluntarily provided numerous admissions to other officials, first, on the 911 emergency call (T.P. 403, 13-15; 503, 12-17) then to the Captain of the Fire and Rescue Department upon arrival to the residence to transport her son (T.P. 439) then to a doctor, Chaplain, and Child Services

-i-

Investigator upon arrival at the hospital. (T.P. 408; 503, 12-17). Richmond's confessions were identical to these admissions, consistent with the nature of the injury "immersion," and she voluntarily provided multi-layered confessions; first, beginning upon detectives arrival at Shriner's Burn Institute where Richmond waived her Miranda rights the first time and voluntarily provided a tape recorded confession at approximately 3:30 pm January 2, 1997. (T.P. 23, 15-22; 409-410; 463; 490-491; 513, 16-25)(See also Doc. 53, P.Exhibit G, first waiver "1447 hours"). Richmond was then taken to police headquarters (CIS) where she maintained independent responsibility (T.P. 512, 7-10; 467; 468) where Appellant was left in a public lobby because he was not a suspect and not ordered to stay nor involved in any way. (T.P. 42; 481, 19-25)(not suspect T.P. 42, 1-3; 463, 17-25; 464, 1-16; 481, 19-25). Then detectives took Richmond to the residence were she waived her Miranda rights a second time and she demonstrated how she gave the bath that cause the injury. (See P.Exhibit G, 2d waiver form; T.P. 468, 6-10; 485, 1-9; 487, 1-11; 490, 12-16; 515, 6-8; 519, 21-25; 520, 23-24; 521, 523, 3-25). Then Richmond was taken back to CIS where she waived her Miranda rights a third time and maintained sole and independent responsibility, (See P.Exhibit G, 3d waiver form; T.P. 469, 6-13; 486, 8-25; 487, 3-11; 495, 11-13), most importantly, Richmond did so knowingly, intelligently, and voluntarily, and without the grant of immunity which is a strong indicator of reliability as the Court held in Carriger v. Stewart, 132 F.3d 463, 475-76 (9th Cir. 1997). The issue here is not Richmond's credibility because regardless of her credibility it does not diminish the fact that she gave valid, trustworthy, and reliable confessions consistent with the injury and other facts which is powerful evidence of Richmond's guilt and Appellant's innocence. Detectives knew, therefore the State knew, and proved that Richmond's confessions were

consistent with the nature of the injury because they knew from doctors it was an "immersion burn," (T.P. 543; 544; 545) and police knew and testified that Richmond confessed that she found him in "a pool of water" (T.P. 487, 7-9) with an "expressionless face," (T.P. 513, 16-25; 523, 10-11) which was consistent with the nature of the injury "immersion," and consistent with her son's seizure disorder described as a "blank stair." (T.P. 347, 19-25; 348, 19-25; 304-307). Detectives testified therefore the State was fully aware of the seizure disorder, (T.P. 540, 6-18) and that Richmond's confessions were consistent with the facts of the injury which are admissions by the State and highly probative evidence. Therefore, they knew and admitted the injury could have happened the way Richmond confessed or some way close to this because detectives testified that they knew Richmond's fabrications diverting blame to Appellant were lies. (T.P. 543; 544; 545).

Then at 9:30pm on January 2, 1997, during detective's seven (7) hour long interrogation that mentally wore Richmond out (T.P. 469, 17-18) forcing Richmond against her will to suddenly divert blame, and after having a private conversation with one of the detectives (T.P. 470, 14-25) where she found out that she was going to be charged with numerous crimes, Richmond suddenly fabricated a story diverting full blame to Appellant that did not possess any evidentiary support or corroborating evidence whatsoever supporting that her multi-layered confessions were lies. (T.P. 426, 11-25; 543, 8-25). The State presented absolutely no evidence whatsoever proving that her confessions were lies, nor in support her new fabrications about Appellant punishing her son with cold baths then punishing her son with a hot bath that allegedly caused the injury, and, most importantly, the State admitted through its police (prosecutorial machinery) that they knew Richmond's fabrications suddenly diverting blame implicating Appellant were all lies (T.P. 543; 544; 545)

-iii-

which they supported with expert witness evidence as the basis of this admission. Therefore, neither the jury, sentencing court, nor the appellate court could have relied upon any of Richmond's fabrications to support Appellant's multi-layered convictions and multi-layered sentences for what could only have been determined to be a single offense of placing Richmond's son in a bathtub of hot water [one time]. Nevertheless, the evidence possessing the highest probative value (Richmond's confessions) proving beyond a reasonable doubt were consistent with the nature of injury as the State admitted that it knew because it was consistent with expert witness testimony, and her confessions were valid, trustworthy, and reliable due to the voluntariness factor. Therefore, her confessions were the only thing that reached the requisite standard of proof beyond a reasonable doubt.

Then Richmond testified confessing again while viewing the photos of her son's injury to knowing the severity of the injury from the onset. (T.P. 375; 393; 394; 395; 429; 430; 523, 16-17). Thus, confession in open court that she was fully aware of the severity, and the State cannot argue, as it has, that Richmond suddenly found out how sever her son's injury was causing her to divert blame (T.P. 525) which demonstrates the detective's willingness to falsify information to the jury.

Then after submitting multi-layered confessions, and after confessing that Appellant was not even there at the time the injury occurred and when she called 911 emergency, (T.P. 42; 409) Richmond, when questioned by detectives on tape whether or not anybody prevented her from calling 911 or for other help responded, "I am an independent person, I have a brain, and I can make these decisions on my own," (T.P. 409; 424; 425; 427; 491; 549) thus, Richmond confessed in open court at appellant's trial to being solely responsible and confessed again when she entered her guilty plea prior to the trial (T.P. 15;

-iv-

16) proving beyond a reasonable doubt that she was solely responsible for the decision not to obtain medical treatment for her son. Additionally, Richmond was her son's sole legal guardian and had been a mother with (12) years experience. (T.P. 345). Appellant was neither a father, nor serving in the capacity of father for Richmond's son. (T.P. 345; 370, 6-12). Richmond's fiance' "Ron Evans was the only individual who ever served in the capacity of father. (T.P. 346). Appellant had only known Richmond for a month, (T.P. 417, 22-25) and Appellant was not there at the time the injury occurred; (T.P. 42) therefore, Appellant was not aware of the severity of the injury even though he came home later that evening on January 1, 1997, when the injury occurred. (T.P. 484, 19-20). The State failed to prove with any evidence whatsoever that Appellant was there when the injury occurred, and the State failed to prove that Richmond showed Appellant the injury or made him aware of the severity, and as demonstrated above, Richmond possessed full control and was the only authority over when she obtained medical treatment for her son. Therefore, it is indisputable that she is responsible for the resulting death from the damage caused by the delay which is what her son died of as expert witness testimony proved beyond a reasonable doubt. Most importantly, Appellant possessed no parental authority, or power, or authority and control over Richmond or her two member family. Richmond is the responsible party that possessed the only legal obligation, power, and authority in the equation. Therefore, the State knowingly pursued and obtained a conviction on one they knew was innocent.

   Expert witness testimony fully established that Richmond's son died of damage to the lungs caused by Richmond's (12) hour delay in seeking medical treatment for her son. As stated above, Richmond was an "independent person," she "has a brain," and she "can make these decisions on her own." and, as the

Doctor testified this delay is what he died of "in actuality," (T.P. 578, 21-23) and, that, they could have controlled and reduced the damage. (T.P. 578, 5-7). The Doctor testified that there was a high probability of (65) percent of her son living had she obtained immediate medical treatment (T.P. 575, 12-25) instead of controlling the outcome because it was a (74) percent burn, (T.P. 706, 10-11), but, that plummeted to ten (10) percent due to her (12) hour delay (T.P. 579, 15-17) which is nearly non-existent. Therefore, since Richmond knew the severity of her sons injury from the onset, and because her son died of the damage resulting from the her delay, and Richmond confessed to being solely responsible for causing the injury and for independently causing the delay then the State proved Appellant's innocence by proving that Richmond was solely and independently responsible and in full control and legal authority over everything that occurred. The State failed to present any evidence of Appellant's involvement other than Richmond's fabrications diverting blame which the State admitted to knowing were lies and relying upon and proving they were lies with highly probative expert witness evidence and with highly valid, trustworthy, and reliable confession evidence. Richmond's fabrications were calculate for the sole purpose of diverting blame to Appellant to evade further indictment and to curry favor with the State to obtain a minimal, nominal, or favorable sentence for the single count indictment that Richmond plead guilty to. Of equal importance, is that Richmond's sentencing hearing was strategically scheduled and rescheduled for after Appellant's trial to manipulate and control Richmond's trial testimony and it had that effect; therefore, the jury could not have accurately factored Richmond's sentence into their determination, nor was the jury aware that she was only charged with a single count indictment. The jury did not factor into its determination that Richmond had a plea bargain arrangement where she was

-vi-

granted partial immunity and promised leniency at her upcoming sentencing hearing. (as fully set forth in Habeas Petition). Since the State withheld this evidence this conviction should be overturned.

The State falsely presented an alleged apology note through Richmond's testimony. Knowing that it was false testimony and failed to disclose the evidence proving beyond a reasonable doubt that her testimony concerning the note was a fabrication. First, Richmond mis-read the note. (T.P. 400; 401 compare to P.Exhibit I). Therefore, the State permitted Richmond to fabricate testimony concerning the note. (See P. Exhibit I, page 5). And, failed to correct what it knew was false testimony in violation of Due Process of Law. Second, trial counsel placed on record that the State withheld this note. (T.P. 402). By withholding the note it prevented investigation and discovery of the search warrants, and, most importantly, denied meaningful cross-examination at trial to prove the origin of the note and to prove Richmond's testimony to be another fabrication. Counsel was unable to connect the search warrants to the testimony concerning the note. Third, the State withheld the search warrants which is the evidence proving where the note came from which demonstrates both that Richmond's story about the note was another fabrication, and that the State knew that it was a lie because it possessed the search warrants; therefore, it knew or should have known. The the search warrants demonstrate, that, (1) the note was not found in the mailbox as Richmond testified, (2) the note was found by Detectives in the kitchen trash after the fact and was placed there prior to the injury. The record demonstrates that Appellant was in the county jail when it was discovered by detectives and Appellant could not have placed it in the trash after the injury because Appellant was never in the apartment after the injury occurred which is evidenced by the record. (as fully set forth in the Habeas Petition).

(3) The evidence (search warrants) demonstrates that the note Richmond

testified to is the exact same note that was discovered by detectives, rather

than Richmond, during their execution of the search warrants which is the

evidence that it was the note in the white envelope that was read to the jury.

Therefore, Richmond did not find the note in the mailbox and deliver it to

detectives, and the entire testimony revolving around the note is simply one

of Richmond's fabrications. The State failed to connect the note to the injury

in any significant way because the note does not make any reference to this

injury and Richmond's testimony does not qualify and evidence connecting it in

any way. Therefore, admission of it is in violation of Due Process of Law

because it was non-disclosed, unconnected to the incident, and revolved around

Richmond's fabrications therefore, it was a lie, and the State failed to

disclose the search warrants and the actual note denying effective

cross-examination at trial. The State's police departments search warrants are

highly probative evidence, especially, here due to the fact that the search

warrants identify the note specifically as being the one in the white

envelope.

Then the State unlawfully and falsely testified that Appellant gave an

admission in a (30) minute interrogation, (T.P. 30, 19-25) but this

information is false because the State admitted into evidence that Appellant

unwaiveringly invked his Miranda rights by refusing to voluntarily give

detectives any statement other than refusals to voluntarily provide verbal and

tape recorded statements, (T.P. 62, 1-3; 497, 20-25) refusals to voluntarily

give written statements, (T.P. 61, 24-25) and refusals to voluntarily sign

detective's notes; (T.P. 498, 3-10; 40, 13-19) therefore, Appellant did not

adopt whatever was written on the paper as being his own statement. These

refusals work the same as Combs' "talk to my lawyer" statement in Combs v.

Coyle, 205 F.3d 269, 286 (6th Cir. 2000). First, because they mean the same thing; second, because Appellant's refusals possess the same probative force of invoking Miranda rights in the absence of an attorney. Since, these refusals had to have occurred prior to detective's alleged interrogation began because that would have been the only time that detectives asked the question whether Appellant would provide verbal, tape recorded, or written statements, and Appellant refused to sign the notes at the end of the interrogation is proof that Appellant unwaiveringly invoked his rights designated by Miranda v. Arizona because it lasted throughout the entire interrogation. Therefore, this proves when Appellant invoked his Miranda rights was, in fact, prior to detective's interrogation and interrogation did not stop as it should have. Therefore, in the absence of any evidence whatsoever of what actually transpired that evening because the detectives conveniently failed to tape record anything (T.P. 29; 497) after Richmond provided numerous tape recorded confessions. The State failed to prove any such statement was made and the only evidence that exists with any probative value was that Appellant invoked his Miranda rights prior to interrogation.

Second, the State entered into evidence through its police that the alleged inculpatory statement was also a lie because they knew it could not have happened that way. (T.P. 481, 1-4; 504, 15-25; 505). Therefore, it is not evidence possessing any probative value and does not reach the proof beyond a reasonable doubt standard. Therefore, the jury could not have relied upon what it knew was a lie because it was proven to be a lie with the highest ranking and the most highly probative evidence that can be presented to a court, the State's own admission through its "prosecutorial machinery" (the detectives testimony). Since, the State's admission qualifies as a statement against interests it possesses an even greater probative value. If the jury relied on,

-ix-

or Appellant's alleged admission could have affected the judgment of the jury in any way the conviction must be reversed because it is an automatic violation of the Due Process Clause of the United States Constitution for the State to present what it knew was a lie to achieve a conviction upon. It is indisputable that it was a lie and equally indisputable that the State knew it because its police testified that it was a lie. The mere fact that Appellant was allegedly not providing truthful statements demonstrates again that police were trying to overbear Appellant will after Appellant was invoking his Miranda rights. If Appellant was "voluntarily" providing statements then there would have been no prohibition about providing factually accurate tape recorded statements. The State's reliance upon what it knew was a false statement is in violation of Due Process.

Third, Appellant invoked his rights unwaiveringly at trial by not taking the witness stand. Therefore, the alleged admission was inadmissible because Appellant did not leave the door open for introduction of that evidence at trial. Its admission into evidence was in violation of Due Process of Law.

## GROUNDS FOR ISSUING COA

(1) On November 16, 2001, Petitioner/Appellant filed habeas corpus petition. On June 27, 2005, the United States District Court Southern District of Ohio issued an order adopting the Magistrate Judge's report and recommendation erroneously dismissing the habeas corpus petition with prejudice (Doc. 82) on the grounds that  (1) "...dismissal on procedural grounds of all claims for relief with the exceptions of grounds two, three, and fifteen," and "A certificate of appealability shall not issue with respect to the dismissal on procedural grounds of all claims for relief..."; (2) The Court also erroneously denied certificate of appealibility with respect to grounds two, three, and fifteen based on Petitioner/Appellant "has failed to make a substantial showing of the denial of a constitutional right remediable in this federal habeas corpus proceeding," and because "Petitioner has not demonstrated that reasonable jurists could debate whether these claims should have been resolved in a different manner or that issues presented were 'adequate to deserve encouragement to proceed further.' " (Doc. 82, at 2). The Court's determination provides the inference that in the remaining grounds, Appellant has made the requisite showings of denial of constitutional rights remediable in federal habeas corpus proceedings but dismissed on procedural grounds. The dismissal on procedural grounds was in error for the reasons set forth herein.

> "In order for this court to grant a certificate of appealibility, defendant must make a 'substantial showing of the denial of a constitutional right'. 28 U.S.C. 2253(c)(2). In addressing the requirements of obtaining a certificate of appealability under 2253(c), the Supreme Court recently stated that a defendant must show a substantial denial of a constitutional right by demonstrating 'reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.' Slack v. McDaniel, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 1603-04 (2000)." U.S. v. Espinoza-Seanz, 235 F.3d 501, 502 (10 Cir. 2000).

"[w]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealibility] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. Slack v. McDaniel, 529 U.S. 473, 120 S.Ct. 1595, 1604 (2000). Therefore, the determination of whether a certificate of appealability should issue in this case must have 'two components, one directed at the underlying constitutional claims and one directed at the district court's procedural holding.' id. Because the district court did not reach the merits of ... petition, and our certificate of appealability is confined to the procedural issue of timeliness, we must examine [the] underlying constitutional claims." Adams v. LeMaster, 223 F.3d 1177, 1179 (10th Cir. 2000).

"Petitioner need not demonstrate, however, that he would ultimately prevail on the merits. Drew v. Collins, 5 F.3d 93-95 (5th Cir.)." Rector v. Johnson, 120 F.3d 551, 558 (5th Cir. 1997).

(2) First, Appellant's fourteenth and fifteenth grounds for relief were withdrawn by motion by Appellant at an earlier date in (Doc. 67) which was granted by the Court; (Doc. 69) therefore, they were not part of this litigation which leaves grounds one through thirteen. Appellant moves to appeal on these remaining grounds with the additional procedural issues that caused the dismissal of all of the claims with prejudice. These procedural issues are based upon proceedings and State court decisions that the result of which were rendered "fundamentally unfair" by violations of the constitution and laws of the United States; therefore, Appellant is Constitutionally entitled to the requested relief.

"Federal habeas relief is available to petitioners in state confinement as a result of a proceeding that was rendered fundamentally unfair by violation of the Constitution, laws, or treaties of the United States. See Norris, 146 F.3d at 323 (citing Etelle v. McGuire, 502 U.S. 62, 68, 112 S.Ct. 475 (1991)." Combs v. Coyle, 205 F.3d 269, 291 (6th Cir. 2000).

"...review of district court's dismissal of a habeas petition as abusive..." ... "The district court abuses its discretion if the court's decision is based on 'an erroneous finding of fact.' " Paradise v. Arave, 130 F.3d 385, 390 (9th Cir. 1997).

-2-

"The State Court's findings of fact are presumed to be correct and
may only be contravened by clear and convincing evidence. 28 U.S.C.
2254(e)(1)." Monzo v. Edwards, 281 F.3d 568 (6th Cir. 2002).

"We review the district court's conclusions concerning a habeas
petition de novo and its factual findings for clear error. See Lucas
v. O'Dea, 179 F.3d 412, 416 (6th Cir. 1999)." Monzo, at 575.

## I. FAILURE TO EXHAUST STATE REMEDIES

One of the main issues was and the District Court erroneously held that

Appellant failed to exhaust a remedy of delayed appeal to the Ohio Supreme

Court in which Appellant demonstrated that he has, in fact, pursued the

requisite delayed appeal to the Supreme Court. The dismissal on the grounds of

failure to exhaust remedies should have been a dismissal "without prejudice"

until the filing of a renewed petition which would have been the more

appropriate determination as fully set forth in Appellant's. (TR Doc. 70, at

17-18 (¶15); 20-21 (¶16); Objection to M.J. RR Doc. 81, 15-18(¶11, ¶12; ¶13,

¶14). The Court's findings of fact and law were erroneous because they were

contrary to the facts and contrary to and unreasonable application of clearly

established law. Appellant requests to appeal on these grounds.

## II. SECOND AND THIRD GROUNDS FOR RELIEF

(3) The Court's holding that grounds two and three are not remediable on

habeas corpus is in error because the ruling was contrary to the facts and

contrary to Federal Constitutional Law in violation of Appellant's Due Process

rights. The State Court's determinations on the same were also in violation

of, contrary to, and unreasonable application of clearly established

Constitutional rights rendering the proceedings "fundamentally unfair."

"When 'a state prisoner has defaulted his federal claims in state
court pursuant to an independent and adquate state procedural rule,
federal habeas review of the claims is barrd unless the prisoner can
demonstrate cause for the default and actual prejudice as a result of
the alleged violation of federal law, or demonstrate that failure to
consider the claims will result in a fundamental miscarriage of
justice.' Coleman v. Thmopson, 501 U.S. 722, 11 S.Ct. 2546 (1991);
Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639 (1986)..." Monzo, at
575.

## FAILURE TO PROVIDE NOTICE OF FINAL JUDGMENT

First, Appellant requests to appeal this issue on ground two because failure to provide notice of a final order to the "interested party" is a Federal Due Process of Law violation as established by the United States Supreme Court as the District Courts held in Woodard v. Williams, 236 F.3d 1135 (10th Cir. 2001); Day v. Sullivan, 794 F.Supp at 821-22 (S.D. Ohio 1991); and Matter of Park nursing v. Samules, 766 F.2d 261 (6th Cir. 1985) which provides sufficient cause for procedural default and requires automatic reversal of defaulted judgment because failure of the State's officials to provide notice of judgment to the only interested party in the equation also qualifies as "some interference by public officials" and "some objective factor external to petitioner's control" which constitutes "cause" under Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645 (1986); and Coleman v. Thompson, 501 U.S. 722, 753, 111 S.Ct. 2546 (1991). More fully set forth in (Traverse/Response (TR)(TR Doc. 70, at 14-16) Habeas grounds two and three). Therefore, not only did the State deny clearly established Due Process of Law rights, but it also caused the procedural default by not providing the only "interested party" in the equation opportunity to pursue redress of constitutional violations because Appellant missed all of his filing deadlines. This affects the fact and duration of incarceration as the court in Kirby v. Dutton, 794 F.2d 245 (6th Cir. 1986) holds falls "squarely within [the] traditional scope of habeas corpus," id. at 246, because it caused Appellant "to be illegally detained longer than he would otherwise be detained" by denying opportunity for redress of Constitutional injuries from trial and on appeal which is a matter of Federal Constitutional Due Process of Law, thus, is remediable in habeas corpus proceedings because the habeas court can order the State to provide an adequate appellate review or review the

-4-

claims. Second, Appellant was entitled to have the State Court set aside judgment of default for this very reason because of its "equal obligation to enforce and protect Appellant's Federal rights"; thus, the District was obligated to enforce the requisite Federal Law since the State failed to do so pursuant to Williams, Day, and Samules which provides failure to receive notice of judgment provides cause for the State procedural default and requires "automatic reversal of a judgment in default." And, the proceedings were rendered "fundamentally unfair" by the constitutional violation, Matter of Park Nursing, at 262-263, therefore, is remediable in these proceedings.

Third, the State Court's failure to provide an indigent Appellant adequate mechanism/process for remedying errors by providing copies of documents necessary to the appeal is another Due Process violation because it prevented earlier, timely filing of the 26(B) application rendering the proceedings "fundamentally unfair" by the Constitutional violation. (more fully set forth in Habeas grounds two and three; TR Doc. 70, 12-16 (¶9)-(¶11); Objection to M.J. RR Doc. 81, 5-15 (¶13)-(¶19); Doc. 81, 21-22 (¶20)). "...any arbitrary denial of a state-created right for which there is no state remedy is also a violation of procedural due process." Norris v. Schotten, at 329. The State created Appeal Rule 26(B) to remedy the Constitutional violation of ineffective assistance of appellate counsel. But, when, as here, an Appellant is denied the process (as provided by Crim.R. 32(B); and Griffin v. Illinois, 351 U.S. 12, 79 S.Ct. 585 (1956)) by which to invoke that remedy, this constitutes a Due Process violation that falls "squarely within the the traditional scope of habeas review." What occurred is, very soon and diligently after learning that the appeal had been decided within (18) days after learning of the judgment entry, Appellant very quickly and diligently prepared and attempted to file an original of the 26(B) application with an

-5-

affidavit of indigence and letter requesting copies to be made but the clerk
refused filing, and Appellant also demonstrated, at that time, that, the
record already established Appellant to be proceeding under in forma pauper
status. The clerks refusal to file the documents without additional copies
caused the 26(B) application to be late. Then Appellant attempted to obtain
the copies necessary for filing by filing a "Motion to Reduce Number of
Copies" to the court filed shortly after the clerk refused filing, but it was
arbitrarily denied. Appellant presented a copy of this motion and its judgment
entry denying it to the Court of Appeals in Appellant's motion for leave
showing good cause for late filing of the 26(B) application at the later date
after Appellant saved the funds necessary to obtain the copies and postage
necessary for filing. Indigency qualifies as an "objective factor external to
petitioner's control," and the clerks refusal to file the application because
there were not enough copies and the Court of Appeals' denial of an adequate
"mechanism/process for remedying the errors" (Monzo at 329) qualify as
"interference by government officials," and "some objective factor external to
petitioner's control" because the Appellate Court and the clerks qualify as
government officials impeding Appellant's ability to obtain redress.
Therefore, appellant was "unavoidably prevented" from timely filing by
"objective factors external to his control" and by "[s]ome interference by
government officials," thus, Appellant has met the requirements of Murray v.
Carrier, and Coleman v. Thompson establishing cause for the procedural
default. Appellant demonstrated by more than "clear and convincing evidence"
that he was indigent and could not afford the requisite copies and postage
necessary for the filing of the 26(B) application. Appellant provided an
affidavit of indigency to the clerk of court, a letter requesting the
necessary copies to be made, and a copy of the state's docket sheet showing

-6-

that Appellant had already been determined to be proceeding in forma pauperis
and this was evident from the record. The affidavit of indigency was verified
and notarized by qualified prison (government) officials. Prison officials
would not have allowed Appellant to falsify that document in their presence.
The affidavit states specifically "sworn and subscribed in my presence" on a
specific day, month, and year, and the Notary Public had easy instant access
to Appellant's account and previous income information; therefore, the
document and its contents sworn to are "indisputable" and meet and exceed the
"clear and convincing evidence" standard that Appellant was indigent, thus,
unavoidably prevented from obtaining the copies and postage necessary to
obtain redress of Constitutional violations that occurred in the earlier
proceedings. In Appellant's motion for leave pursuant to 26(B) showing good
cause, Appellant provided a copy of the letter to the clerk requesting copies
as an exhibit, a copy of the affidavit of indigency provided to the clerk with
the letter as an exhibit, a copy of the return letter from the clerk refusing
filing containing the reasons for the clerk's refusal to file as an exhibit
which was impermissibly based upon Appellant's indigency, and a copy of the
state docket sheet as an exhibit, the first line of which shows pauperis
status. Appellant demonstrated for the District Court the enormous costs
involved with supplying the transcripts, copies of other evidence, and extra
copies for service on the prosecutor. (Objection Doc. 81, at 9(¶4); Doc 70,
15-16(¶11)). There is more to it than simply filing a ten page unsubstantiated
accusation. Appellant had to have submitted everything, according to Rule in
his possession, to adequately support his claims to fully exhaust remedies and
obtain an adequate review because a vague ten page allegation with no
supporting evidence would have been insufficient to demonstrate ineffective
assistance of appellate counsel and prejudice. Costs of the documents required

-7-

by Rule 26(B) was the problem, as well as, the postage. Nevertheless, the
affidavit, verified and signed by a government prison authority who is
credible enough to possess the status of Notary Public, possesses the
probative value exceeding the "clear and convincing evidence" standard. The
information on the State's docket sheet showing Appellant's indigence
(affidavit and docket sheet were provided at all stages as exhibits) also
possesses that probative value and even more because it is the State's record.
The clerk of courts, the Court of Appeals, the Ohio Supreme Court, and the
District Court were all provided all of the above stated evidence in the
exhibits to demonstrate cause for the procedural default. Clearly established
Federal Law requires only that a petitioner/defendant provide [s]ome evidence,
that, "[s]ome objective factor external to Appellant's control impeded his
ability to comply with the state's procedural rule" to establish cause for a
procedural default. This Appellant has done at all stages in all of the
proceedings. Additionally, the State has never provided any evidence
whatsoever to controvert the verity and probative value of the evidence
provided by Appellant to show cause. Most importantly, the United States
Supreme Court in Evitts v. Lucey, 469 U.S. 105 S.Ct. 830 (1985) pointed out
that it held in Griffin v. Illinois, 351 U.S. 12, 79 S.Ct. 585 (1956), that,
the State must provide "a transcript to indigent criminal appellants who could
not afford to buy one if that was the only way to assure an 'adequate and
effective' appeal." Evitts, at 393/834. Which applies with equal force to
copies necessary to achieve filing of a 26(B) application which the court in
White v. Schotten, 201 F.3d 743 (6th Cir. 2000) established was an equal part
of the "appeal as of right" protected by the same Due Process of Law
principles, thus, to ahcieve a Constitutionally "adequate" and "effective"
determination in the 26(B) proceeding stage of the "appeal as of right," the

-8-

State was Constitutionally obligated to provide the requisite mechanisms/
processes (copies) to be made to secure filing of the 26(B) application, at
minimum, this should have occurred when Appellant brought it to the Court of
Appeals' attention in Appellant's "Motion to Reduce Number of Copies" for the
filing of the 26(B) application. The application was late because Appellant
was not timely notified of the judgment entry; therefore, there was no way he
could have known that the time was running and had run out which also serves
as "some objective factor external to Appellant's control that impeded his
ability to comply with the state rule" providing "cause." In addition, Rule
32(B) of the Ohio Rules of Criminal Procedure guarantee an indigent appellant,
on his "appeal as of right," copies of documents necessary to the appeal, and
the 26(B) proceedings qualify as part of that "appeal as of right" where
Federally protected Due Process rights attach. Therefore, the State
arbitrarily denied state-created rights and rights guaranteed by the United
States Supreme Court by denying the mechanisms/processes by denying adequate
timely notice of judgment and denying the copies necessary to the filing of a
26(B) application to an indigent Appellant, thus, denying Due Process of Law
on that part of "the state created appeal as of right." White v. Schotten.
Therefore, the District Court's and State's Court's determinations were
contrary to the facts and contrary to and unreasonable application of clearly
established law because both grounds two (2) and three (3) advance adequate
Federal Due Process of Law claims exactly like the claims advanced in Evitts,
Griffin, Williams, Day, Matter of Park Nursing, and White v. Schotten.
Therefore, Appellant is entitled to habeas relief on these grounds because,
"...habeas relief is available to petitioner's in state confinement as a
result of proceedings that were rendered fundamentally unfair by violation of
the Constitution or laws of the United States. id. Paradise, at 390.

-9-

Fourth, the Sixth Circuit held in White v. Schotten, 201 F.3d 743 (6th Cir. 2000) that 26(B) proceedings were Federally protected by Federal Due Process of Law principles. Therefore, not only did Appellant possess the right to effective assistance of an attorney in 26(B) proceedings, but he first possesses, as White did, the Due Process right to have an attorney before he can possess the right to effective assistance of an attorney. Appellant, therefore, possessed the same Federally protected rights as White did to have an attorney timely draft and submit his constitutional claim in the 26(B) proceeding in his behalf which Appellant was arbitrarily denied. Appellant's "Motion to Reduce Number of Copies" should have been sufficient to alert the court to appoint counsel or order the copies or to reduce the amount of copies necessary to make the filing because at that time the failure to properly notify the "interested party" of entry of judgment was sufficient to overcome the time laps. Nevertheless, it is clearly established, the United State Supreme Court holds, that, " '[I]t is settled that were the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request.' " Miranda v. Arizona, 384 U.S. 436, 476, 86 S.Ct. 1602, 1629 (1966); therefore, since 26(B) proceedings are part of the "appeal as of right" the very same Due Process of Law principles apply. Appellant was unconstitutionally denied notice that he possessed the right to an attorney if he wanted one for the purpose and denied notice of the judgment entry. Therefore, Appellant's second and third ground for relief are, in all actuality, claims showing good cause and that the proceedings were rendered "fundamentally unfair by violation of the Constitution, laws or treaties of the United States," Combs, at 291, because Appellant was denied the Constitutional right to effective assistance of an attorney, and the Constitutional right to have copies made of the documents necessary for

-10-

specifically, (the 26(B) proceedings); (4) Appellant was entitled to
replacement counsel during the initial part of the appeal. Therefore,
Appellant should never have been "held to a stringent definition of 'cause.' "
Strickland, at 599. (more fully set forth in TR Doc. 70, 10-15(¶8)-(¶10)).
This issue supports grounds one through thirteen, and Appellant is only
required, as a pro se applicant, "to state facts that point to a real
possibility of constitutional error." Franklin v. Rose, 765 F.2d 82, (6th Cir.
1985) citing United States Supreme Court holding in Hanes v. Kerner, 404 U.S.
519, 92 S.Ct. 594 (1972). Since, Appellant was entitled to but denied of the
Constitutional guarantees stated above, Appellant should be entitled to the
liberal construction rule, and procedural leniency. Here as in White v.
Schotten, Appellant should be permitted review by the Federal Courts of those
claims that should have been brought to the attention of the Ohio state courts
by counsel throughout the course of state proceedings but were not. White, at
753. Contrary to the District Court's determination in (Doc. 82),  all of
Appellant's pro se claims set forth colorable Federal Due Process claims
remediable in this action. The law says nothing about requiring an indigent
pro se litigant to draft, litigate, and submit pro se litigation like an
attorney especially during the stages where Appellant was entitled to
appointment of and effective assistance of counsel but was being denied, the
denial of which meets 28 U.S.C. 2253(2) requirements and provides "cause" for
the procedural defaults. Appellant requests to appeal on these grounds because
the Courts should have provided the requisite constitutional protections to
Appellant's pro se averments which were sufficient to make the Courts aware
that violations have occurred or were occurring. Appellant was entitled to but
denied the Constitutional protections listed above and forced into proceeding
pro se. Those Courts possessed an "equal obligation" to protect Appellant's

filing, and the Constitutional right to have been notified of entry of
judgment since Appellant was the only "interested party" in the equation.
Appellant could not have possibly known that the time was running and had
expired for the filing of the 26(B) application and for appeal to the Ohio
Supreme Court. This serves a cause for the procedural defaults. Here, as in
White, an attorney would have made all of the difference in the world as to
the timing, drafting, and filing. Had Appellant received the requisite
mechanisms/processes the outcome would have been different. At minimum,
Appellant's claims would have received the review guaranteed by the United
States Constitution, that, Appellant was denied the appellate review
guaranteed on "a state created appeal as of right," Evitts, at 393/834, which
is also in violation of Due Process of Law.

Fifth, Appellant requests to appeal on the ground that he was
Constitutionally entitled to the replacement attorney requested formally
before the Court of Appeals' review in those proceedings. (fully set forth in
TR, at 2-9 (¶1)-(¶5); Habeas petition Doc. 53 at 1-7). Because, had Appellant
received the "effective assistance of an attorney" in the direct appeal the
outcome of the appeal would have been different, and there would have been no
basis for or default of the 26(B) application. Had the court replaced counsel
or ordered counsel to amend the deficiencies in his brief and ordered counsel
to perfect Appellant's pro se claims there would be no procedural default.

In addition, Sixth, Appellant advances another Due Process Claim that he
was entitled to procedural leniency, Strickland v. Marshall, 632 F.Supp 590,
599 (S.D. Ohio 1986), because he was entitled to the (1) assistance of an
attorney; (2) to adequate notice of the Appellate Court's judgment so that he
could invoke the jurisdiction of the Supreme Court and in a 26(B) application;
(3) Appellant was entitled to copies of the documents necessary to the appeal,

rights at every stage which the courts failed to do, and which constitutes
another Due Process of Law violation that Appellant requests to appeal on.
Appellant requests to appeal on all the above stated grounds, as well as, the
grounds advanced in the habeas petition.

Seventh, it was unconstitutional for the State Courts and the District
Court to permit an attorney to control whether or not Appellant was permitted
to invoke any further judicial proceedings, appeals, and all other remedies
after the Court of Appeals entered judgment. An attorney should never possess
that kind of power or authority over a defendant's case. The appellate
attorney's failure to properly, adequately, and, most importantly "timely"
inform Appellant that the Court of Appeals entered judgment in Appellant's
case left Appellant without any further remedies in which Appellant possessed
the Constitutional right to invoke. Counsel's "failure" precluded Appellant
from invoking all proceedings thereafter including Federal Habeas relief
through his failure to timely notify Appellant of the entry of judgment. Rule
22(B) of the Ohio Rules of Appellate procedure provides, "when a decision is
announced, the clerk shall give notice thereof by mail to counsel of record in
the case." App.R 22(B). This places the appellate attorney in an
overwhelmingly powerful position to cut off any and all future remedies which
is what occurred in this case causing the procedural default. This constitutes
ineffective assistance of appellate counsel which provides cause for the
procedural default because this is an objective factor external to Appellant's
control. Therefore, Rule 22(B) is unconstitutional to the extent that it
permits counsel of record predetermination of any and all other remedies that
existed. A power to prevent all future litigation of a case by withholding
timely notice of judgment to the only "interested party" in the equation, the
appellant. This is not only an overwhelmingly unreasonable amount of power for

an attorney to possess over a case, but it is also "fundamentally unfair" in violation of Due Process of Law to permit an appellate attorney to control the outcome of all judicial remedies including Federal Habeas Corpus Actions. The United States Supreme Court holds that failure to provide the "interested party" notice of a final judgment is in violation of Due Process of Law requiring automatic reversal. (See citings page 4 herein; Moldovan v. Cyahoga Welfair Dpt., 25 Ohio St.2d 293, 496 N.E.2d 466 (1986)). Counsel of record cannot be considered an "interested party" because an "interested party" possesses interest in redress in future proceedings after the proceeding previously decided. Once counsel files an appeal brief and appears for oral argument, his job is through; therefore, he cannot be construed as an interested party to justify serving notice of entry of judgment upon until and unless Appellant is served as "the interested party." Appellant provided the evidence as an exhibit in his "Motion for Leave to File Late 26(B)" application (see Doc. 53 Exhibit "F") proving beyond any doubt the date when the appellate attorney formally informed Appellant of the entry of judgment which was long after the filing deadlines expired. This evidence was counsel's certified time stamped envelope received by Appellant when counsel belatedly informed Appellant of the Court of Appeals' entry of judgment. This evidence possesses the same amount of probative value as the very same evidence that the State presented in one of Appellant's Ohio Supreme Court "appeals as of right" to get that appeal dismissed on procedural grounds. The State of Ohio (Appellee in that action) presented Appellant's time stamped envelope as evidence to prove when Appellee received Appellant's service of the Merit Brief. Since, this constitutes evidence of that magnitude where it can get an "appeal as of right" dismissed in the Ohio Supreme Court, then it also works as evidence rising to the requisite standards for Appellant to show "cause"

for a procedural default. Appellant provided the State's document relying on this very same evidence in Appellant's (Doc. 53 Appendix of Exhibits, as exhibit "P"'s exhibit). Since, this evidence is sufficient for the State to prove when it receives a document being served on it, then Appellant's evidence of counsel's certified time stamped envelope possesses equal probative value proving when Appellant belatedly received notice of judgment from counsel. This is only "fundamentally fair" and equal distribution of law. Therefore, Appellant has proven that he did not receive timely notice of judgment in time to proceed on appeal to the Ohio Supreme Court, nor in time to invoke 26(B) proceedings. The State argues that Appellant "cannot demonstrate cause" for the procedural default, but there is no proof of this because Appellant completely complied with the "cause" and "prejudice" doctrine in its entirety and with sufficient evidence demonstrating "cause" and 'prejudice.' Therefore, Appellant is entitled to judgment in his favor since he proved that an "objective factor external to his control impeded his ability to comply with the State procedural rule" because he "was unavoidably prevented from earlier filings." Appellant supplied the Court of Appeals and District Court with the above stated evidence in (Doc. 53, Exhibit "F" Motion for Leave to File Late 26(B) Application).

Eighth, Appellant was completely denied an attorney on an "appeal as of right" (26(B) proceedings) to conduct a reasonable investigation to discover the prison records of incoming legal correspondence which prove that Appellant received nothing from counsel after the Court of Appeals' entry of judgment until the time limits had expired. Therefore, Appellant's claim is objectively verifable and constitutes "an objective factor external to Appellant's control" which meets the "cause" requirement. Appellant could neither afford an attorney, nor could he obtain the prison's records on his own. But, had

-15-

Appellant been provided the requisite attorney for the 26(B) proceedings, those records would have been obtained. Therefore, Appellant suffered prejudicial effect by being precluded from invoking all judicial remedies and from obtaining evidence.

### III. PROCEDURAL BAR OF ALL OF THE CLAIMS

(4) First, Appellant made a substantial showing of ineffective assistance of appellate counsel in ground four of the habeas petition which should have overcome the procedural default. It was based on the clearly established fact that counsel failed to raise any arguable issues because they were not supported by the record in any way and had absolutely nothing to do with "prejudicial" trial errors. "Prejudicial" being the key basis of one of Appellant's complaints against that attorney's performance. Counsel failed to raise any of the more powerful clams and evidence that stood a high probability of prevailing, but instead, only raised very weak, no-merit, non-supportable claims. Appellant supplied tons of evidence in support of his claim of counsel's deficiencies. In other words, counsel failed to advance Lany] claim that stood a chance of prevailing that was supported by any evidence in the record, thus, violating Appellant's Sixth and Fourteenth Amendment rights. The State, Magistrate Judge, and the District Court failed to state which claim that counsel raised that had arguable merit that it would have reversed on; therefore, there were no claims advance by counsel that were arguable that protected Appellant's Constitutional rights. Counsel, as well as, the courts possess equal duties and obligations to protect Appellant's Constitutional rights. This did not occur at any stage. Thus, violating enumerated Constitutional rights again and again continually and repeatedly. This has been Appellant's complaints about counsel's performance from the onset. And, here is an example of how the courts and counsel continually and

-16-

repeatedly violated Appellant's constitutional rights was when the Magistrate
Judge quoted the State court's erroneous finding,

> "...Klein had disciplined Matthew for incidents of incontinence by
> immersing the child in a tub of cold water," (Doc. 80, at 3), and
> 'Matthew suffered another incident, and Klein took him into the
> bathroom while Richmond remained in another room. Approximately
> twenty-five minutes later, Klein emerged from the bathroom and
> reported to Richmond that Matthew had been accidentally burned." (Doc.
> 80, at 3).

The courts' findings are evasive of the truth and contrary to and
unreasonable determination of the evidence, without any record support
whatsoever; therefore, no court or jury could have found this because it was
never proven anywhere in the record, and there is absolutely no evidence
whatsoever anywhere to support these fabrications because the State of Ohio
vacated its position that Appellant caused the injury and death when it
testified before the court that it knew these fabrications from Richmond
diverting blame to Appellant were blatant lies, thus, testifying that
Appellant did not commit the crimes, nor did any of the other events occur as
Richmond's entire testimony were lies and fabrications aimed at her goal of
diverting blame from herself after confessing to being solely and
independently responsible for causing the injury that caused the death of her
child. Since, the State of Ohio itself admitted and testified that Richmond's
fabrications that Appellant had disciplined her child with cold water, then
disciplined her child with hot water causing the injury are all lies, then the
State of Ohio proved Richmond's fabrications were lies and there is no
evidence to support the above stated quotations. The State's own testimony
supported by its evidence that it claims supports its admissions to
Appellant's innocence proves beyond a reasonable doubt that Richmond caused
her child's injury and death. And, the State's testimony to these facts and
the evidence it relied upon to render this determination are the highest

-17-

ranking evidence that can be presented to a Court of Law because admissions by
the State carry the highest probative value especially when, as here, the
State supports its admissions with highly probative expert witness evidence in
support of its admissions. Therefore, no court or jury could ever rely upon
what it knows to be "lies" and "fabrications" to support a conviction because
that is a "blatant violation of Due Process of Law" by taking two dramatically
opposed positions in one litigation as established by the United States
Supreme Court, Jacobs v. Scott, 513 U.S. 1067, 115 S.Ct. 711, 712 (1995), and
by relying upon what it knew were lies and fabrications. Gigilo v. United
States, 405 U.S. 150, 153-54, 92 S.Ct. 763, 766 (1972)(quoting Mooney v.
Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 342 (1935)). (see statement of facts
for transcript citings and other evidence in support). Therefore, Appellant
has met the 28 U.S.C. 2253(c)(2) requirement of "a substantial showing of the
denial of a constitutional right," and "jurors of reason would find it
debatable whether the District Court was correct in its procedural ruling."
Because, the denial on procedural grounds revolves upon whether Appellant
shows ineffective assistance of counsel which is "cause", with the other
"cause" and "prejudice" demonstrated earlier herein for the 26(B) procedural
default in which the evidence set forth in this motion meets and exceeds. Had
Appellant received the requisite investigations and representation by both
trial and appellate counsels, the results of both of the proceedings would
have been different because Appellant, on his own investigation into the
available records found overwhelming, substantial, credible, and highly
probative evidence of actual innocence existed but was locked up by the State.
(fully set forth later herein supporting actual innocence claim). This is
based on the fundamental concept that Appellant should only have been punished
based upon conduct proven beyond a reasonable doubt, and the above stated

-18-

quotes violate this principle. Appellant's above stated evidence meets and
exceeds the "clear and convincing" standard which is all Appellant needed to
show to gain the review and relief sought in the first place. Counsel failed
to even touch lightly on any of the critical and more powerful claims
contained in Appellant's record; therefore, rendering severally ineffective
assistance of appellate counsel. In addition, the State of Ohio presented its
admission that Appellant "was not even there when the injury occurred"
therefore Appellant could not have caused the injury that caused the death of
Richmond's child. The State of Ohio admitted that it possessed "valid,"
"trustworthy," and "reliable" evidence that Appellant was not there at the
time the injury occurred; therefore, Appellant could not have committed the
crimes charged. Counsel failed to touch even lightly on any of evidence
possessing the highest probative value that can be presented to a court, the
State's own admission supported by "expert witness" evidence. The issue of
whether or not to review Appellant's pro se claims revolves around the
ineffective assistance of appellate counsel claim. If counsel was
"effectively" litigating Appellant's case the State failed to point to where
and when. Respondent did not oppose Appellant's ineffective assistance of
appellate counsel claim, there is no opposition it. And, Respondent's
procedural default defense to Appellant's ineffective assistance of appellate
counsel claim should have been overruled because Appellant has already fully
demonstrated "cause" with more than "clear and convincing evidence."
Respondent failed to argue or prove that appellate counsel rendered
constitutionally effective assistance. Therefore, Respondent agreed that
Appellant advanced valid and supported ineffective counsel claims. The claim
is fully set forth in Appellant's fourth ground for relief for the purpose of
overcoming the procedural default. At minimum, this court can order the State

-19-

to provide the "adequate," "meaningful," and "effective" appeal because the
State owes Appellant the Constitutionally "adequate" and "effective" appeal
guarantees required by the United States Constitution. Although, the
Constitution does not require a state to provide appeals of right, when it
creates an appellate system, "the procedures used in deciding appeals must
comport with the demands of the Due Process and Equal Protection Clauses of
the Constitution." Evitts, at 393/834. Therefore, since Appellant's Due
Process rights were violated in so many ways throughout the course of trial
and appellate review, and due to the fact that Appellant was denied
representation, Appellant requests to appeal on these grounds because
Respondent failed to oppose Appellant's ineffective assistance of counsel
claim, and the District Court's determination was erroneous.

Second, The District Court's determination that all of Appellant's claims
are procedurally barred is in error because it was contrary to the facts and
contrary to clearly established Supreme Court precedent. The last State court,
the Ohio Supreme Court could not have silently regarded a procedural bar
because that issue was not properly placed before that court by the State for
consideration. (fully set forth in TR Doc. 70, 17-20(¶15)). The State falsely
and erroneously presented the claim to the Ohio Supreme Court that Appellant
failed to timely file his Appeal Rule (5) application, but Appellant had never
in the course of State litigation ever filed an App.R. (5) motion for delayed
appeal because there was no reason to. That argument did not even apply to
this case; therefore, the Supreme Court could not have considered an issue
that was never placed before it, that, Appellant's 26(B) application was time
barred. The issue was not adequate for the Supreme Court to have considered
into its denial of appeal because it did not apply to any procedural
circumstances existing in this case. Therefore, the Court of Appeals'

-20-

procedural ruling on the 26(B) application does not preclude Federal Habeas Corpus review because the last state court reviewing this case, the Ohio Supreme Court, could not have rested its decision on the Court of Appeals' procedural dismissal. Appellant requests appeal on this ground.

Third, the State failed to present to the Ohio Supreme Court a claim that the delayed appeal to the Ohio Supreme Court was time barred, and the Ohio Supreme Court Rules of Procedure Rule II, Section 2(4)(b) provides:

> "(b) The provision for delayed appeal applies to appeals on the merits and does not apply to appeals involving postconviction relief, including appeals brought pursuant to State v. Murnahan, (1992), 63 Ohio St.3d 60, and App. R. 26(B). The Clerk shall refuse to file motions for delayed appeal involving postconviction relief. Oh. S.Ct. R. II, Section 2(4)(b).

Therefore, Appellant's appeal to the Ohio Supreme Court was, in fact, delayed appeal to that Court because the Clerk would not have allowed a delayed appeal to be filed from the 26(B) proceedings. Appellant was obviously seeking review of all of his claims in that "delayed appeal," and the State's Appeal Rule (5) argument did not reflect what was actually occurring was, in fact, "DELAYED APPEAL" to the Ohio Supreme Court. "IF" the State presented that as a defense then the Supreme Court could have dismissed on that averment, but no such challenge was presented or preserved on the record by the State. Therefore, the only thing that the Supreme Court could consider were the merits of all of Appellant's claims because a 26(B) default was not presented by the State. The State could not have prevailed on that averment because it was non-responsive to Appellant's case. Therefore, there is still no adequate opposition to Appellant's request for Habeas Corpus review by the Federal Courts. Appellant requests appeal on this ground.

Fourth, Appellant's appeal (Doc. 70, exhibit Q, at 2-3, attached therein) constituted delayed appeal to the Ohio Supreme Court under the particular circumstances that existed at that time as fully set forth in ("Petitioner's

-21-

Objection to Magistrate's Report and Recommendation" Doc. 81, at 15-20(¶11)).
Therefore, the Ohio Supreme Court was considering the merits of all the claims
and not whether or not this case was procedurally barred in the Court of
appeals, nor was it considering the ineffective assistance of appellate
counsel claim independently because all of Appellant's claims were drafted
into the memorandum in support of jurisdiction, and Appellant specifically
requested review of all of the claims independently in the beginning of that
document. Appellant requests to appeal on these grounds.

Fifth, the issue as to whether or not Petitioner should pursue another
delayed appeal to the Ohio Supreme Court is inconsistent with law because
Appellant's first Supreme Court appeal constituted the delayed appeal, and
Appellant was only required to invoke that Court's jurisdiction one time
pursuant to O'Sullivan v. Boerckle.

> "...we have never interpreted the exhaustion doctrine to require
> prisoner's to file repetitive petitions." O'Sullivan v. Boreckel, 526
> U.S. 838, 844, 119 S.Ct. 1728, 1732 (1999).

> "Nor, '...require a state prisoner to invoke any possible avenue
> of state court review, we have never interpreted the exhaustion
> requirement in such a restrictive fashion.' " O'Sullivan, at 844/1732.

> "...a state prisoner need not have invoked every conceivably
> 'available' state remedy in order to avoid procedural default."
> O'Sullivan, at 855/1737.

> "...state prisoners must give the state courts [one] full
> opportunity to resolve any constitutional issues by invoking [one]
> complete round of the State's established appellate review process."
> O'Sullivan, at 845/1732.

Since Appellant has invoked the Court of Appeals and then delayed appeal
to the Ohio Supreme Court, and since the Supreme Court could not have
considered any procedural default because that issue was not adequately placed
before it, then Appellant is entitled the O'Sullivan definition (above) of
what constitutes exhaustion "to avoid procedural default." O'Sullivan, at
844.1732. Nevertheless, Appellant was entitled to have the default judgment

-22-

from the 26(B) proceedings set aside for the reasons set forth in Day, Matter
of Park Nursing, and Moldovan. And, when the (45) day time limit began running
the state of the law, Sixth Circuit Rust v. Zent, established that appeal from
the 26(B) application was the "delayed appeal to the Ohio Supreme Court," or
Appellant would have filed at an earlier date if that was required to exhaust
State remedies which was the basis of Appellant's decision not to pursue a
delayed appeal to that court at an earlier time. Therefore, Appellant has, in
fact, pursued the requisite delayed appeal, and Appellant could not have
predicted a change in law. Nevertheless, Appellant was only required to invoke
the jurisdiction of the Ohio Supreme Court [once] to exhaust remedies and
avoid procedural default, and the Ohio Supreme Court was not considering
Appellant's ineffective assistance of appellate counsel claim independently
because that delayed appeal never would have made it past the Clerk and got
filed. Therefore, Appeallant requests to appeal on these grounds.

   Sixth, Appellant's pro se claims were not given review by the Court of
Appeals in the direct appeal due to arbitrary abuse of power. (See First
Ground for Relief Doc. 53 habeas petition; Doc. 81, at 21-22 (¶20-21)). The
Court of Appeals granted Appellant's motion for leave to amend and supplement
counsel's deficient appeal brief. This was when full Due Process of Law
principles attached to Appellant's pro se pleadings because the Court denied
the requested replacement counsel for the purpose which forced Appellant to
proceed pro se in violation of Due Process of Law. Then the Court
unjustifiably struck the pro se brief without review on the merits and without
any reason in violation of Due Process of Law. Therefore, Appellant's suffered
prejudicial effect because Appellant's pro se claims were not reviewed on
their merits nor were they ready for Supreme Court review when the (45) day
time limit began running and ran out because of the State's failure to provide

-23-

notice of entry of judgment. Appellant has not raised any of counsel's claims
in the habeas petition due to counsel's sever deficiencies in performance.
Appellant suffered prejudicial effect because counsel left Appellant without
any arguable claims on the "appeal as of right" or to advance to the Supreme
Court at that time; therefore, Appellant had to proceed on the 26(B)
application before presenting the claims to the Ohio Supreme Court. The Court
of Appeals' failure to review Appellant's pro se claims, failure to appoint an
attorney to cure the deficiencies in existing counsel's performance, and
failure to provide the mechanism/process to cure the problem was in violation
of "fundamental fairness" Due Process of Law and Appellant suffered
prejudicial effect because counsel's assignments of error were inchoat and
non-arguable, and Appellant's motion to amend counsel's deficient brief
specifically requesting replacement counsel to cure the problems was itself
sufficient to alert the court that a sever problem existed in this appeal and
should have been dealt with accordingly. (as more fully set forth in TR Doc.
70, at 2-9). Appellant requests to appeal on these grounds.

Seventh, there is an absence of available state court remedies therefore
Appellant is entitled to federal relief.

> "An application for a writ of habeas corpus shall not be granted
> unless the petitioner has exhausted his state court remedies, there is
> an absence of available state corrective process, or circumstances
> exist that render such process ineffective to protect petitioner's
> rights." Castille v. Peoples, 489 U.S. 346, 109 S.Ct. 1056 (1989).

> "...the state appellate court was obligated to examine the claim
> on its merits, and that the state court's failure to do so did not
> undermine the exhausted nature of the claim." Pillette v. Foltz, 824
> F.2d 494, 497 (6th Cir. 1987).

(see also Doc. 81, 8-9). There is an absence of state remedies available
for when Appellant was not provided notice of entry of Court of Appeals'
judgment in time to proceed to the Ohio Supreme Court and to invoke 26(B)
proceedings to set aside judgment in default entered by the Court of Appeals

-24-

in Appellant's 26(B) proceedings, as well as, the default to the Ohio Supreme
Court which requires the filing of delayed appeal to that court. Pursuant to
Day v. Sullivan, 794 F.Supp 801 (S.D. Ohio 1991), and Moldovan v. Cuyahoga
Welfair Dpt., 25 Ohio St.2d 293, 496 N.E.2d 466 (1986), and Matter of Park
Nursing, 766 F.2d 261 (1985) automatic reversal was required, but there was an
absence of state corrective process for Appellant to raise and correct the
problem, and the processes available have been ineffective to protect
Appelant's rights or there would be no procedural default issue at this time.
And, as fully set forth above, there was an absence of state corrective
process adequate to provide the requisite copies of documents necessary for
the filing of the "appeal as of right" (26(B) proceedings) for indigent
appellants, and for appointing counsel for those proceedings, or for providing
adequate access to the court for those proceedings to achieve "adequate" and
"meaningful" review. Therefore, the processes available were ineffective to
protect Appellant's rights. The processes available were inadequate to remedy
the problems and inadequate to provide adequate protection of Appellant's
rights. Appellant should not be held procedural defaults created by
unconstitutional conduct of the State's officials (clerk's refusal to file
26(B) application) and unconstitutional procedural decisions denying adequate
corrective process (denial of copies; denial of counsel for the 26(B)
proceedings; erroneous entry of default in 26(B) proceedings; failure to
provide notice of Court of Appeal's entry of judgment) which rendered
ineffective the processes available, and also constitutes enumerated
Constitutional violations of Appellant's rights. The State Court's processes
were ineffective in curing the following constitutional violations as well.
The United States Supreme Court holds:

"...a defendant may not default a constitutional claim through

-25-

conduct that occurs as a result of the constitutional violation.
Coleman v. Thompson,..." Morris v. California, 966 F.3d 488, 454 (9th
Cir. 1991).

"Federal court will review claims, ...if no State court has
provided a full and fair opportunity to litigate those claims." Wright
v. West, 505 U.S. 277, 112 S.Ct. 2482, 2486 (1992).

"It is not necessary for any State court to have actually
addressed the merits of the claims, so long as the claims have been
presented to the highest court in the State." "We more hold, that a
petitioner who is representing himself on appeal because he is no
longer entitled to the assistance of counsel should not be held to a
stringent definition of 'cause.' " Strickland v. Marshall, 632 F.Supp
590-598 (S.D. Ohio 1986).

Appellant's procedural "conduct" was caused by the procedural

constitutional violations that caused the defaults. Appellant cannot be held

to procedural defaults that occur as a result of the violations. The State

Court failed "to provide full and fair opportunity to litigate those claims"

by failure to provide notice of judgment; failure to provide requisite and

requested attorney's; failure to cure the deficiencies in the appeal; failure

to provide processes for a pro se litigant that requested aid to achieve an

"adequate" and "meaningful" review. These Constitutional violations compounded

and multiplied until Appellant did not receive any "appeal as of right" at

all. In addition, the Court of Appeals was Constitutionally obligated to

review Appellant's pro se claims in the early part of the appeal process

because it obligated itself when it granted Appellant's motion to amend and

supplement counsel's deficient appeal brief, especially, when it denied the

replacement attorney specifically requested to cure the problems or failed to

order existing counsel to cure them himself. This was when all Due Process of

Law principles attached to Appellant's pro se litigation because Appellant was

not requesting to proceed pro se, he requested an attorney in the beginning of

the direct appeal in his Motion to Amend and Supplement Counsel's Deficient

Brief. Appellant specifically requested an attorney to cure counsel's

deficiencies and perfect Appellant's pro se claims to "exhaust remedies on them" (See motion to amend) before the Court of Appeals' review of the case. The Court failed to provide the requisite attorney to cure the deficiencies in the appeal and failed to provide the requisite processes to achieve this. Providing the requisite mechanisms and process is not discretionary it was mandatory and guaranteed by the United States Constitution. Therefore, it obligated itself to review Appellant's claims on their merits but arbitrarily struck Appellant's brief with no justification whatsoever. This also obligated the State to provide Appellant, not the attorney, with notice of judgment because now Appellant was attorney of record and the existing attorney was not supposed to be representing Appellant in this matter because Appellant requested to have that attorney removed from the case and replaced by another who is competent. Now, the Court of Appeals had only three (3) choices in the equation, (1) to review Appellant's pro se calims providing liberal construction, or (2) provide the requisite effective assistance of an attorney, or (3) order existing counsel to cure the deficiencies in his brief and perfect Appellant's pro se claims and make them arguable appeal issues. This the Court of Appeals failed to do, thus, entitling Appellant to Federal review of all of his pro se claims not raised by the unwanted, fired, and removed appellate attorney becaue the State court failed did "not provide full and fair opportunity to litigate those claims," Wright, at 2486, because Appellant "may not default a constitutional claim through conduct that occurs as a result of the constitutional violations. Coleman v. Thompson,..." Morris, at 454, and Appellant was entitled, as a pro se litigant who was entitled to the aid of counsel, to procedural leniency, liberal construction, and not being held to a stringent definition of "cause." Strickland v. Marshall, at 598. Therefore, Appellant requests to appeal on these grounds because the

-27-

District Court was clearly wrong in its procedural ruling because Appellant

supplied more than sufficient evidence of "cause" to overcome the procedural

defaults.

### IV. ACTUAL INNOCENCE, MISCARRIAGE OF JUSTICE

"...a prototypical example of 'actual innocence' in a colloquial sense is the case where the State had convicted the wrong person of the crime." "...it may turn out later, for example, that another person has credibly confessed to the crime, and it is evident that the Law made a mistake." Sawyer v. Whitley, 505 U.S. 333, 340-41 112 S.Ct. 2514 (1992).

"...a petitioner asserting both innocence and constitutional error 'need carry less of a burden' with respect to innocence than a petitioner like Herrera who claimed only innocence." Schulp v. Delo, 513 U.S. 298, 316, 115 S.Ct. 851, 861 (1985).

"...a habeas petitioner need not prove his innocence beyond all doubt in order to reach the safe haven of the miscarriage exception: it suffices if the petitioner can show a probability that a reasonable jury would not have convicted but for the constitutional violation. See Murray,..." Burks v. Dubois, 55 F.3d 718 (1st Cir. 1995).

"The Carrier standard requires the habeas petitioner to show that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.' " Schulp, at 327/867.

"To satisfy the Carrier gateway standard, a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schulp, at 327/867.

"...the Carrier standard requires a petitioner to show that it is more likely than not that 'no reasonable juror' would have convicted him." Schulp, at 329/868.

"Under a proper application of either Sawyer or Carrier, petitioner's showing of innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict." Schulp, at 331/869.

Appellant objected to the Magistrate Judge's erroneous findings on this

issue (See Petitioner's Objection Doc. 81, at 15) and further adds that

Appellant provided more than the requisite evidence in support of this claim

to overcome any existing procedural default. The evidence was "newly

discovered," and could not have been discovered for the trial. The evidence is

-28-

highly credible because it was part of the Prosecutor's case file and police
and State records kept as part of the police and State's regular course of
business. The State failed to provide the evidence in discovery, and in
conjunction with the State's admissions in the transcripts the evidence proves
Appellant's innocence. Appellant provided fifteen (15) pages demonstrating
actual innocence in Appellant's (TR) with supporting evidence from the State's
authorities which possesses a high probative value. (TR Doc. 70, 26-40).
Therefore, the District Courts holding that "...petitioner has not
demonstrated that a fundamental miscarriage of justice will occur if his
ineffective assistance of counsel clams are not addressed on the merits..."
(Doc. 80, at 19) is contrary to the, facts , evidence, and contrary to law.
Appellant carries a lesser burden of persuasion when supplementing the actual
innocence claim with Constitutional violations which Appellant has done. The
evidence met all of the requisite criteria because it was newly discovered and
not presented at trial. It was unavailable for appeal and could not have been
advanced then. It was the State's own admissions and its records and police
records kept as part of the regular course of business which renders the
evidence so highly probative that it exceeds the requisite standard necessary
for Appellant to prove his innocence to a preponderance of the evidence and
with "clear and convincing" evidence because it exceeds the proof beyond a
reasonable doubt standard.

### THREE (3) MIRANDA WAIVERS

The first evidence not provided by the State and not presented to the jury
for consideration was Richmond's three (3) Miranda waivers. Neither Appellant
nor trial counsel knew Richmond signed these. The jury was not permitted to
weigh and Appellant was unavoidably prevented from proving the "validity,"
"trustworthiness," and "reliability" of Richmond's multiple confessions to

-29-

police as being solely and independently responsible for the injury that
caused the death of her son. (more fully set forth in TR Doc. 70, at 27-31
(¶121)-(¶123)). Since, the jury was not presented Richmond's three (3) Miranda
waivers it was unable to render an accurate and reliable determination as to
the "validity," "trustworthiness," and "reliability" of Richmond's repeated
confessions as being solely and independently responsible for her child's
injury and death. As the Miranda Court holds, validity of the Miranda waiver
is determinative of the "validity," "trustworthiness," and "reliability" of a
confession because whether or not a confessions possesses this probative force
is determined by whether the individual has "knowingly," "intelligently," and
"voluntarily," waived their Miranda rights and provided voluntary confessions
in which Richmond did repeatedly throughout detective's (12) hour
interrogation of Richmond. Additionally, Richmond's confessions were
consistent with the nature of the injury and facts as the State knew from
doctors. Detectives testified to this. What makes this evidence so critical is
that Richmond suddenly and without any evidentiary justification diverted the
entire blame to Appellant after this (12) hour interrogation where she
maintained sole and independent responsibility. Detectives testifies that they
knew her fabrications diverting blame to Appellant were lies because of the
information they received from doctors and they testified to this. The issue
is whether her fabrications suddenly diverting blame to Appelant are more
trustworthy and reliable than her confessions after voluntarily waiving her
Miranda rights on three (3) different occasions, and Appellant possessed the
Constitutional right to be armed with this evidence and to present it to the
jury for evaluation into their determination, the absence of which left a
gigantic void in Appellant's case. The State neither proved with any evidence
that Richmond's multi-layerd confessions were lies, nor did the State prove

-30-

with any evidence that Appellant was responsible for anything. An individual
can be incredibly uncredible and still have provided "valid," "trustworthy,"
and "reliable" confessions; therefore, this is not an issue of Richmond's
credibility, it is an issue of law whether or not her confessions are more
trustworthy and reliable than her fabrications diverting blame to and
implicating Appellant. The trial record mentions extremely candedly and
vaguely that Richmond waived her Miranda rights, but that does not have the
impact nor the probative force that three (3) signed Miranda waivers have when
an individual voluntarily tape records confessions and even takes police to
the crime scene waives Miranda rights again in writing then demonstrates how
she caused the injury then after being taken back to the police station she
waives her Miranda rights a third (3) time and maintains sole and independent
responsibility. The trial record demonstrates that detectives testified that
they knew Richmond's statements suddenly diverting blame to Appellant were
lies because they knew from doctors how the injury occurred and it could not
have occurred as Richmond implicated Appellant, but in the vacuum created by
the absence of evidence proving beyond a reasonable doubt that Richmond's
confessions as being solely and independently responsible were "valid,"
"trustworthy," and "reliable, the detective's admission that her fabrications
implicating Appellant were lies lost its natural and reasonable force because
the jury's determination failed to include that she "knowingly,"
"voluntarily," and "intelligently" gave "valid," "trustworthy," and "reliable"
confessions as being solely and independently responsible. Therefore,
Appellant's defense lost force because of the absence of evidence of
innocence, and Richmond was given a five (5) year sentence and is now
released, but Appellant was given an unconstitutional (31) year sentence
without any chance of parole, judicial release, or earlier release for

-31-

Richmond's crimes. Appellant was the wrong individual to impose multi-layered convictions and sentences upon and this evidence proves beyond the requisite standards necessary. The United State Supreme Court holds, "The fact that a confession is made without the grant of immunity and overwhelmingly against the individuals penal interests 'is a strong indicator of reliability.' See Williams v. United States, 512 U.S. 549, 599, 114 S.Ct. 2431, 2435 (1994)..." Carriger v. Stewart, 132 F.3d 436, 475 (9th Cir. 1997). Here, as in Carriger, the record viewed as a whole does not support the State's contention that Richmond's trial testimony diverting blame implicating Appellant was more reliable than her confessions. Carriger, at 475-76. Her sudden recantation of her confession after a (12) hour long interrogation where she continually and repeatedly confessed to being solely and independently responsible were simply recantations which the court's view with extreme suspicion. Carriger, at 483. Additionally, the Court in Smith v. Zant, 887 F.2d at 1435 held that "confessions carry 'extreme probative weight.' " The State presented no evidence whatsoever to discount Richmond's confessions to render her false trial testimony implicating Appellant more reliable than the probative force of her continued and repeated confessions as being solely and independently responsible. Regardless of Richmond's credibility, she provided "valid," "trustworthy," and "reliable" confessions that carry a high probative value which was the highest ranking evidence presented at that trial. As Appellant sets forth in his Traverse (TR Doc. 70, 28-31) Richmond called 911 and confessed then confessed to doctors, nurses, social service investigators, and a chaplain upon arrival at the hospital. Her confessions were identical which adds to their verity and reliability.

The State's failure to provide defense with this evidence is in violation of the Due Process Clause, thus, qualifies as "a constitutional violation"

-32-

that has "probably resulted in the conviction of one who is actually innocent." Carrier, 496/2650, and in violation of Due Process of Law because "due process does require the state to allow the accused to present a complete defense." California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528 (1984). Therefore, the State's failure to provide the defense with this evidence violated due process and has resulted in the conviction of one who is actually innocent.

This also proves ineffective assistance of trial counsel for failure to conduct a "reasonable investigation" and discover and present the evidence, thus, failing to protect Appellant's Constitutional rights by failing to present a complete defense which constitutes another Constitutional violation that caused the conviction of an innocent individual. The ineffective assistance of counsel also works as cause to overcome the procedural default. This, in conjunction with the record evidence that the State admitted that it possessed valid, trustworthy, and reliable evidence that Appellant was not there when the injury occurred, and that it possessed expert evidence that Richmond's fabrications suddenly diverting blame implicating Appellant were lies, and in conjunction with the fact that Richmond continually and repeatedly voluntarily gave confessions as being solely and independently responsible, the only logical, rational, and reasonable determination is that Appellant is innocent.

## EVIDENCE OF ALIBI

Another piece of evidence that possesses a high probative value and the jury was not permitted to factor into their determination is that detectives had already established that Appellant was not even a suspect (T.P. 463) because he was not there when the injury occurred (T.P. 42) which was supported by "valid," "trustworthy," and "reliable evidence, Richmond's own

-33-

confessions voluntarily provided after repeatedly waiving her Miranda rights. Richmond did not just suddenly include Appellant into the crime, she diverted fully the blame, culpability, and responsibility for causing the injury and the death of her son. (facts fully set forth in TR Doc. 70, 28-32(¶22)-(¶24); See also Statement of Facts for all evidence referred to herein). The record demonstrates that Richmond was fully aware of the severity of her son's injury from the onset, and she was sole legal guardian, thus, solely responsible for the care and welfare of her child. The record demonstrates that Appellant was neither the father, nor in a position of control over Richmond or her son, and Appellant had only known Richmond for about a month which gave Appellant no legal authority over Richmond's family, and Richmond confessed to being solely responsible for the (12) hour delay in seeking medical treatment which caused the death of her son. Appellant cannot be blamed for Richmond's crimes. The State's failure to provide the jury with what it knew was an ironclad alibi, and charging, trying, and convicting an individual that it possessed overwhelming evidence of innocence that Appellant was not there at the time of the injury therefore he could not have caused the injury is in flagrant defiance to all Due Process of Law principles, thus, this requires reversal. Because, had the jury heard that the State possessed evidence of this probative force there would be no jury alive that could have found Appellant guilty. This is one Constitutional Due Process of Law violation that renders Appellant innocent under the Carrier standard. Second, trial and appellate counsel failed to touch even lightly on these facts to defend Appellant's Constitutional rights; therefore, Appellant was left without the adequate defense that he was Constitutionally entitled to at trial and on Appeal. The real big question is, how could the State of Ohio charge, try and convict an individual that it proved with the words of its own mouth supported by

"valid," "trustworthy," and highly "reliable" evidence proving beyond a reasonable doubt that Appellant was not even there. This was where the buck should have stopped. The second question is how could trial counsel and the State of Ohio go through an entire trial and not even mention these facts to the jury one time. Therefore, the numerous Constitutional violations justify full Federal Habeas Corpus review.

## (12) HOUR DELAY IN SEEKING MEDICAL TREATMENT

More evidence that the jury was not permitted to factor into their determination was that Richmond was not charged for causing her son's injury, or for causing her son's death through her (12) hour delay in seeking medical treatment as the State's testimony on record makes clear. (T.P. 15, 24-25; 16, 1-0). Richmond's guilty was to endangering children for, as the State put it, "the pain and suffering endured" by Richmond's son due to "her" (12) hour delay in seeking medical treatment. Appellant received (31) years for this, but Richmond received five (5) years. The jury's verdict of Appellant's guilt was cut by the fact that it was not provided all of this evidence. The State pursued a complicity charge; therefore, the only thing the jury could have found was that Appellant might have been in complicity with Richmond on all of the charges because the jury was not provided what all Richmond was charged with and the record evidence does not demonstrate that Appellant had anything to do with causing the injury or delaying medical treatment for (12) hours. That was all on the mother (Richmond) who was solely and independently responsible for her son's care because she was sole legal guardian. Richmond confessed to being solely responsible for the delay when she told police that she "was an independent person," she "had a brain," and "she could make that decision on her own." Thus, demonstrating that she was in full control over every little thing that occurred and maintained that. It was in violation of

-35-

Appellant's Due Process right to charge, try, and convict him of something
that he possessed absolutely no knowledge of and no control over. This is
fully set forth in Habeas Corpus Petition.

### GRANT OF IMMUNITY FROM OTHER FIVE COUNTS

More evidence that the defense was not provided and the jury was precluded
from factoring into their determination was that Richmond was grated immunity
from prosecution and the State failed to provide defense with the promises for
use at trial for impeachment purposes which was the basis of Appellant's Fifth
Gorund For Relief advanced as a Brady claim. (Habeas Petition Doc. 53, at
36-44; see also TR Doc. 70, 32-33(¶26)). It is obvious from the after-record
after Richmond made multi-layered confessions after signing multi-layered
Miranda waivers for causing the injury and death of her son that she was not
charged for that she was granted immunity. The record demonstrates that this
was discovered after trial and included in Appellant's motion for new trial
where the prosecutors admitted that they granted Richmond immunity. That was
when Appellant should have received a new trial under Brady. The jury was not
provided the fact that Richmond was only charged with a single count
indictment whereas Appellant was given a six (6) count indictment for the same
thing, and she received only a five (5) year sentence for payment for her
promise of immunity or partial immunity which is the same thing, and Appellant
was given (31) year sentence for exactly the same thing. Had the jury been
presented with all of the facts about how heavily Richmond was paid by the
State for providing incriminating testimony then it is indisputalbe that this
would have severally effected their determination. The Brady Constitutional
violation caused Appellant to be convicted of Richmond's crimes, and
constitutes cause for the procedural default under Carrier. Appellant requests
to appeal on these grounds.

-36-

## PROMISE OF LENIENCY

More evidence that the jury was not provided to factor into their decision was the fact that the State promised Richmond that it would stand silent and not even pursue a prison term leaving Richmond with the impression that if she testified favorably for the State she would either not go to prison, or she would receive a minimal sentence. (See Habeas Petition Fifth Ground for Relief; TR Doc. 70, 33-34(¶27)). Richmond's sentencing hearing was strategically scheduled and rescheduled until after Appellant's trial which was about a year which constituted an extreme motivating factor and caused Richmond to fabricate her trial testimony to continue to divert blame and to attempt to obtain a favorable minimum sentence at her upcoming sentencing hearing. The State also admitted on the record after trial at a motion for new trial hearing that it made this promise (T.P. 767, 4-9) which should have been sufficient to cause a new trial. The Court found that the State did not disclose these promises (immunity and leniency) neither prior to or at trial. (T.P. 752, 24-25; 753). This promise was not discovered until after trial by Appellant's attorney. (T.P. 753). The evidence demonstrates that Richmond sought only to continue to divert blame and curry favor with the State to evade the six (6) count indictment that Appellant received and to mitigate her own sentence at her upcoming sentencing hearing. Had the jury been provided this evidence to factor into its determination this would have proven Appellant's innocence and the outcome of the trial would have been different in the absence of this constitutional violation.

## FALSELY ALLEGED APOLOGY NOTE

More evidence that the jury was not provided to factor into its determination was the police search warrants and inventory lists demonstrating that Richmond's testimony concerning the origin, contents, especially the

-37-

meaning of the note was all a fabrication aimed at Richmond's continued efforts to keep blame from herself and to fully divert blame to Appellant. (See Habeas Petition Sixth Ground for Relief, at 50-52; TR, Doc. 70, 34-35(¶28)). This was in violation of Appellant's Due Process rights established in Giglo v. United States, 405 U.S. 150,153-54, 92 S.Ct. 763, 766 (1972); Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 342 (1935)(knowing presentation of false evidence combined with Brady suppression of evidence). This constitutes a constitutional violation that probably caused the conviction of one who is actually innocent. The note does not state anything connecting it to this injury. The only thing connecting it was Richmond's fabrications about it. The police inventory lists demonstrate where the alleged apology note came from and when it was obtained which was in no way connected to the fabrication that Richmond fed to the jury and the prosecutors were fully aware of where this note came from because they possessed the search warrants and inventory lists written by detectives. The police search warrants do not lie as to the origin of the note in the white envelope which establishes that this note was discovered in the kitchen trash by detectives during execution of their search warrants on January 3d, or 8th 1997. This evidence possesses probative force in its extreme because it was part of police records kept as part of their regular business routine. The Due Process Clause provides, "[e]vidence cannot have probative value unless a party connects it to the defendant in some meaningful way." Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475 (1991). The State failed to connect that note to the injury in any way because Richmond's testimony possesses absolutely no probative value whatsoever under the circumstances that exits in this case. Therefore, it violates Due Process of Law for the State to fail to connect the note to the injury "in some '"meaningful"'" way." In other words, it is

indisputable that detectives found the notes in the kitchen trash three (3) or eight (8) days after Appellant's arrest and the State knew this because they possessed the search warrants and it says so in the search warrants and inventory lists attached to them. Appellant was in the county jail for this charge and could not have written the letter (note) and placed it in the kitchen trash because he was never in the apartment at all after the injury and the State knew this. Third Due Process of Law violation is that this was Brady material and defense counsel testified on record that he did not receive this in discovery. (T.P. 402, lines 8-10). Fourteenth Amendment Due Process violation by the State and Sixth Amendment rights violation because Appellant was denied "meanigful" investigation and defense by trial counsel to uncover and connect the search warrants to the note to prove the notes were written prior to the injury then disgarded in the trash. Counsel did not lie about not receiving this note in discovery. Defense counsel did not receive the search warrants either and they did not surface until years later after direct appeal was over. Nobody but the State knew that the search warrants contained exculpatory evidence demonstrating that the alleged apology note had nothing to do with Richmond's son's injury or death until defense uncovered the search warrants years later. The note was marked with the State's inventory number to identify it and the date the note was discovered in the kitchen trash. It is indisputable that the note had nothing to do with the injury. It is indisputable that the prosecutors knew it had nothing to do with the injury, or they should have properly identified the origin and verity before trial and provided defense with copies for investigation purposes which would have uncovered the search warrants before trial identifying that Richmond's testimony about the note was simply another fabrication calculated to continue to divert blame and curry favor with the State in an attempt to obtain a

-39-

minimal or no prison term at her upcoming sentencing hearing and to evade further indictments. Therefore, Appellant suffered prejudicial effect that he was unable to counter, challenge, and impeach possibly the most damaging fabrication at all during trial which also denied opportunity to develop an accurate record for appeal in violation of Due Process of Law.

### PART TWO OF FIFTH GROUND FOR RELIEF

### EVIDENCE OF CAUSE OF DEATH

In violation of Brady denying Appellant of "effective impeachment cross examination" and of a "powerful defense" at trial. Gigilo v. United States, 405 U.S. 150, 92 S.Ct. 763 (1972); United States v. Bagley, 473 U.S. 667, 677, 105 S.Ct. 3375,3381 (1985). The State withheld the evidence that Richmond's (12) hour delay in seeking medical treatment is what caused the death of her son. (Habeas Petition Doc. 53, 39-44). At the end of the trial expert witness testimony demonstrated that her son had a (65) percent probability of living with the (70) percent burn, (T.P. 575) but that plummeted to ten (10) percent due to her (12) hour delay in seeking medical treatment. Richmond confessed to controlling when medical treatment was obtained for her son which the record demonstrates. Expert witness Doctor Warden testified that her son died of "shock lung" caused by the (12) hour delay and they could have controlled this and this is what he die of "in actuality." (T.P.578; 583). This evidence was material because it was Richmond's delay not Appellant's because as Richmond told police during her confession "I am an independent person, I have a brain, and I make those decisions on my own" referring to when she obtained medical treatment (T.P. 424; 425; 427; 491; 549) therefore, Richmond controlled the outcome because she was her son's only legal guardian (Statement of Facts) and Appellant had only known her for about a month and did not possess any authority over Richmond or her family. Since, Richmond was taking care of her

-40-

son as she seen fit, Appellant cannot be held responsible for her actions which is what occurred. Therefore, Appellant cannot be held responsible for the death because that was brought on by Richmond's (12) hour delay. Appellant was denied of a very powerful defense throughout the trial because defense counsel did not know the significance of this delay until after all of the witnesses had testified and it was not adequate to recall all of the witnesses in an attempt reformulate the most powerful trial strategy that Appellant would have had. This evidence was material to who actually caused and was responsible for the death. Richmond diverted the entire blame over to Appellant and was only charged for the pain and suffering that her delay caused (T.P. 15-16) and only received a five (5) year sentence after providing full confessions and a guilty plea, whereas, Appellant received (31) years without parole or any chance of earlier release most of which stems from the result of this (12) hour delay that Appellant possessed no control over. The record demonstrates that Appellant was not even there most of the time. Richmond was alone with her son; therefore, it was her choice and authority of when to obtain treatment for her son, and Appellant is entitled to Habeas relief. Appellant was not the candidate for a life sentence. Nevertheless, the State failed to provide defense with any clue of the significance of the delay because before trial defense counsel filed a motion to dismiss and accused the State of withholding evidence that the delay did not cause the death (T.P. 86, 16-20; 87, 11-14) because that was the premise of Richmond's plea hearing (T.P. 10-16) she was not charged for the resulting death, and the prosecutors argued rigorously that it possessed no such evidence; therefore, the withheld evidence was that the delay did cause the death. The evidence was material because it was Richmond's delay and since the delay was the cause of death "in actuality" (T.P. 578, 22-23) as the expert witness testified; therefore,

-41-                                                                 n

Richmond is responsible for the death because she controlled when her son received medical treatment not Appellant. The State cannot deny that the delay in seeking medical treatment did not cause the death because the State relied upon this very factor and argument in closing argument that Appellant was responsible for the death because he delayed medical treatment for Richmond's son. The probability was high that Richmond's son would have lived had she not been so controlling and obtained immediate medical treatment. Appellant was denied of a full and fair defense, as well as, effective assistance of trial counsel which Appellant requests to appeal on.

<u>SIXTH GROUND FOR RELIEF</u>

The State, through police testimony, continually, repeatedly, and knowingly presented false and misleading testimony to the jury with the sole intent of obfuscating the trial and to vouch, bolster, and create false credibility for Richmond's testimony, thus, violating elementary principles of Due Process of Law as the United States Supreme Court holds:

> " '...a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' United States v. Agurs,..." United States v. Bagley, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381 (1985).

> "Where Governments case depended almost entirely on testimony of witness who was named as co-conspirator but was not indicted, and without it there could have been no indictment and no evidence to carry the case to the jury, such witness' credibility was important issue in the case..." Gigilo v. United States, 405 U.S. 150, 92 S.Ct. 763, 764 (1972).

> "...deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentry demands of justice.' ... '[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.' ... A new trial is required if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury...' " Gigilo, at 153-54/766.

> "Moreover, whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." Gigilo, 153-54/766.

-42-

"...there is no suggestion that different 'arms' of the government
are severable entities, particularly when they are closely connected.
United States v. Deutsch, 475 F.2d 55, 57 (CA 5, 1973). Therefore, the
city's police department represents the state no less than the
prosecutor's office, and the taint on the trial is not less if police,
rather than the state's attorney, are guilty of misrepresentations.
Barbee v. Warden, 331 F.2d 842 (CA 4, 1964)." State v. DeFronzo, 59
Ohio Misc. 113, 394 N.E.2d 1027, 394 N.E.2d 1027, 1032 (1978).

"The dignity of the United States Government will not permit the
conviction of any person on tainted testimony. ... The government of a
strong and free nation does not need convictions based upon such
testimony. It cannot afford to abide with them." Mesarosh v. United
States, 352 U.S. 1, 14, 77 S.Ct. 1, 8 (1956).

Here, the police department repeatedly, "knowingly," and blatantly lied to
the jury and the prosecutors, as well as, defense counsel failed to do or say
anything about the numerous instances. The proof is in the record. First, the
police repeatedly lied by repeating Richmond's fabrications and calling them
the truth without any supporting evidence then advanced more false testimony
to vouch for and create false credibility for Richmond's statements diverting
blame implicating Appellant. Then a detective testified that they all knew
Richmond's statements diverting blame to Appellant were all lies because of
evidence obtained from doctors. It could not have happened that way. The state
failed to support any of Richmond's fabrications with any evidence whatsoever
and the detective's false testimony was solely to create false credibility for
her unsupported accusations. The newly discovered evidence, set forth above,
combined with the fabricated testimony demonstrates the State's intent to
deprive Appellant of a "fundamentally fair trial" in violation of Due Process
of Law. The police knowingly made statements they knew were false because
based upon expert witness testimony, Doctor Warden, Richmond's confessions
were consistent with the nature of the injury, "immersion," and consistent
with her son's seizure disorder described as a "blank stare," but her
fabrications implicating Appellant were non-corroborated. Therefore, the jury

-43-

could not have found her fabrications implicating Appellant to be "valid,"
"trustworthy," "reliable," nor truthful to have based its determination upon
because those fabrications do not possess the probative value that rise to the
requisite standard of proof beyond a reasonable doubt, and the police false
testimony fabricating more testimony to create false credibility severally
undermined the truth finding function of the trial violating Appellant's Due
process rights established in Mooney v. Holohan, 294 U.S. 103, 112 S.Ct. 55
S.Ct. 340, 342 (1935). Gigilo, at 150/764. The police claimed to have
conducted self-created experiments, and self-created presumptions of
Richmond's innocence and Appellant's guilt that possessed absolutely no
logical or reasonable evidentiary support and was, in fact, contrary to what
the state knew was proven with credible expert witness evidence. Expert
witness testimony and numerous voluntary confessions carry high probative
evidentiary value reaching the proof beyond a reasonable doubt standard;
therefore, the only reasonable and rational determination that can be drawn
from the entire trial is that Richmond caused her sons injury during
Appellant's absence from the residence, then failed to adequately inform
Appellant of the true severity, then she delayed medical treatment while she
hid her son in his room until Appellant left for work the next morning, then
two hours later decided she could not hide the injury any longer and then
called 911 for help. This is the only thing that can be deducted from the
trial evidence, and since the only thing that the jury could have based its
determination upon was false testimony which is in violation of Due Process of
Law and since Appellant was denied a full and fair trial, as well as, full and
fair hearings on appeal this conviction should be overturned, and Appellant
requests to appeal on his Sixth Ground for Relief.

-44-

Case 1:01-cv-00794-SSB-TSB    Document 85    Filed 07/22/2005    Page 56 of 62

## SEVENTH GROUND FOR RELIEF

### "PETITIONER'S ALLEGED ADMISSIONS"

The State violated Appellant's Fifth and Fourteenth Amendment rights when
it presented at trial detective's testimony of alleged statements during
police interrogation. Petitioner was denied a full and fair hearing and
reliable determination of voluntariness pursuant to Jackson v. Deno, 378 U.S.
368, 84 S.Ct. 1774, 1781 (1964); therefore, Appellant was entitled to Habeas
review. The alleged false admission was not admissible pursuant to Miranda v.
Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966) because Appellant did not
voluntarily provide [any] statements. The alleged admission was not admissible
pursuant to Combs v. Coyle, 205 F.3d 269 (6th Cir. 2000) because Appellant's
"talk to my lawyer" statement to detectives possesses the exact same force
that it possessed in Combs; and counsel was ineffective exactly the same as in
Combs, and the jury was not provided all of the evidence from the pre-trial
hearings that demonstrate that Appellant made no admission or any statements
at all, thus, invoking his Fifth Amendment privilege unwaiveringly; therefore,
Appellant was not provided a full and fair hearing or trial on the issue of
voluntariness, and police were permitted without objection or any challenge to
falsely present what they wanted. Appellnat's refusal's to voluntrily make
[any] statements to police is the decimal equivalent of Combs' "talk to my
lawyer" statement and requires reversal. Counsel, as well as, the State failed
to provide the jury with the indisputable evidence that Appellant refused to
voluntarily give [any] statements at the time of arrest even though it was on
record from the earlier hearings; therefore, Appellant was denied a
"fundamentally fair trial" in violation of Due Process of Law. Here as in
Rickman v. Bell, 131 F.3d 1150 (6th Cir. 1997), counsel failed to "actively
advocate his client's cause" by failure to present to the jury critical

-45-

evidence that Appellant refused to give [any] statements in the absence of an attorney. Here as in Combs, at 286, counsels failure to object or challenge in any way the unconstitutional use of the false alleged admission constitutes ineffective assistance of counsel. Appellant did not take the stand, thus, did not "open the door" for use of the alleged false statement at trial for impeachment purposes; therefore, the State's presentation of the alleged admission is in violation of Due Process of Law. Here as in Broseclose v. Bell, 130 F.3d 1161 (6th Cir. 1997), counsel's failure to develope defense theory, and "to conduct any meaningful adversarial challenge as shown by his failure to cross-examine" on the critical issue of the alleged admission was also a denial of due process of law. And, the State's unlawful admission of the alleged statement was in violation of Fourteenth Amendment Due Process rights. Here as in Tucker v. Prelesnik, 181 F.3d 747 (6th Cir. 1999) counsel came "unprepared for trial" and "had not obtained critical evidence of which he was aware" from the pre-trial hearings that he knew proved that Appellant refused to voluntarily given [any] statements in the absence of an attorney. The jury was not provided any rebuttal evidence or challenges due to counsel's deficiencies. Tucker, at 757-58. Here as in Jackson v. Deno, 378 U.S. 368, 84 S.Ct. 1774 (1964) "the procedures employed in this case did not afford a reliable determination of voluntariness," and "did not adequately protect Appellant's rights." And, "without the confession (admission) the evidence is insufficient." Jackson, at 1783. Appellant's Due Process rights were violated because Appellant possesses the, "...constitutioal right at some stage in the proceedings to object to the use of the confessions and to have a fair hearing and reliable determination on the issue of voluntaryness, a determination uninfluenced by the truth or falsity of the confession." Jackson, at 1781. Additionally, "...a reliable and true confession need not be rejected as

-46-

involuntary and that evidence corroborating the truth or falsity of the confession and the guilt or innocence of the accused is indeed pertinent to the determination of the coercion issue." Jackson, a t 1784. The State admitted that the alleged admission was not reliable because it was false. (T.P. 481; 504, lines 16-25; 505, lines 1-9). Therefore, the alleged admission was not reliable because it was so factually incorrect it is obvious that it had to have been coerced, but Appellant never made any such statement, nor did it reach the standard of proof beyond a reasonable doubt required for a jury to have relied upon it because of its inconsistency with true facts. And, it was unconstitutionally presented. Appellant requests to appeal on these grounds.

### NINTH GROUND FOR RELIEF

### FOURTH AMENDMENT CLAIM

"...claims under Mapp are not cognizable on habeas as long as the state court have provided full and fair opportunity to litigate them at trial or on direct review. See Stone v. Powell,..." Wright v. West, 505 U.S. 285, 293, 112 S.Ct. 2482, 2491 (1992).

Appellant was not provided a full and fair hearing on his Fourth Amendment rights claim which is closely intertwined with his Fifth Amendment right claim, neither before, during trial, nor on direct appeal due to the erroneous procedural rulings on appeal. First, Counsel moved for a hearing to litigate the Fourth Amendment right claim, (T.P. 93, lines 2-25) but no argument or evidence was ever presented nor was anything resolved, and Appellant possessed a very powerful Fourth Amendment rights claim. The Court was not considering the pertinent facts that render the alleged arrest unlawful and the alleged "admission" obtained unlawful due to ineffective assistance of counsel because counsel was not adequately presenting the pertinent facts. This cannot be construed as a "full" and "fair" opportunity; therefore, Appellant was denied

-47-

a "full" and "fair" hearing on his Fourth Amendment right claim which renders
it reviewable in Habeas proceedings. Here, the record demonstrates (totality
of the circumstances) that Richmond just spent the earlier (12) hours
confession to being solely and independently responsible for causing her son's
injury and for delaying medical treatment for (12) hours which caused the
damage that caused the death of her son then suddenly after she learned that
there were going to be legal ramifications, and without any basis or
evidentiary justification, Richmond suddenly diverted full blame to Appellant
and Detectives knew these statements to be lies. (T.P. 543; 544; 545).
Richmond's fabrications diverting full blame to Appellant do not possess the
validity, trustworthiness, nor reliability to be evidence necessary for police
to establish probable cause for police to arrest Appellant in the absence of
corroborating evidence or information in which police did not possess because
they knew her statements implicating Appellant were lies. And, Illinois v.
gates, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328 (1983); U.S. v. Williams, 10
F.3d 1070, 1074 (4th Cir. 1993). This requires Richmond's statements to be
reasonably corroborated by other matters within the officer's knowledge, Jones
v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 735 (1960), and police
testified that they knew Richmond's statements implicating Appellant were lies
because they knew from doctors how the injury occurred and it could not have
happened that way, (T.P. 543; 544; 545) they knew Appellant was not there at
the time the injury occurred, (T.P. 42) Richmond had continually and
repeatedly confessed to being solely and independently responsible after
waiver her Miranda rights on three (3) different occasions during detective's
seven hour long interrogation, they knew Richmond's confessions were
consistent with the nature of the injury "immersion" and her sons seizure
disorder described as a blank stare, (T.P. 540; 487) and Richmond's statements

-48-

did not possess the veracity and reliability for police to act on them to arrest Appellant. Therefore, police never possessed any information to justify letting Richmond go and arresting Appellant. Appellant's alleged admission should "...have been excluded because it constituted "fruit of the poisonous tree." Williams, at 1074. Appellant requests to appeal on these grounds.

### TENTH GROUND FOR RELIEF

### INSUFFICIENCY OF THE EVIDENCE

Appellant request to appeal on the grounds that there was insufficient evidence to convict Appellant on five (5) out of six (6) counts of the indictment stemming from what the State concedes was a single act or "course of conduct." And, no rational trier of fact could have found any of the elements of the charges proven with any evidence. There simply was no evidence presented that the State did not disavow. As fully set forth in Habeas Corpus Petition. Appellant requests to appeal on these grounds.

### ELEVENTH GROUND FOR RELIEF

### INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Appellant requests to appeal on the grounds that counsel failed to provide adequate assistance which has been partly set forth above, and fully set forth in Habeas Corpus Petition.

### TWELFTH GROUND FOR RELIEF

### TWO DRAMATICALLY OPPOSED POSITIONS

At Richmond's plea bargain hearing where she confessed again to being solely responsible for the 12 hour delay that caused the death of her son, the State took the position that the 12 hour delay had absolutely nothing to do with the death because it was Richmond's delay not Appellant's. Defense counsel filed a motion to dismiss (T.P. 85) arguing that the State withheld evidence that the delay in seeking medical treatment did not cause the death.

The State argued rigorously that it possessed no such evidence. Therefore, this is not a proven fact. Then at trial the State presented expert witness testimony establishing that the 12 hour delay caused the death, "in actuality." (quoting expert witness Doctor Warden T.P. 578). The State avered in closing argument that Appellant was guilty of manslaughter for the delay in seeking medical treatment; thus, severally violating Appellant's Due Process rights because it could only have been Richmond's delay due to the fact that she is sole legal guardian, Appellant was not the father nor acting as father, nor did Appellant have any control, authority, power, or knowledge over the matter of when medical treatment was obtained. And, Appellant possessed no authority, control, or power to force Richmond to do anything with her family, and Appellant did not know of the severity of the injury; therefore, the State's multiple positions were severally prejudicial causing Appellant to be convicted of a charge that the circumstances of which Appellant possessed absolutely no control over. Appellant requests to appeal on these grounds.

## THIRTEENTH GROUND FOR RELIEF

## IMPOSING MULTIPLE PUNISHMENTS FOR ONE OFFENSE

The State violated Appellant's Fifth and Fourteenth Amendment rights by imposing multi-layered convictions and punishments for what could only have been construed as one offense, one act, one course of conduct, one alleged behavior. The State could not have prevailed on the multi-count indictment in the first instance because it possessed no evidence of all of the elements of any of the charges and the guilty verdict on five counts and multi-layered sentences totaling (31) years is  far beyond what the State was authorized to impose which is in violation of Appellant's Fifth and Fourteenth Amendment rights. Therefore, Appellant requests to appeal on these grounds.

-50-

## FOURTEENTH AND FIFTEENTH GROUNDS FOR RELIEF

Appellant withdrew these two grounds in earlier proceedings stated above.

For the foregoing reasons, Appellant respectfully requests to appeal on the foregoing grounds, as well as, the grounds set forth in Appellant's traverse/response, and objection to Magistrate's Report.

Respectfully submitted,

Richard J. Klein III 350-022

Petitioner/Appellant, pro se

R.C.I. P.O. Box 7010

Chillicothe, Ohio 45601

## CERTIFICATE OF SERVICE

Appellant certifies that at true copy of the foregoing has been served upon counsel for respondent Assistant Ohio Attorney General Diane Mallory at 150 East Gay Street Columbus Ohio by regular U.S. mail on this_____day of July, 2005.

Richard J. Klein III

Petitioner/Appellant, pro se

-51-